UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

Plaintiff,

v.

JEFF S. SMITH,

Defendant.

FILED
U.S. DISTRICT COURT

2017 AUG 1 (VF) AM 9: 42

S.D. OF N.Y.W.P.

17 Civ. **17 CV ___ 5808**

**COMPLAINT**

**JUDGE SEIBEL**

International Business Machines Corporation ("IBM" or the "Company"), by its

undersigned attorneys, upon personal knowledge with respect to itself and its actions and

otherwise on information and belief, alleges as follows:

**Nature of the Action**

1.      Defendant Jeff Smith was, until he recently resigned to compete against

IBM, one of IBM's most senior executives with knowledge of IBM's most closely guarded

product development plans.   He now threatens to violate his one-year non-competition

agreement by going into direct competition with IBM as a senior executive of Amazon Web

Services ("AWS"), one of IBM's main competitors in Cloud Computing.   IBM brings this

action to enjoin Smith to honor his agreements with IBM and to recover damages for Smith's

other breaches of those agreements.

2.      If not enjoined to wait a year before competing against IBM -- as he

expressly agreed he would -- Smith will take with him to AWS all the highly confidential

information he knows about the technological innovations IBM is developing *specifically in the

Cloud Computing business where AWS competes directly against IBM.*  As one of only a dozen

high-ranking executives involved in top-level decision-making discussions regarding the

development of IBM's next generation Cloud Computing technology, which is set to be launched in the coming year, Smith knows such trade secrets as the product cost, design specifications, performance capabilities and release plans -- all of which would be very valuable to AWS. The competition in Cloud Computing is intense, with *Forbes* reporting just last week that "IBM Beats Amazon" in the "Cloud Wars" by becoming the first enterprise technology provider to surpass $15 billion in cloud revenue for a 12-month period.

   3. The IBM secrets that Smith threatens to take to IBM's competitor are so sensitive that he was instructed not to retain copies of written project presentations. As a colleague described one of the product development presentations shared by Smith, "Wow, this is amazing stuff." Yet, Smith violated that simple confidentiality obligation. In addition, Smith shared inside IBM information with the CEO of AWS, Andrew Jassy, *while Smith was serving as a trusted IBM executive.* Confirming that he cannot be trusted to protect and preserve IBM's trade secrets, Smith wiped his company-issued phone and tablet, making it impossible for IBM to detect other communications with Jassy or to determine if he transferred any other IBM information.

   4. Given Smith's first-hand knowledge of IBM's business strategies and product plans for competing in the Cloud Computing business where AWS and others compete directly against IBM, and having already disregarded his confidentiality obligations to IBM, it is inevitable that Smith will use IBM's trade secrets against IBM if he joins AWS before the expiration of his non-compete period. Smith will be reporting directly to the CEO of his employer, now in this case AWS, as part of the senior leadership team responsible for deciding how to compete against IBM. Switching sides in the competition with the type of competitively

sensitive information Smith knows puts those secrets at high risk of disclosure -- which is exactly why Smith agreed to wait a reasonable interval before joining a competitor.

5.     Nevertheless, Smith plans to start working at AWS on August 7, 2017, without waiting the remaining nine months required by his non-competition agreement. Smith's breach is especially flagrant because, as a Chief Information Officer (CIO), he could find employment in almost any industry.  Before coming to IBM, he was the CIO of a banking business and a telecommunications company.  But he has chosen to leave IBM and go not only to a direct competitor, but one of the competitors that would have the greatest use for the IBM secrets he was entrusted to protect.

6.     Accordingly, the injunctive relief IBM seeks by this action -- enforcing Smith's non-competition agreement for the remaining nine months -- is just, reasonable and necessary.  IBM also seeks to recover the equity compensation Smith has forfeited by violating his contractual duties to IBM.

### Parties

7.     IBM is a New York corporation with its principal place of business in Armonk, New York.

8.     Jeff Smith is an individual who resides in Ridgefield, Connecticut.

### Jurisdiction and Venue

9.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

10.     The Court has personal jurisdiction over Smith because, in the Noncompetition Agreement, he agreed to exclusive jurisdiction and venue in the federal and

state courts of the State of New York, New York County or County of Westchester, for all disputes arising from the agreement.

