UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

Plaintiff,

v.

JEFF S. SMITH,

Defendant.

17 Civ. 5808

**PLAINTIFF IBM'S MEMORANDUM OF LAW IN SUPPORT
OF ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND MOTION FOR A PRELIMINARY INJUNCTION**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Steven C. Herzog
Pietro J. Signoracci
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff*
*International Business Machines Corporation*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 4

ARGUMENT ................................................................................................................... 8

I.     IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE
RELIEF ................................................................................................................. 9

     A.    This Court Has Found Irreparable Harm Under IBM's
Noncompetition Agreements Before ........................................................ 13

     B.    The Risk of Disclosure of Trade Secrets Constitutes Irreparable
Harm ......................................................................................................... 14

     C.    The Risk of Exploiting Customer Goodwill Constitutes Irreparable
Harm ......................................................................................................... 16

     D.    Smith Stipulated That a Violation of His Noncompetition
Agreement Would Irreparably Harm IBM ............................................... 17

II.    IBM IS LIKELY TO PREVAIL ON THE MERITS ........................................... 18

     A.    The Limitations on Smith's Post-IBM Employment Are
Reasonable ............................................................................................... 19

     B.    IBM Has a Legitimate Interest in Safeguarding its Confidential
Information ............................................................................................... 20

III.   IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO
TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS
IN IBM'S FAVOR ............................................................................................... 22

IV.   A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND
AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET .......... 23

CONCLUSION ............................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alside Div. of Associated Materials Inc. v. Leclair,*
 743 N.Y.S.2d 898 (N.Y. App. Div. 3d Dep't 2002) ............................................19

*Ashland Mgmt. Inc. v. Janien,* 624 N.E.2d 1007 (N.Y. 1993) ......................................21

*Amazon.com Inc. v. Powers,*
 No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012)..........................................7

*Ayco Co., L.P. v. Feldman,*
 No. 1:10-CV-1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ........................18

*Battenkill Veterinary Equine P.C. v. Cangelosi,*
 768 N.Y.S.2d 504 (N.Y. App. Div. 3d Dep't 2003) ............................................19

*BDO Seidman v. Hirshberg,*
 93 N.Y.2d 382 (N.Y. 1999) ...................................................................17, 21

*Bus. Intelligence Servs., Inc. v. Hudson,*
 580 F. Supp. 1068 (S.D.N.Y. 1984)..............................................................20

*Cont'l Grp., Inc. v. Kinsley,*
 422 F. Supp. 838 (D. Conn. 1976) (Newman, J.) ................................................14

*Covenant Aviation Sec., LLC v. Berry,*
 15 F. Supp. 3d 813 (N.D. Ill. 2014) ...............................................................12

*DoubleClick, Inc. v. Henderson,*
 No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997)...........................22

*EarthWeb, Inc. v. Schlack,* 71 F. Supp. 2d 299 (S.D.N.Y. 1999) ................................14

*Estee Lauder Cos. Inc. v. Batra,*
 430 F. Supp. 2d 158 (S.D.N.Y. 2006)................................................... passim

*Global Switching Inc. v. Kasper,*
 No. CV 06 412(CPS), 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006)......................16

*Global Telesys., Inc. v. KPNQwest,* 151 F. Supp. 2d 478 (S.D.N.Y. 2001) ..................8

*IBM Corp. v. Papermaster,*
 No. 08-CV-9078 (KMK), 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008).......... passim

**Page(s)**

*IBM Corp.* v. *Visentin*, No. 11 Civ. 399 (LAP), 2011 WL 672025 (S.D.N.Y. Feb.
    16, 2011) ........................................................................................................21

*IDG USA, LLC* v. *Schupp*,
    No. 10-CV-76S, 2010 WL 3260046 (W.D.N.Y. Aug. 18, 2010) ...........................18

*Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*,
    No. 9202–08, 2008 WL 5206291 (N.Y. Sup. Ct. Dec. 12, 2008)...........................18

*Int'l Creative Mgmt., Inc.* v. *Abate*,
    No. 07-CV-1979 (PKL), 2007 WL 950092 (S.D.N.Y. Mar. 28, 2007) .................18

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................17

*Lumex, Inc.* v. *Highsmith*,
    919 F. Supp. 624 (E.D.N.Y. 1996) ................................................................ *passim*

*Lusk* v. *Vill. of Cold Spring*, 475 F.3d 480 (2d Cir. 2007) .............................................9

*N. Atl. Instruments, Inc.* v. *Haber*,
    188 F.3d 38 (2d Cir. 1999)...............................................................................18, 21

*Natsource LLC* v. *Paribello*,
    151 F. Supp. 2d 465 (S.D.N.Y. 2001)...........................................................19, 20, 22

*Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477 (S.D.N.Y. 2007) ...........14, 16,19

*Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590 (N.Y. 1976) ......................21

*Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)....................................................................................21

*Synthes, Inc.* v. *Emerge Med., Inc.*,
    25 F. Supp. 3d 617 (E.D. Pa. 2014) .......................................................................12

*Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63 (2d Cir. 1999)....................................18, 22

*Wal-Mart Stores, Inc.* v. *Mullany*,
    C.A. No. 6040-VCL (Del. Ch. Dec. 15, 2010) ......................................................12

*Youtie* v. *Macy's Retail Holding, Inc.*,
    653 F. Supp. 2d 612 (E.D. Pa. 2009) .....................................................................12

**STATUTES**

Pennsylvania Uniform Trade Secrets Act....................................................................12

**Page(s)**

## OTHER AUTHORITIES

Fed. R. Civ. P. 65(b) .............................................................................................23

Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last
    visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-
    2G2O5FC&ct=150519.........................................................................................10

Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From
    Microsoft, Google, IBM* (last visited July 10, 2017)
    http://www.investors.com/news/technology/amazon-cloud-services-under-
    growing-threat-from-microsoft-google-ibm ......................................................10

Restatement of Torts § 757 cmt. b ..........................................................................21

Plaintiff International Business Machines Corporation ("IBM" or the "Company") respectfully submits this memorandum of law in support of its application for a temporary restraining order and a preliminary injunction to prevent its former senior executive, defendant Jeff Smith, from commencing employment at IBM's direct competitor, Amazon Web Services ("AWS"), in violation of his one-year Noncompetition Agreement with IBM (the "Noncompetition Agreement").