11.     Venue properly lies in this Court both because of Smith's aforementioned agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters are in this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## Relevant Facts

**IBM**

12.     IBM is a globally integrated business that offers information technology ("IT") products and services to a wide range of business, public sector, and individual customers.

13.     IBM designs, develops, and brings to market a portfolio of software products and services for customers in all industries, including Hybrid Cloud, which offers businesses and government entities infrastructure, services, and tools for integrated Cloud Computing.

14.     Cloud Computing is the delivery of on-demand computing resources -- everything from applications to data storage -- over the internet on a pay-for-use basis. Cloud Computing enables individuals and businesses to access, store and use data and software via the internet on computer servers owned and/or managed by third-party "Cloud" service providers -- such as IBM, AWS, Microsoft -- and pay for that service based on usage.

15.     IBM relies on trade secrets, other confidential information, and proprietary methods and processes in developing, implementing and marketing its product and services offerings, and each year it spends billions of dollars and dedicates extensive research efforts to the development of technological innovations supporting its hardware, software and services businesses. Among other things, IBM utilizes trade secrets, proprietary information and methods, confidential technical know-how, competitively sensitive customer and distribution

4

information and confidential competitive strategies to design, develop, manufacture and bring to market a variety of products and services relating to computer systems.

16.     In order to protect its trade secrets, IBM asks a select group of some 1,700 of its approximately 380,000 employees to enter into noncompetition agreements.

**Jeff Smith**

17.     Smith started working at IBM in August 2014, as the CIO of the Company.

18.     Before joining IBM, Smith had been the CIO of Suncorp, a finance, insurance, and banking corporation headquartered in Brisbane, Australia.  Prior to that, he had served as the CIO for Telstra, an Australian telecommunications and media company; as CIO for Honeywell AlliedSignal, an aerospace, automotive and engineering company based in New Jersey that was acquired by commercial conglomerate company Honeywell International, Inc.; and as CIO for Schlage Lock Company, a hardware manufacturing company acquired by Ingersoll Rand, Inc.

19.     On March 28, 2017, Smith informed IBM that he intended to accept an offer to join AWS as Vice President, reporting directly to AWS's CEO.  IBM learned that Smith intended to commence employment with AWS on April 24, 2017.  In response, IBM raised concerns regarding the noncompetition agreement Smith entered into with IBM (attached hereto as **Exhibit A**) and his confidentiality obligations.  As a result of conversations among counsel, in which IBM expressed its concerns about Smith's joining a competitor like AWS, Smith decided to resign from IBM effective May 2, 2017, without accepting AWS's offer of employment.

20.     On June 13, 2017, Smith's counsel provided formal notice to IBM that Smith had, in fact, accepted a new offer to work as Vice President with AWS and intended to start working on August 7, 2017.

21.     As IBM's CIO, Smith was responsible for, among other things, devising and implementing IBM's competitive and proprietary strategies concerning developer tools; corporate data security; and cultural transformation, specifically Agile Culture.

22.     Smith also was a member of IBM's senior executive leadership team and technology development team, through which he was privy to confidential business information concerning IBM trade secrets, including the Company's ongoing plans to launch competitive products later in 2017 and 2018, as well as the Company's financial plans and competitive strategies.

23.     The IBM senior executive leadership team's meeting materials confirm that through his participation on this committee, Smith was privy to the Company's most sensitive information, including discussions about IBM's strengths and competitive strategies against its major competitors, including in the Cloud Computing business in which AWS competes directly against IBM.  This information will remain relevant and competitively sensitive well into 2018.

24.     As he was required to do, Smith regularly participated in the senior technology development team's meetings, and the meeting materials confirm that Smith regularly received sensitive Company information, including information regarding competitive products that IBM has not yet launched or publicly announced.  These include new IBM offerings under development in Cloud Computing; a new offering called Agile Accelerate, which will help customers manage and optimize their corporate culture and organizational performance; and new suites of products and services in regulatory and compliance technology.