## PRELIMINARY STATEMENT

Until he resigned from IBM on May 5, 2017, Jeff Smith was one of the most senior executives of IBM and had direct knowledge of some of IBM's most secret product development plans. He was IBM's Chief Information Officer and a member of two select groups of high ranking IBM executives that developed and debated IBM's commercial strategies, financial plans and technological innovations                                                    .

Because he was privy to such highly confidential and competitively valuable information, Smith agreed not to take a similar position at a competitor without waiting one year after leaving IBM.

Smith now threatens to do just that. Having waited only 3 months, Smith should be enjoined to comply with the remaining 9 months of his Noncompetition Agreement. Despite having the talent and experience as a CIO to work in any industry—he was CIO at a bank and a phone company before coming to IBM—Smith announced that he is going to become Vice President of AWS, IBM's largest competitor in Cloud Computing. The competition in Cloud Computing is intense, with *Forbes* reporting just last week that "IBM Beats Amazon" in the "Cloud Wars" by becoming the first enterprise technology provider to surpass $15 billion in cloud revenue for a 12-month period. Smith is threatening to change sides in that competition and, just like his position at IBM, Smith will be a senior executive reporting directly to the CEO, but now at AWS.

In breach of both the terms and purpose of the Noncompetition Agreement, Smith wants to immediately switch sides in the competition between IBM and AWS, and bring with him IBM's current (but secret) plans for that competition. In particular, Smith knows the details about several Cloud Computing products and services currently in development ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As a member of IBM's ▮▮▮▮▮▮▮▮▮▮

▮▮▮, Smith was briefed about and discussed the design, functions and capabilities of brand new software and hardware products scheduled to be released in late 2017 and early 2018.

Perhaps most sensitive of all to IBM, Smith knows what it will cost IBM to provide this new Cloud Computing service to customers in head-to-head competition against AWS. Since the cost of Cloud Computing service is one of the key factors in competing for customers, the ▮▮▮▮▮▮▮▮▮▮▮▮ was directed not to keep copies of certain written materials—a confidentiality directive Smith violated. As one of the colleagues to whom Smith gave the confidential product development materials exclaimed, "Wow, this is amazing stuff."

Smith also was responsible for meeting with IBM's top customers and prospective customers on a near daily basis, with the goal of persuading those customers to select IBM's hardware, software and service offerings over those of its competitors, including AWS. In the last 12 months alone, Smith met with nearly 200 of IBM's top customers, and he attended numerous industry events as IBM's highest ranking customer goodwill representative.

Smith's Noncompetition Agreement is enforceable under New York law for precisely this situation: to protect highly valuable trade secrets, such as new products in development set to be launched during the remaining 9 months of the restricted period—in particular, products designed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2

The threat that Smith will disclose or use trade secrets at AWS is inherent in the high level executive position he seeks to take. Smith's role at AWS will involve him in the development of AWS's competitive strategies and product initiatives reporting directly to the CEO. The risk of inevitable disclosure is confirmed by Smith's personal relationship with AWS CEO Andrew Jassy—a relationship he cultivated while working at IBM by sending private emails to Jassy                                                                                     Smith also did not comply with his duty of confidentiality as a                            member. And he wiped information off his electronic devices before returning them to IBM.

If Smith was not fully faithful to IBM as an IBM executive, there is no reason to trust that he will protect IBM's interests and secrets as an AWS executive. The Noncompetition Agreement is in place so that IBM does not have to trust Smith to be a vigilant guardian of IBM's competitive secrets while working for the competition.

Smith accepted when he signed that agreement that, when he left IBM, he would have to take a short break from the competition or, as he had done before, work outside the competition. He even stipulated that if he did not abide by his employment restrictions, IBM would suffer irreparable harm and be entitled to injunctive relief. In fact, when Smith resigned from IBM in May 2017, Smith initially declined an employment offer from AWS after IBM raised concerns regarding Smith's noncompetition and confidentiality obligations. IBM then approved Smith's request to become a consultant to a non-competitive business. But Smith subsequently informed IBM that he had accepted an offer to become AWS's Vice President on August 7, 2017, leading key areas of AWS's Cloud Computing business.

IBM merely seeks to have Smith honor the balance of his agreement for the next 9 months.

3

## STATEMENT OF FACTS

A full statement of the facts regarding Smith, his responsibilities in his former role at IBM, his departure from IBM, and the competition between IBM and AWS is set forth in the declaration of Arvind Krishna, Senior Vice President of IBM Hybrid Cloud and Director of IBM Research, and the declaration of Pietro Signoracci, counsel for IBM.

### Smith's Noncompetition Agreement with IBM

Smith joined IBM as its CIO in August 2014. Until his resignation in May 2017, Smith was a member of IBM's                                        . Of IBM's more than 380,000 employees, only the top 65 senior executives sit on the                          and only 12 sit on the                     . Smith also was a member of IBM's Growth & Transformation Team, a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.