25.     Smith was also a frequent speaker on behalf of IBM at industry conventions and other gatherings.  In the past 18 months, he visited with over 200 customers or

partners.  Through this role, Smith marketed IBM business across all of its product lines.  Smith developed close relationships with many important IBM customers and partners in his role as IBM's CIO.  By his own admission, he was recently involved directly in transactions with two important customers in the financial services industry.

26.     Smith also was responsible for directly supervising IBM's Chief Information Security Officer, who regularly reports to Smith on IBM's strategies and incidents regarding Information Security.  As a result, Smith has highly sensitive IBM confidential information regarding IBM's information security.  This IBM confidential information could cause the Company irreparable harm if it were disclosed to anyone outside the Company, especially to an IBM competitor.

27.     Smith was a "Band A" executive at IBM.  IBM employees with letter Bands (beginning at Band D and rising to Band A and AA) are IBM executives, and IBM employees with number Bands (beginning at Band 1and rising to Band 10) are non-executives. Band A and AA executives are the highest ranking executives in the Company.  And he was a member of IBM's selective Growth & Transformation Team ("G&TT"), a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.  As a G&TT member, Smith participated in executive strategy sessions concerning all of IBM's business, including the most recent G&TT session that occurred in January 2017 and featured presentations on IBM's Cloud Computing strategies for 2017 and 2018.

**IBM's Executive Leadership and Technology Development Teams**

28.     Smith became a member of IBM's senior executive leadership team not merely by virtue of his role as IBM's CIO, but also because of his unique role in developing Company-wide strategies and pursuing customer opportunities.  Prior to Smith, only one IBM

7

CIO had been a member of IBM's senior executive leadership team; the current CIO (Smith's replacement) is not currently a member of that team.

29.     As a member of IBM's senior executive leadership team and participant in the quarterly meetings with the Company's senior officers, Smith was privy to the Company's most sensitive business secrets and confidential information, including discussions about IBM's strategies for competing against its major competitors, including specifically AWS.

30.     Smith's participation on IBM's senior executive leadership and technology development teams exposed him to highly sensitive, strictly confidential IBM information regarding product development and competitive strategies, including in connection with Cloud Computing business that competes directly against AWS.  The information concerns, among other things, planned offerings that will combine new hardware and software to provide Cloud Computing services to large enterprises (such as banks, insurance companies, and government agencies) that are faster, more secure, and less expensive than before.  This information is held closely secret even within IBM.  Smith's participation on IBM's senior executive leadership and technology development teams also involved him in critical strategy and decision-making discussions with the Company's most senior executives.

31.     Smith knows the proprietary and confidential components, capabilities, and costs of IBM's forthcoming Cloud Computing products, as he received, reviewed, and discussed materials outlining the project in detail.  Specifically, Smith was briefed in detail about the enhanced speed and security of IBM's new Cloud Computing offering.  Smith also was told what it will cost IBM (per server per month) to deliver this new Cloud Computing service to customers, which is the most important competitive metric in setting prices to win business.  Smith attended meetings, received presentations and participated in discussion about IBM's

server costs, IBM's competitive cost targets, and IBM's technology strategies and roadmap for achieving those targets.

32.   The confidential information Smith knows about the capabilities and cost of IBM's new Cloud Computing offering under development would be very helpful to a competitor, especially AWS, in attempts to counteract or compete against IBM -- if AWS knows the costs to IBM of providing those services to customers, AWS could use that information to set its pricing of potentially competitive services to a point that would undercut IBM's business. AWS could also use what Smith knows to devise competitive marketing and sales strategies in advance of IBM's launch.

33.   IBM's competitors and industry analysts are closely watching IBM's next moves in Cloud Computing. In June, a report from technology analyst Gartner stated that "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date."[1] That IBM is developing a next generation technology in the Cloud Computing business in which AWS and others compete directly against IBM is not a secret, but what that technology is, how it works, what it costs, and when it will be launched are trade secrets.