These roles exposed Smith to some of IBM's most highly confidential and competitively sensitive trade secrets and confidential information, including details about the functionality, costs, and projected launch dates of IBM Cloud Computing products in development. Precisely because of his exposure to highly confidential and commercially sensitive information, Smith was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM information in the event that he left the Company.

Smith executed his Noncompetition Agreement with IBM on June 7, 2014. (Cmplt. Ex. A.) In that agreement, Smith acknowledged and agreed that:

> during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . , [he] will not directly or indirectly within the "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] intentionally or

4

unintentionally using, disclosing, or relying upon IBM Confidential Information
to which [he] had access by virtue of [his] job duties or other responsibilities with
IBM; [or] (ii) . . . solicit, for competitive business purposes, any customer of the
Company with which [he was] directly or indirectly involved as part of [his] job
responsibilities during the last twelve (12) months of [his] employment with
IBM." (Noncompetition Agreement § 1(e)(i), 1(e)(ii).)

"Restricted Area" is "any geographic area in the world in which [he] worked or for which [he]

had job responsibilities, including supervisory responsibilities, during the last twelve (12)

months of [his] employment with IBM." (*Id.* § 2(f).) "Business Enterprise" means "any entity

that engages in, or owns or controls an interest in any entity that engages in, competition with

any business unit or division of the Company in which [he] worked at any time during the three

(3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

   In sum, Smith agreed in the Noncompetition Agreement that, for a period of one

year following the termination of his employment from IBM, he would not work for any

competitor of IBM in any geographic area in the world for which he had job responsibilities in

the last 12 months of his employment with IBM if such employment could result in the

intentional or unintentional use or disclosure of IBM Confidential Information to which he was

exposed in his IBM employment, and he would not directly or indirectly solicit, for competitive

business purposes, any customer of the Company with which he was directly or indirectly

involved in the last year of his employment with IBM.

   Additionally, in the Noncompetition Agreement, Smith agreed and acknowledged

that (a) "the business in which the Company is engaged is intensely competitive" (*id.* § 1(c));

(b) his "employment by IBM has required . . . that [he] have access to, and knowledge of, IBM

Confidential Information" (*id.*); (c) "the Company would suffer irreparable harm if [he failed] to

comply with [the noncompetition and the nonsolicitation covenants]" (*id.* § 3); and (d) "the

restrictions set forth in [the covenants] are reasonable as to geography and duration" (*id.*).

5

**Smith Violates the Noncompetition Agreement**
**by Accepting Employment with AWS As Its Vice President**

Notwithstanding the promises he made in his Noncompetition Agreement, Smith told IBM on March 28, 2017 that he intended to accept a job at AWS, with a proposed start date of April 24, 2017. Smith later informed IBM that the proposed role was Vice President of AWS, and would include responsibility for managing the overall strategy and operations of key segments of AWS's Cloud Computing business.

As a result of discussions among counsel for IBM, counsel for Smith, and counsel for AWS, Smith announced his resignation from IBM effective May 5, 2017, without accepting employment from AWS. (*See* Signoracci Decl. ¶ 5.) Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM. (*Id.*) Shortly after his resignation, Smith informed IBM that he had been offered a consulting role at a non-competitor, ANZ Bank. IBM approved Smith's acceptance of this offer. (*Id.*)

On June 9, 2017, counsel for Smith informed IBM that Smith had accepted a new offer to join AWS, with his employment commencing on August 7, 2017. Counsel for AWS eventually informed IBM that AWS intends for Smith to be a Vice President and AWS's senior leader in major areas of its Cloud Computing business, including global marketplace, developer tools, and global support and managed services.

AWS is on record in litigation it has brought itself to enforce its own non-compete agreements describing the role of AWS Vice Presidents:

- Directing the development of many of AWS's Cloud Computing business strategies;

- Participating in the highest levels of decision-making in the Cloud Computing business;

6

- Attending AWS Weekly Business Metrics Meetings, at which senior management discuss goals and metrics across all of AWS's products and services; and

- Participating in AWS's semi-annual formal operations planning processes.[1]

The IBM confidential information and competitive business secrets Smith knows, and the IBM customers Smith knows by virtue of his responsibilities as IBM CIO, will all be relevant to these AWS strategy, planning and decision-making activities.

As Vice President, Smith also will report directly to AWS's CEO, Andrew Jassy. Emails uncovered since his departure reveal that Smith ingratiated himself to Jassy by

████████████████████████████████████████████████

████████—all while working as an IBM executive.  In emails he sent to Jassy using his personal (non-IBM) Gmail account, █████████████████████████████████████

███████████████████████████████████████████████████

████.  Smith shared with Jassy his opinions about ████████████████████████

███████████████████████████████████████████████

████████     These emails show that Smith had little allegiance to IBM, even when he was purporting to serve as one of IBM's most senior and trusted executives.[2]

Smith also disregarded IBM's internal confidentiality policies.  Like all

█████████████████ members, Smith received repeated instructions that the ████████████████ meeting materials were not to be distributed to other IBM employees, precisely because of the sensitivity of the confidential information those materials contained.  (Krishna Decl. ¶ 31.) IBM's review of Smith's server mail proves that Smith violated this policy on multiple

---

[1]   *See* Plaintiff Amazon.com Inc.'s Motion for Temporary Restraining Order, *Amazon.com Inc.* v. *Powers*, No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012) [Docket No. 4] Ex. A pp. 6–8.

[2]   IBM discovered Smith's personal emails to Jassy through a review of Smith's IBM server mail, as Smith forwarded a number of his communications with Jassy to his IBM email.  (Signoracci Decl. ¶ 8.)