34.   This report illustrates the importance of the confidential information Smith knows about IBM's costs, and its usefulness to AWS. The report compared offerings from IBM and AWS in the business area of "Cloud Infrastructure as a Service, Worldwide," with a focus on the costs of the competitors' Cloud Computing offerings. The report stated that, "AWS is perceived as a cost leader" in the Cloud Computing market, but suggested that IBM's forthcoming Cloud Computing offerings could make IBM even more competitive on costs. The

---

[1]   *See* Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519.

report concludes: "The eventual rollout of [IBM's new Cloud Computing offerings] is likely to help IBM evolve beyond its current status as a hosting-scale provider, making it more viable for IBM to match the cost economics of the market leaders," including AWS.

## IBM-AWS Competition

35.     IBM and AWS market to the same enterprise and government customers hardware, software and services offerings that compete directly against each other in many fields, especially in Cloud Computing.  Recent industry reports identify IBM and AWS as among the top competitors in Cloud Computing.[2]  IBM recently surpassed AWS in the area of cloud-computing revenue, making it the first enterprise-tech vendor to make over $15 billion in fully recognized cloud revenue for a 12-month period.[3]

36.     AWS is listed in IBM's SEC 10-K filing as among IBM's "principal competitors."[4]  IBM considers AWS a "Champion Competitor," publicly measures its services

---

[2]  *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (last visited July 10, 2017) http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and AWS as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

[3]  *IBM Beats Amazon in 12-Month Cloud Revenue, $15.1 Billion to $14.5 Billion* (last visited July 30, 2017), https://www.forbes.com/sites/bobevans1/2017/07/28/ibm-beats-amazon-in-12-month-cloud-revenue-15-1-billion-to-14-5-billion/#160b4ee939d6.

[4]  U.S. SEC, *IBM Form 10-K For the Year Ended December 31, 2015* (last visited June 29, 2017), www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

against those offered by AWS,[5] and reports publicly on instances when customers switch over from AWS to IBM.[6]  AWS likewise promotes articles describing IBM as its competitor.[7]

37.    AWS has increased its competition against IBM by marketing new services in data, analytics, and applications in an attempt to gain a greater market share in the enterprise customer base.  Many large enterprise customers, including banks and insurance companies, have historically constituted IBM's customer base.  AWS is actively attempting to encourage certain enterprise customers to go to AWS, rather than IBM, for help with "digital transformation," such as migrating data to the Cloud.  In recent months, AWS also has recruited high-level executives with experience in selling and providing Cloud Computing services to such enterprise customers, including executives from IBM.  AWS's hiring of Smith appears to be part of this effort.

**Smith's Noncompetition Agreement with IBM**

38.    Precisely because of his exposure to highly confidential and commercially sensitive information, Smith was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM

---

[5]    *See, e.g.,* IBM Advantage Blog, *Competitive Study of IBM Bluemix vs. AWS for Moving WAS Workloads to the Cloud* (Jan. 13, 2017), https://advantage.ibm.com/2017/01/13/competitive-study-of-ibm-bluemix-vs-amazon-aws-for-moving-was-workloads-to-the-cloud/; IBM Cloud computing news, *SoftLayer delivers a competitive edge in the fast-paced film industry* (Nov. 24, 2015), www.ibm.com/blogs/cloud-computing/2015/11/softlayer-delivers-a-competitive-edge-in-the-fast-paced-film-industry/; IBM Offering Information, *Evaluating Price And Performance of Cloud Providers SoftLayer vs. AWS and Microsoft* (Aug. 14, 2015), www-01.ibm.com/common/ssi/cgi-bin/ssialias?htmlfid=KUV12538USEN.

[6]    *See* IBM News Releases, *MutualMind Migrates From Amazon Web Services and Rackspace to IBM Cloud to Unlock the Power of Social Media Data* (Sept. 25, 2014), www-03.ibm.com/press/us/en/pressrelease/44977.wss.