7

occasions, circulating [redacted] materials to other IBM employees who were not members of the group for their review and discussion. (Signoracci Decl. Ex. 12.) And when Smith was instructed to delete all local copies of a [redacted] Powerpoint presentation he had received in September 2016, he failed to do so—and he made no effort to ensure that the IBM employees to whom he had sent the presentation (against the [redacted]'s stated policy) deleted the copies he had given them. (Krishna Decl. ¶ 40.) This disregard for IBM's confidentiality policies, even while an IBM employee, proves that Smith cannot be trusted to safeguard the Company's secrets while he is working for an IBM competitor.

Smith's departure confirms his contempt for IBM. Apart from taking a job to compete directly against IBM, Smith has not acted like a loyal custodian of IBM's confidential information. After Smith first announced his intention to join AWS, IBM asked Smith to turn in his mobile work devices to the Company. (Signoracci Decl. ¶ 8.) When Smith did so, IBM discovered that Smith had wiped his IBM-issued mobile phone and his IBM-issued tablet of all data, making it impossible for IBM to determine whether Smith had downloaded or transferred any IBM confidential information from those devices to other locations in violation of his confidentiality obligations. (*Id.*)

On July 31, 2017, counsel for IBM advised Max Garfield of Schulte Roth & Zabel LLP, counsel for Smith, that IBM would seek a temporary restraining order from this Court on August 1, 2017, to enjoin Smith from commencing employment with AWS prior to the expiration of the restrictive period in his Noncompetition Agreement. (*Id.* ¶ 13.)

## ARGUMENT

Smith should be enjoined from commencing his proposed employment with AWS during the remaining 9 months of his noncompetition period. Both a temporary restraining order and a preliminary injunction are appropriate here because IBM can demonstrate "'(1) that [it]

8

will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'" *IBM Corp.* v. *Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at \*6 (S.D.N.Y. Nov. 21, 2008) ("*Papermaster*") (quoting *Lusk* v. *Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)).

## I.    IBM WILL SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF

As set forth in the accompanying Declaration of Arvind Krishna, Smith has knowledge about, *inter alia*, IBM's                                    ; another proposed product offering under development called Agile Accelerate; and new offerings under development in regulatory and compliance technology. These forthcoming product launches will directly compete against AWS. Smith has knowledge of these forthcoming products and services, and he has knowledge of the competitive strategies that IBM will use to market and implement those offerings to customers and prospective customers that are being pursued by both IBM and AWS. IBM has spent tens of millions of dollars developing these offerings and strategies, and the information that Smith knows about them is highly confidential and closely guarded, even within the Company. IBM would be severely harmed if AWS become privy to the information that Smith knows.

Smith's knowledge of                                    is particularly sensitive, as those projects involve the introduction of hardware and software that constitutes a "next generation" technology that IBM anticipates will increase competition against AWS in providing Cloud Computing services to enterprise and other customers. Indeed, one of the colleagues to whom Smith gave the confidential product development materials about these Projects exclaimed, "Wow, this is amazing stuff." (Signoracci Decl. Ex. 12.)

9

These technologies are at the core of the competition between IBM and AWS. The information that Smith knows about the anticipated costs to IBM of providing services to customers of ▮▮▮▮▮▮ is so sensitive and closely guarded that all ▮▮▮▮▮▮ members, including Smith, were instructed to delete any copies of written ▮▮▮▮▮▮ materials they were provided. It is crucial that AWS have no knowledge of IBM's costs, as AWS could use that information to improperly undercut IBM's Cloud Computing business.

This is confirmed by industry reports describing the competition between IBM and AWS in Cloud Computing, which focus on the costs of the competitors' offerings. For example, a report published on June 15, 2017 from Gartner, a leading industry commentator, compared offerings from IBM and AWS in the business area of "Cloud Infrastructure as a Service, Worldwide."[3] The report stated that "AWS is perceived as a cost leader" in the Cloud Computing market, but suggested that IBM's forthcoming Cloud Computing offerings could make IBM even more competitive on costs. The report concludes: "The eventual rollout of [IBM's new Cloud Computing offerings] is likely to help IBM evolve beyond its current status as a hosting-scale provider, making it more viable for IBM to *match the cost economics of the market leaders*," including AWS.

The Gartner report also confirms that industry analysts and IBM's competitors, like AWS, are closely watching IBM's next moves in Cloud Computing. The report notes that, "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date." Indeed, IBM recently surpassed AWS in the area of cloud-

---

[3]  *See, e.g.*, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (last visited July 10, 2017) http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and AWS as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

10

computing revenue, making it the first enterprise-tech vendor to make over $15 billion in fully recognized cloud revenue for a 12-month period.

The risk that Smith may disclose or use some of this confidential IBM information at AWS (even if inadvertently) is not only likely but inevitable, because the position that AWS has offered him will place Smith at the table for the same high-level competitive strategy discussions at AWS that he participated in at IBM. AWS is proposing that Smith participate in AWS's plans to develop and market offerings, and design and implement competitive strategies, that will target the same business and government customers for which Smith was responsible in his recent role at IBM. The market is the same. The customers are the same. And the competition is the same, except that now Smith would be on AWS's side instead of IBM's.

It is impossible to believe that Smith will be able to wall off within his own mind his knowledge of IBM's hardware, software and services product development plans from his responsibility for developing and implementing AWS's product development and other competitive strategies. Smith will be responsible for meeting with AWS's highest ranking executives, including its CEO, to decide how AWS can best compete against IBM—including in the same business area and for the same customers that IBM is targeting with its upcoming

launch. Smith and AWS thus will have an opportunity to develop pre-emptive marketing strategies and product development initiatives to blunt the competitive advantage of these product launches from IBM.