[7]    *See* AWS Resources, *AWS named as a leader in the Infrastructure as a Service (IaaS) Magic Quadrant report for 6th consecutive year* (last visited June 29, 2017), https://aws.amazon.com/resources/gartner-2016-mq-learn-more/ (linking to TechRepublic, *Amazon still crushing cloud competition, says Gartner Magic Quadrant for IaaS* (Aug. 5, 2016)); AWS Media Coverage, *The Washington Post: Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013), https://aws.amazon.com/about-aws/media-coverage/2013/10/13/washington-post-amazon-web-services-wins-court-case-over-cia-cloud-contract/ (linking to The Washington Post, *Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013)).

information in the event that he left the Company.

39.     Smith executed his Noncompetition Agreement with IBM on June 7, 2014.

40.     In that agreement, Smith acknowledged and agreed that:

> during [his] employment with IBM and for twelve (12) months following the
> termination of [his] employment . . . , [he] will not directly or indirectly within the
> "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or
> (b) any competitor of the Company, if performing the duties and responsibilities
> of such engagement or association could result in [his] intentionally or
> unintentionally using, disclosing, or relying upon IBM Confidential Information
> to which [he] had access by virtue of [his] job duties or other responsibilities with
> IBM; [or] (ii) . . . solicit, for competitive business purposes, any customer of the
> Company with which [he was] directly or indirectly involved as part of [his] job
> responsibilities during the last twelve (12) months of [his] employment with IBM.
> (Noncompetition Agreement § 1(e)(i), 1(e)(ii).)

41.     The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

(a)     "Restricted Area" is defined as "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(f).)

(b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor." (*Id.* § 2(c).)

(c)     "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

(d)     "IBM Confidential Information" is defined as including, among other things, information about "the Company's selling, manufacturing, servicing methods and

business techniques, implementation strategies . . . product information, customer and

prospective customer lists, other customer and prospective customer information, client data,

global strategic plans, marketing plans, information about the Company's management

techniques and management strategies . . . information regarding the development status of

specific Company products, assessments of the global competitive landscape of the industries in

which the Company competes . . . [and] financial status and plans." (*Id.* § 2(d).)

42.     Thus, Smith agreed in the Noncompetition Agreement that, for a period of

one year following the termination of his employment from IBM, he would not work for any

competitor of IBM in any geographic area in the world for which he had job responsibilities in

the last twelve months of his employment with IBM if such employment could result in the

intentional or unintentional use or disclosure of IBM Confidential Information to which he was

exposed in his IBM employment.

43.     Additionally, in the Noncompetition Agreement, Smith agreed and

acknowledged that:

(a)     "the business in which the Company is engaged is intensely competitive"

(*Id.* § 1(c));

(b)     his "employment by IBM has required . . . that [he] have access to, and

knowledge of, IBM Confidential Information" (*Id.*);

(c)     "the Company would suffer irreparable harm if [he failed] to comply with

[the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)     "the restrictions set forth in [the noncompetition and the nonsolicitation

covenants] are reasonable as to geography and duration." (*Id.*)

**Smith Violates the Noncompetition Agreement**
**by Accepting Employment with AWS As Its Vice President**

44.     Notwithstanding the promises he made in his Noncompetition Agreement, Smith told IBM on March 28, 2017 that he intended to accept a job at AWS, with a proposed start date of April 24, 2017.  Smith later informed IBM that the proposed role was Vice President of AWS, and would include responsibility for managing the overall strategy and operations of key segments of AWS's Cloud Computing business.

45.     As a result of discussions among counsel for IBM, counsel for Smith, and counsel for AWS, Smith announced his resignation from IBM on April 27, 2017, without accepting employment from AWS.  Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM.  Smith's resignation from IBM became effective May 2, 2017.  Shortly after his resignation, Smith informed IBM that he had been offered a consulting role at a non-competitive Australian bank.  IBM approved Smith's acceptance of this offer.

46.     Counsel for AWS eventually informed IBM that AWS intends for Smith to be Vice President for AWS and AWS's senior leader in managing the overall strategy and operations of major areas of its Cloud Computing business, including global marketplace, developer tools, and global support and managed services.