The risk that Smith will exploit his knowledge of what it will cost IBM to deliver its new Cloud Computing services in competition with AWS's services is reason enough to enjoin him. *See, e.g.*, *Lumex, Inc.* v. *Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. 1996)

11

(granting preliminary injunction to enforce noncompetition agreement where employee had access to highly sensitive information concerning costs, pricing and new products).[4] For example, if AWS knows IBM's cost—whether in absolute terms or relative to AWS's own cost—then AWS can price its Cloud Computing services to beat IBM when competing in bidding contests for large corporate customers and financial institutions. In addition, Smith was responsible for directly supervising IBM's Global Chief Information Security Officer. (Krishna Decl. ¶ 64.) In his role as CIO, Smith attended certain steering committee meetings to discuss IBM's most sensitive data. (*Id.*) This highly confidential information is kept closely secret within IBM, and it could cause the Company irreparable harm if this information were disclosed to anyone outside the Company—especially a competitor like AWS.

Smith's knowledge of IBM's confidential information, including IBM's costs and new product strategy, together with the similarity between his job at IBM and his new job at AWS, creates a risk of inevitable disclosure of trade secrets that satisfies the criteria for finding irreparable injury in a noncompete case under New York law. *See, e.g.*, *Lumex*, 919 F. Supp. at 631. "'A trade secret once lost is, of course, lost forever' and, therefore, such a loss 'cannot be measured in money damages.'" *Estee Lauder Cos. Inc.* v. *Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting *FMC Corp.* v. *Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)); *accord Papermaster*, 2008 WL 4974508, at *7.

Applying comparable law to a noncompete agreement, the Delaware Court of Chancery enjoined an executive vice president of Wal-Mart from becoming a division president at CVS Caremark. *Wal-Mart Stores, Inc.* v. *Mullany*, C.A. No. 6040-VCL (Del. Ch. Dec. 15,

---

[4]   Costs are protectable trade secrets. *See, e.g.*, *Youtie* v. *Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 623 (E.D. Pa. 2009) (finding that manufacturer's costs constituted trade secret information under the Pennsylvania Uniform Trade Secrets Act); *Synthes, Inc.* v. *Emerge Med., Inc.*, 25 F. Supp. 3d 617, 706 (E.D. Pa. 2014) (same); *Covenant Aviation Sec., LLC* v. *Berry*, 15 F. Supp. 3d 813, 818–19 (N.D. Ill. 2014) (holding that internal costs were adequately alleged as protectable trade secrets).

2010). The court held that claiming not to be "a salesperson or a scientist" does not immunize a

senior executive with confidential strategic information:

> If noncompetes apply effectively anywhere, they apply to the senior, big dog,
> alpha male and female individuals who are actually running the corporation, and
> have knowledge of its strategies and tactics and deepest secrets. The fact that
> these folks are perhaps multiple steps removed from a particular customer list or
> secret formula that might be the focus of analysis if you were dealing with
> noncompete involving, say, a salesperson or a scientist doesn't mean that these
> noncompetes are suddenly unenforceable as to senior executives because they can
> claim not to know anything.

*Id.* at 69-70.

## A.  This Court Has Found Irreparable Harm
## Under IBM's Noncompetition Agreements Before

In *Papermaster*, this Court preliminarily enjoined another IBM employee from

working for another competitor, Apple, based on the prospective violation of his noncompetition

agreement. *See* 2008 WL 4974508, at \*7-9. Although the ex-employee had not yet disclosed

any confidential information to the rival, professed no intention to make such disclosure, and did

not act in bad faith in any way, the Court found that "it is likely that Mr. Papermaster inevitably

will draw upon his experience and expertise" at IBM. *Id.* at \*9.

Here, Smith is knowledgeable about IBM's confidential information and trade

secrets, including its confidential product development plans

▮▮▮▮. Like Papermaster, Smith agreed that IBM would suffer irreparable harm if he violated his

Noncompetition Agreement. *Id.* (citing *Lumex* for the proposition that risk of irreparable harm

exists "where employee was a 'member of the elite strategic planning committee' and therefore

'privy to discussions' involving marketing strategy and product lines"). And like Papermaster,

since Smith has been "inculcated" with IBM trade secrets concerning the company's plans in the

growing and highly competitive Cloud Computing market, "it is no great leap for the Court to

find that [IBM] has met its burden of showing a likelihood of irreparable harm." *Id.* at \*8.

13

But unlike Papermaster, there is substantial evidence and reason to believe that Smith is not loyal to IBM—and that his loyalty was compromised even while he was still working at IBM. This is clearly a case where preliminary injunctive relief is appropriate.

**B.     The Risk of Disclosure of Trade Secrets Constitutes Irreparable Harm**

Courts find irreparable harm where there is a risk that a former employer's trade secrets likely will inevitably be disclosed because "'the movant competes directly with the prospective employer and the transient employee possesses highly confidential or technical knowledge concerning . . . marketing strategies, or the like.'" *Estee Lauder*, 430 F. Supp. 2d at 174 (quoting *EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)). The factors that guide courts in determining whether there is a risk of inevitable disclosure include:

> (1) the extent to which the new employer is a direct competitor of the former employer; (2) whether the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; (3) the extent to which the trade secrets at issue would be valuable to the new employer; and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quoting *Payment Alliance Intern., Inc.* v. *Ferreira*, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007)).

The "inevitable disclosure" test is based on the *risk* of disclosure. It does not require proof that the new employer will for certain use the trade secret in the same way as the former employer. As one court held:

> Of course, the nature of the subsequent employer's work is relevant to determining the risk of disclosure. But I find no requirement in the New York decisions that the first employer's secrets be readily usable by the second employer. <u>It is enough if the second employer's work is sufficiently similar to that of the first employer to make likely the risk of disclosure</u> by the employee in the course of his subsequent employment.