47.     AWS is on record in litigation it has brought itself to enforce its own non-compete agreements describing the role of AWS Vice Presidents:

• Directing the development of many of AWS's Cloud Computing business strategies;

• Participating in the highest levels of decision-making in the Cloud Computing business;

- Attending AWS Weekly Business Metrics Meetings, at which senior management discuss goals and metrics across all of AWS's products and services; and

- Participating in AWS's semi-annual formal operations planning processes.[8]

48.     The IBM confidential information and competitive business secrets Smith knows, and the IBM customers Smith knows by virtue of his responsibilities as IBM CIO, will all be relevant to these AWS strategy, planning and decision-making activities.

49.     The job that Smith intends to take at AWS is thus in competition against the job he held at IBM.  Smith intends to move from IBM's strategic leadership team to AWS's strategic leadership team.  His proposed role at AWS would involve him in the development of AWS products and competitive strategies to compete against IBM, including with respect to IBM's new offerings under development in Cloud Computing, Agile, and regulatory and compliance technology.

50.     Smith poses a particular competitive threat to IBM, not merely because he knows the Company's trade secrets, but because he developed relationships with significant IBM customers or potential customers on the strength of IBM's goodwill, products and services, and often served as the public face of IBM at major industry events as IBM's highest ranking customer goodwill representative.

51.     In addition, Smith was responsible for directly supervising IBM's Global Chief Information Security Officer.  In his role as CIO, Smith attended certain steering committee meetings to discuss IBM's most sensitive data.  This highly confidential information

---

[8]   *See* Plaintiff Amazon.com Inc.'s Motion for Temporary Restraining Order, *Amazon.com Inc.* v. *Powers*, No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012) [Docket No. 4] Ex. A pp. 6–8.

is kept closely secret within IBM, and it could cause the Company irreparable harm if this information were disclosed to anyone outside the Company -- especially a competitor like AWS.

52.     As AWS Vice President, Smith will report directly to Andrew Jassy, AWS's CEO.

**IBM's Right to Rescind Long-Term Incentive**
**Awards It Provided to Smith**

53.     As recently as June 2016, Smith accepted awards of IBM stock options, Restricted Stock Units, and Performance Share Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 ("LTPP"). (The LTPP Prospectus is attached hereto as **Exhibit B**.) Smith's equity awards also were governed by a document titled "Terms and Conditions of Your Performance Share Units (PSUs) – Growth Award: Effective June 8, 2016" (the "Terms and Conditions") (attached hereto as **Exhibit C**).

54.     The equity awards that Smith received under the LTPP were in addition to, and not part of, the salary he received for his work at IBM.

55.     Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is subject to repayment. In particular, the awards may be canceled and rescinded if the participant engages in "Detrimental Activity," as defined in the Plan.

56.     Detrimental Activity consists of eight categories of conduct, including, among others:

> (a)     the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company;
>
> (b)     the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential

Information and Intellectual Property, relating to the business of
the Company, acquired by the Participant either during or after
employment with the Company;

(c)     any attempt directly or indirectly to solicit the trade or business of
any current or prospective customer, supplier or partner of the
Company; and

(d)     any other conduct or act determined to be injurious, detrimental or
prejudicial to any interest of the Company.

57.     Smith's disclosure of IBM information to Jassy and his plan to work for
AWS constitute Detrimental Activity under the LTPP, triggering IBM's right to rescind and
recover awards granted to him in the prior twelve months.

58.     Smith had the choice each year whether to accept his equity awards.
Upon acceptance of the awards in June 2016, he agreed that he understood that "IBM may
cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in
accordance with the terms of the Plan, including, without limitation, canceling or rescinding this
Award if you render services for a competitor prior to, or during the Rescission Period. You
understand that the Rescission Period that has been established is 12 months." (A copy of
Smith's "Long-Term Incentive Award Acceptance Information" is attached hereto as **Exhibit
D.**)

59.     In the Terms and Conditions to the LTPP, Smith acknowledged and
agreed that if he were to violate the prohibition on direct or indirect solicitation of IBM
customers, "the Company would suffer irreparable harm" and that "the Company will be entitled
to any appropriate relief including money damages, equitable relief and attorneys' fees." (Ex. C
p. 5.)