*Cont'l Grp., Inc.* v. *Kinsley*, 422 F. Supp. 838, 845 (D. Conn. 1976) (Newman, J.) (emphasis added).

Thus, the law does not require proof that the defecting employee intends to

disclose trade secrets prior to issuance of an injunction. As the court in *Papermaster* observed:

> [T]he Court has no evidence before it that Mr. Papermaster has disclosed any
> IBM trade secrets to date. The harm to IBM, however, is more likely to derive
> from inadvertent disclosure of the IBM trade secrets that have defined
> Mr. Papermaster's long career. . . . Thus, while the Court ascribes no ill-will to
> Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent
> disclosure is sufficient to establish a real risk of irreparable harm to IBM.

2008 WL 4974508, at *10 (citations omitted and emphasis added).

Here, given the breadth, depth and duration of Smith's tenure at IBM and his high

ranking executive role and responsibilities, his knowledge of IBM's product plans and costs, and

his proposed position at AWS, there is a "likely inevitability of even inadvertent disclosure"

sufficient to establish a real risk of irreparable harm and sustain an injunction even if Smith had

the best intentions.

Smith's behavior to date demonstrates a lack of loyalty to IBM and, thus, makes it

doubtful that he has the ability and willingness to keep IBM's confidential information a secret.

Smith has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮. To cultivate his relationship with Jassy, Smith ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—acts which cast serious doubt

upon any promises by Smith to be the guardian of IBM's confidential information. Also, upon

resigning and prior to returning his IBM-issued mobile devices, Smith wiped all data from his

IBM-issued mobile devices, preventing IBM from determining through forensics review whether

Smith had copied, downloaded, or transferred any IBM confidential information from his work-

issued mobile devices to another location. (*See* Signoracci Decl. ¶ 8.)

In *Estee Lauder*, 430 F. Supp. 2d at 182, the court enjoined a product marketing

manager at Estee Lauder from working for a cosmetics rival on the basis that the executive new

15

about his former employer's products in development.  The defecting employee was responsible

for developing marketing strategies, and had "a general idea of the plans for launch of new

products, including the marketing and geographic plans and the channels of distribution for these

products." *Id.* at 163.  Rejecting the argument that the plaintiff-employer could not suffer

irreparable harm because the employee had no "technical expertise" and "was not the scientist

behind the formulas and the development of new products," the court in *Estee Lauder* granted a

preliminary injunction based upon the risk of inevitable disclosure of marketing trade secrets—

specifically, information about upcoming product launches. *Id.* at 175-76.[5]

> Because an injunction is appropriate where there is a likelihood that the former

employer's confidential information will inevitably (even if inadvertently) be used or disclosed,

the Court should issue an injunction here, barring Smith from working at AWS during the

remaining 9 months of his non-competition agreement.

### C.    The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm

> Courts also find irreparable harm where there is a risk that a former employee

might exploit or expropriate the goodwill of client or customer relationships cultivated through

the former employee's job responsibilities. *See, e.g.*, *Global Switching Inc.* v. *Kasper*, No. CV

---

[5]   In *Lumex*, the court issued a preliminary injunction enjoining a former product manager for a manufacturer of weightlifting equipment from going to work for a competitor. 919 F. Supp. at 636.  The court found that the employee's confidential information, including information about the costs to Lumex of providing products to customers, was "confidential and constituted trade secrets" and that "the disclosure of these trade secrets and confidential information would seriously and irreparably damage the future interests of Lumex." *Id.* at 630. The court also noted that the employee "was a member of the elite strategic planning committee together with the top personnel of [his business unit] and attended high level meetings in which future restructuring of [the business unit] was discussed, together with detailed financial information, including costs and [] profit margins." *Id.*

In *Payment Alliance*, the court issued a preliminary injunction to bar violation of a noncompetition agreement by an executive who was knowledgeable about the marketing of a software application that his former employer had launched. 530 F. Supp. 2d at 482, 485.  The court explained, "even if [the employee] acted with the best of intentions, he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact with his new employer." *Id.*

06 412(CPS), 2006 WL 1800001, at \*13 (E.D.N.Y. Jun. 28, 2006) ("The loss of customer

goodwill constitutes an irreparable injury."); *Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,

323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding that "[employee's] actions threaten to cause

[employer] irreparable harm by luring away the business of a number of long-term [] clients" of

employer).

Smith nurtured close personal relationships with major IBM customers in his two

and a half years as IBM's CIO.  (*See* Krishna Decl. ¶¶ 23, 63.)  As CIO of the Company, Smith

attended numerous industry events as IBM's highest ranking customer goodwill representative,

driving sales opportunities to all of IBM's business lines.  In addition to these industry events,

Smith met with over 60 of some of IBM's most important customers on a one-on-one basis in the

last 12 months of his employment with Company alone.  By moving to AWS, Smith threatens to

exploit and/or expropriate the customer relationships he cultivated on IBM's time and with the

benefit of IBM's resources, all to the detriment of IBM.  IBM thus is entitled to an injunction

protecting the customer goodwill that Smith developed throughout his tenure as IBM's CIO.

*See, e.g.*, *BDO Seidman* v. *Hirshberg*, 93 N.Y.2d 382, 392 (N.Y. 1999) ("The employer has a

legitimate interest in preventing former employees from exploiting or expropriating the goodwill

of a client or customer, which has been created and maintained at the employer's expense, to the

employer's competitive detriment.").