60.    The Terms and Conditions also require Smith to pay "all costs and expenses incurred by the Company" in a successful action to enforce the terms of the LTPP, "including reasonable attorneys' fees." (*Id.* p. 4.)

61.    The stock options that Smith exercised and Restricted Stock Units that were released to him in the twelve months prior to his resignation and announcement of his intent to join AWS total approximately $1,714,800.

<u>**COUNT I — Breach of Noncompetition Agreement**</u>

62.    IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 61 above.

63.    The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations.

64.    IBM has complied with all material terms of this agreement.

65.    Smith has breached the terms of that agreement by, among other things, accepting a position as Vice President of AWS without waiting for expiration of the one-year non-compete period to which he expressly agreed.

66.    As Smith agreed in the Noncompetition Agreement, if he is not enjoined from working at AWS as Vice President until May 2, 2018, and thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

67.    In view of the similarity of Smith's job at AWS to his job at IBM, he will inevitably (if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing his job at AWS.

68.    IBM will also be harmed if Smith violates the nonsolicitation covenants in the Noncompetition Agreement.

69.     In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury.  IBM is also entitled to recover money damages to the extent that Smith is not enjoined from violating his agreement.

## COUNT II — Misappropriation of Trade Secrets

70.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 69 above.

71.     IBM possesses certain trade secrets and confidential information with which Smith is familiar, and which Smith has a common law duty not to disclose outside of IBM.

72.     The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations, including the obligations of nondisclosure with respect to IBM's confidential information.

73.     If he is permitted to work for AWS, Smith will inevitably (if inadvertently) use and/or disclose IBM trade secrets for his own benefit and for the benefit of AWS.

74.     As an unavoidable result of Smith's impending misappropriation of IBM trade secrets in violation of his common law and contractual duties, IBM will be damaged.

## COUNT III — Breach of Fiduciary Duty

75.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 74 above.

76.     As an employee of IBM up to and including May 2, 2017, Smith owed IBM fiduciary duties of loyalty and good faith.

77.     Smith breached his fiduciary duties to IBM by sharing inside IBM information with IBM's direct competitor, AWS, while Smith was an employee of IBM.

19

78.     IBM is therefore entitled to compensatory damages, including an amount at least equivalent to compensation paid to Smith after his breach.

### COUNT IV — Declaratory Judgment: Rescission of Equity Award

79.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 78 above.

80.     By accepting employment at AWS in competition against IBM, Smith has engaged in "Detrimental Activity" under the LTPP agreement, triggering IBM's right to rescind and demand repayment of equity awards granted to him in the prior twelve months.

81.     The LTPP agreement is an enforceable agreement, and IBM has performed all of its material obligations under the agreement.

82.     IBM has informed Smith of this claim. Smith has refused and, on information and belief, will continue to refuse to return and repay his equity awards, as required by the LTPP agreement.

83.     IBM does not have an adequate, alternative remedy in another form of action.

84.     Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of Smith's equity awards.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendant Jeff Smith as follows:

(a)     Imposing a preliminary and permanent injunction ordering Smith to refrain from: (i) breaching the terms of his Noncompetition Agreement with IBM, (ii) commencing employment with AWS as Vice President, or in any other position that would create a risk of inevitable disclosure of IBM trade secrets, prior to the expiration of his twelve-month non-competition period on May 2, 2018; or (iii) directly or indirectly soliciting, for competitive business

20

purposes, any IBM customer with which Smith was directly or indirectly involved as part of his job responsibilities during the last twelve months of his employment with IBM.

(b)    Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to Smith in the twelve months prior to his accepting employment with AWS;

(c)    Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

(d)    Awarding IBM monetary damages in an amount sufficient to compensate the Company for Smith's breaches of contract, together with rescission of any LTPP Awards Smith has received from IBM within the last twelve months and of any other compensation or benefits that IBM is entitled to rescind; and

(e)    Awarding IBM such further relief as the Court deems just and proper.

Dated:  New York, New York
        July 31, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _____
    Robert A. Atkins
    Steven C. Herzog
    Pietro J. Signoracci

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
sherzog@paulweiss.com
psignoracci@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*