### D.    Smith Stipulated That a Violation of His Noncompetition Agreement Would Irreparably Harm IBM

In determining whether a threat of irreparable harm exists, "the existence of the

Noncompetition Agreement is highly relevant."  *Papermaster*, 2008 WL 4974508, at \*7.  Smith

agreed that disclosing the IBM confidential information he possesses to a competitor would

cause irreparable injury to IBM, and that an injunction is the appropriate remedy for that threat.

(*See* Noncompetition Agreement §§ 1(b)(1), 5.)  Smith expressly consented to an injunction in the event of breach: "you further consent and stipulate to the entry of such injunctive relief in such a court prohibiting you from breaching this Agreement." (*Id.*)

According to the Second Circuit, contractual provisions that acknowledge such harm "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were [s]he to breach the contract's non-compete provision." *Ticor Title Ins. Co.* v. *Cohen*, 173 F.3d 63, 69 (2d Cir. 1999); *cf. N. Atl. Instruments, Inc.* v. *Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (relying on similar clause in confidentiality agreement in finding irreparable injury to support injunctive relief).  In *Papermaster*, the court relied on the same acknowledgments made by Smith in his IBM Noncompetition Agreement—*i.e.*, "that IBM would suffer 'irreparable harm' if he violated" his obligations—finding that this "'explicit provision in the agreement' and 'common sense' indicate that IBM will be irreparably harmed by the disclosure of the important technical and proprietary information that Mr. Papermaster carries in his head."  2008 WL 4974508, at *9 (quoting *Global Telesys., Inc.* v. *KPNQwest*, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001)).[6]

## II.   IBM IS LIKELY TO PREVAIL ON THE MERITS

IBM is likely to prevail on its claims for breach of contract and misappropriation of trade secrets.  The same facts that support a finding of irreparable harm in the absence of a preliminary injunction also demonstrate IBM's likelihood of success on the merits.  "'In non-compete cases, such as this one, the irreparable harm analysis and the likelihood of success on the merits analysis are closely related and often conflated.'" *Papermaster*, 2008 WL 4974508, at

---

[6]   *Accord Ticor Title*, 173 F.3d at 68-69; *Ayco Co., L.P.* v. *Feldman*, No. 1:10-CV-1213 (GLS/DRH), 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010); *IDG USA, LLC* v. *Schupp*, No. 10-CV-76S, 2010 WL 3260046, at *9 (W.D.N.Y. Aug. 18, 2010), *aff'd in part, vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir. 2011); *Estee Lauder*, 430 F. Supp. 2d at 174; *Ikon Office Solutions, Inc.* v. *Usherwood Office Tech., Inc.*, No. 9202–08, 2008 WL 5206291, at *17 (N.Y. Sup. Ct. Dec. 12, 2008).

*6 (quoting *Int'l Creative Mgmt., Inc.* v. *Abate*, No. 07-CV-1979 (PKL), 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007)).

### A.  The Limitations on Smith's Post-IBM Employment Are Reasonable

Under New York law, "there are no *per se* lines demarcating what constitutes an unreasonable durational or geographic scope" in a noncompetition agreement. *See Estee Lauder*, 430 F. Supp. 2d at 180. The "durational reasonableness of a non-compete agreement is judged by the length of time for which the employer's confidential information will be competitively valuable." *Id.* In the *Papermaster* case, the court found that the same one-year prohibition on competition and customer solicitation that Smith agreed to was "very limited in time." 2008 WL 4974508, at *11 (quoting *Natsource LLC* v. *Paribello*, 151 F. Supp. 2d 465, 471-72 (S.D.N.Y. 2001)). The court also found that IBM had established, in that case, that "the trade secrets that [Papermaster] has been exposed to during his long tenure at IBM are likely to remain competitively valuable to IBM and its competitors for more than a year." *Id.* Other courts applying New York law have upheld two- and three-year noncompete periods. *See, e.g.*, *Payment Alliance*, 530 F. Supp. 2d at 485; *Battenkill Veterinary Equine P.C.* v. *Cangelosi*, 768 N.Y.S.2d 504, 506-07 (N.Y. App. Div. 3d Dep't 2003); *Alside Div. of Associated Materials Inc.* v. *Leclair*, 743 N.Y.S.2d 898, 898-99 (N.Y. App. Div. 3d Dep't 2002).

The overlap between Smith's positions and responsibilities at IBM and his proposed position and responsibilities at AWS also makes enforcement reasonable. The business secrets and confidential information Smith has in his possession will be valuable to AWS, and thus detrimental to IBM, for at least a year. He is familiar with both the specific product development and marketing strategies that IBM is currently employing and the directions in which it is heading in the near future, including the development, design, and marketing plans for offerings that have not been released and which the marketplace recognizes as increasing IBM's

competition in the Cloud Computing business in which AWS competes directly against IBM. (*See* Krishna Decl. ¶¶ 5, 28, 38–42.)  The information that Smith knows will remain part of the competitive battleground between IBM and AWS throughout the next 12 months.  (*Id.* ¶ 39.)

The geographical scope of Smith's restriction is worldwide, which, too, is reasonable because the employer (IBM) and the competitor (AWS) compete globally and Smith's job responsibilities (at IBM and AWS) are global.  In *Papermaster*, the court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'" 2008 WL 4974508, at *11 (quoting *Natsource*, 151 F. Supp. 2d at 471-72).  Other courts have upheld worldwide limits on post-employment competition.  *See, e.g.*, *Estee Lauder*, 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc.* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

Finally, before joining IBM as the CIO of the Company, Smith had served as the CIO for several companies in other industries and geographies, including a large Australian financial institution, a major Australian telecommunications company, an aerospace and automotive company based in New Jersey, and a hardware manufacturing company.  The Noncompetition Agreement Smith entered into with IBM would not prevent him from working as the CIO of a company that does not compete against IBM, like those where he previously worked—indeed, IBM approved Smith's plans to provide consultation to an Australian bank after his IBM employment terminated.  (*See* Signoracci Decl. ¶ 5.)  The Noncompetition Agreement does, however prevent Smith from switching sides and joining IBM's primary adversary in the Cloud Computing business in which Smith was involved at IBM.  That restriction is reasonable under applicable law, and should be enforced.

**B.**    **IBM Has a Legitimate Interest in Safeguarding its Confidential Information**

An employer has a "legitimate interest" in "safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy."

*Estee Lauder*, 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976)); *see also BDO Seidman*, 93 N.Y.2d at 391 (explaining that an employer has a "legitimate interest" in preventing the "competitive use, for a time, of *information* or *relationships* which pertain peculiarly to the employer and which the *employee acquired* in the course of the employment" (emphasis in original)). Therefore, "restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." *Estee Lauder,* 430 F. Supp. 2d at 177 (quoting *Reed, Roberts*, 353 N.E.2d at 593).

The confidential business information that Smith knows constitutes protectable trade secrets under New York law, which considers a trade secret "'any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner of such secrets] an opportunity to obtain an advantage over competitors who do not know or use it.'" *Softel, Inc.* v. *Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 968 (2d Cir. 1997) (quoting Restatement of Torts § 757 cmt. b); *IBM Corp.* v. *Visentin*, No. 11 Civ. 399 (LAP), 2011 WL 672025, at *8 (S.D.N.Y. Feb. 16, 2011) (same); *see also Papermaster*, 2008 WL 4974508, at *8 (noting Papermaster's knowledge of "strategic plans, product development, technical recruitment, and long-term business opportunities for IBM").[7]

New York cases confirm that IBM has a "legitimate interest" in protecting the types of confidential business and marketing information and strategies Smith acquired at IBM.

---

[7] New York courts consider the following factors in determining whether information constitutes a trade secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *N. Atl. Instruments*, 188 F.3d at 44 (quoting *Ashland Mgmt. Inc.* v. *Janien*, 624 N.E.2d 1007, 1013 (N.Y. 1993)). A review of each factor confirms that Smith's knowledge of IBM's future product offerings and the cost of those products are protected trade secrets.

*See, e.g.*, *id.* at 175-76 (knowledge of confidential brand strategies, products in development, and planned innovations); *Lumex*, 919 F. Supp. at 629-31 (knowledge of confidential strategic plans, future product offerings, and pricing and cost information); *DoubleClick, Inc.* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4-5 (N.Y. Sup. Ct. Nov. 7, 1997) (knowledge of confidential revenue projections, future plans, pricing and product strategies).

### III.   IN THE ALTERNATIVE, SUFFICIENTLY SERIOUS QUESTIONS GO TO THE MERITS AND THE BALANCE OF THE EQUITIES WEIGHS IN IBM'S FAVOR

Even if this Court were not satisfied that IBM is likely to prevail on the merits, IBM has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Natsource*, 151 F. Supp. 2d at 470 (quoting *Ticor Title*, 173 F.3d at 69).

Here, the balance of equities tips decidedly in IBM's favor. Smith *agreed* to wait a year before working for one of IBM's competitors, and he did so in exchange for career opportunities and equity compensation at IBM. (*See* Noncompetition Agreement § 1(e).) After benefiting from those opportunities and that compensation, he left IBM voluntarily. Smith chose to start a new phase of his career at a company that competes against IBM for the very same business, revenue and future growth. There is no inequity in compelling Smith to honor his contractual undertaking to wait before beginning that job, and certainly no inequity in delaying his employment by AWS while the Court considers IBM's motion for a preliminary injunction. This is particularly so where Smith's skills can be and have been directly applied in CIO positions for companies that do not directly compete against IBM, and such positions are readily available to him.

In contrast, IBM faces immediate and irremediable damage, including the disclosure of highly confidential and proprietary information, and loss of substantial business, should AWS gain access to the knowledge Smith has about IBM's confidential plans and strategies. In *Papermaster,* the court found that the balance of equities favored IBM because "IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple." *Papermaster*, 2008 WL 4974508, at *13. Similarly, any prejudice to Smith is substantially outweighed by the prejudice IBM would suffer absent injunctive relief.

## IV.   A TEMPORARY RESTRAINING ORDER SHOULD BE ISSUED AND AN EXPEDITED SCHEDULE FOR THE MOTION SHOULD BE SET

The immediacy of Smith's intended employment at AWS justifies a temporary restraining order. *See* Fed. R. Civ. P. 65(b). Smith intends to compete against IBM by becoming AWS's CIO and the face of AWS to its customers and prospective customers as early as August 7, 2017. Unless enjoined, Smith will become an AWS executive soon, creating a real risk that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." *Id.*

## CONCLUSION

For the foregoing reasons, IBM respectfully submits that this Court should enter a

temporary restraining order and a preliminary injunction prohibiting defendant Jeff Smith from

commencing employment at AWS prior to May 5, 2018, in accordance with the Noncompetition

Agreement.

Dated: New York, New York
      July 31, 2017

                    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

              By: _____

                  Robert A. Atkins
                  Steven C. Herzog
                  Pietro J. Signoracci

                  1285 Avenue of the Americas
                  New York, New York 10019-6064
                  (212) 373-3000
                  ratkins@paulweiss.com
                  sherzog@paulweiss.com
                  psignoracci@paulweiss.com

                  *Attorneys for Plaintiff*
                  *International Business Machines Corporation*