UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>JEFF S. SMITH,<br><br>Defendant. | 17 Civ. 5808(CS)(PED)<br><br>**FIRST AMENDED COMPLAINT** |

International Business Machines Corporation ("IBM" or the "Company"), by its undersigned attorneys, upon personal knowledge with respect to itself and its actions and otherwise on information and belief, alleges as follows:

**Nature of the Action**

1.      Defendant Jeff Smith was, from June 2014 until he recently resigned to compete against IBM, one of IBM's most senior executives with knowledge of IBM's most closely guarded product development plans.  Unbeknownst to IBM, during his tenure as a high-ranking executive at IBM Smith regularly communicated, via his personal email address, with Andrew Jassy, the Chief Executive Officer of Amazon Web Services ("AWS"), one of IBM's main competitors in the Cloud Computing business that Smith was involved in at IBM.

2.      IBM now knows that in his private communications with Jassy, from 2014 through 2017, Smith shared inside IBM information with Jassy for his own personal gain, such as reporting to Jassy on sensitive internal deliberations among IBM's senior executives and providing Jassy with updates on confidential communications between IBM and its clients; he ingratiated himself to Jassy in hopes of obtaining an offer of employment from AWS; and he

disclosed critical assessments of IBM, including about its Cloud Computing business—all while Smith was still employed by IBM.

3.    Smith's acts of disloyalty and breaches of his contractual obligations to IBM continued after he left the Company.  IBM reminded Smith of his post-employment obligations to the Company, including his one-year non-competition and customer non-solicitation obligations.  The next month, however, Smith solicited business from significant IBM customers on behalf of AWS, in direct violation of his contractual duties to the Company and his representations to this Court.

4.    Smith now threatens further violations of his contractual and fiduciary duties by going into direct competition with IBM as a senior executive of AWS, one of IBM's main competitors in Cloud Computing.  Smith plans to commence substantive responsibilities as one of the top ten executives at AWS, leading five key segments of AWS's Cloud Computing business that competes directly against IBM, without honoring the remaining eight months of his non-competition and non-solicitation obligations.

5.    In his proposed role at AWS, Smith is likely to continue to use or disclose IBM's confidential information—and exploit the customer goodwill he cultivated at IBM—for the benefit of AWS and himself, in violation of his non-competition agreement with IBM, his customer non-solicitation obligations, and his other contractual and fiduciary duties to the Company.  IBM brings this action to enjoin Smith from violating his noncompetition agreement with IBM, as well as his customer non-solicitation obligations and to recover damages for Smith's other breaches of his contractual and fiduciary duties to IBM.

6.    If not enjoined to wait a year before competing against IBM -- as he expressly agreed he would and for which he was well compensated -- Smith will take with him

to AWS all the highly confidential information he knows about the technological innovations
IBM is developing *specifically in the Cloud Computing business where AWS competes directly
against IBM.*  As one of only a dozen high-ranking executives involved in top-level decision-
making discussions regarding the development of IBM's next generation Cloud Computing
technology, which is set to be launched in the coming year, Smith knows such trade secrets as
the product cost, design specifications, performance capabilities and release plans -- all of which
would be very valuable to AWS.  The competition in Cloud Computing is intense, with *Forbes*
reporting just last week that "IBM Beats Amazon" in the "Cloud Wars" by becoming the first
enterprise technology provider to surpass $15 billion in cloud revenue for a 12-month period.

       7.    The IBM secrets that Smith threatens to take to IBM's competitor are so
sensitive that he was instructed not to retain copies of written project presentations.  As a
colleague described one of the product development presentations shared by Smith, "Wow, this
is amazing stuff."  Yet, Smith violated that simple confidentiality obligation.  In addition, Smith
shared inside IBM information, including information about IBM's Cloud Computing business,
with Jassy, the CEO of AWS, *while Smith was serving as a trusted IBM executive.*  Further
confirming that he cannot be trusted to protect and preserve IBM's trade secrets, Smith wiped his
company-issued phone and tablet, making it impossible for IBM to detect other communications
with Jassy or to determine if he transferred any other IBM information.

       8.    There is a significant risk, if not a virtual certainty, that Smith will use or
disclose his IBM confidential information for the benefit of AWS, whether intentionally or
unintentionally.  First, he already did so:  Smith revealed inside information regarding IBM's
Cloud Computing products and strategy to Jassy, AWS' CEO, and for that Jassy rewarded Smith
with a high-ranking executive position at AWS.  Second, the role that AWS plans to put Smith in

will involve him in strategy discussions regarding the development, marketing, sale, pricing, and performance of AWS Cloud Computing products and services that directly compete against IBM Cloud Computing products and services—including the forthcoming IBM next generation cloud about which Smith knows IBM trade secrets and confidential information.

9.      Given Smith's first-hand knowledge of IBM's business strategies and product plans for competing in the Cloud Computing business where AWS and others compete directly against IBM, and having already disregarded his confidentiality obligations (and his non-solicitation and non-competition obligations) to IBM, it is inevitable that Smith will use IBM's trade secrets against IBM if he performs substantive responsibilities for AWS before the expiration of his non-compete period.   Smith will be reporting directly to the CEO of his employer, now in this case AWS, as part of the senior leadership team responsible for deciding how to compete against IBM.  And he will be involved in strategy sessions with AWS's senior leadership devising AWS's plans for product development and competition in the Cloud Computing business.  Switching sides in the competition with the type of competitively sensitive information Smith knows puts those secrets at high risk of disclosure -- which is exactly why Smith agreed to wait a reasonable interval before joining a competitor.

10.      Nevertheless, Smith plans to commence his substantive responsibilities for AWS immediately, without waiting the remaining eight months required by his non-competition agreement.  Smith's breach of his non-competition agreement with IBM is especially flagrant because, as a Chief Information Officer (CIO), he could find employment in almost any industry.  Before coming to IBM, he was the CIO of a banking business and a telecommunications company.  Since resigning from IBM, Smith received multiple offers to work for non-competing companies.  But he chose to leave IBM and go not only to a direct

competitor, but one of the competitors that would have the greatest use for the IBM secrets he was entrusted to protect.

11.     Accordingly, the injunctive relief IBM seeks by this action -- enforcing Smith's non-competition agreement for the remaining eight months -- is just, reasonable and necessary.  IBM also seeks to recover the compensation that Smith forfeited through his acts of disloyalty to the Company, the equity IBM paid Smith that is subject to rescission as a result of Smith's breaches of his contractual duties to IBM, and any other damages to be proven at trial.

## Parties

12.     IBM is a New York corporation with its principal place of business in Armonk, New York.

13.     Jeff Smith is an individual who, on information and belief, resides in Ridgefield, Connecticut.

## Jurisdiction and Venue

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of costs and interest.

15.     The Court has personal jurisdiction over Smith because, in the Noncompetition Agreement, he agreed to exclusive jurisdiction and venue in the federal and state courts of the State of New York, New York County or County of Westchester, for all disputes arising from the agreement.

16.     Venue properly lies in this Court both because of Smith's aforementioned agreement, and pursuant to 28 U.S.C. § 1391, because IBM's headquarters are in this judicial district and a substantial part of the events giving rise to the claims occurred in this district.

## Relevant Facts

### IBM

17.     IBM is a globally integrated business that offers information technology ("IT") products and services to a wide range of business, public sector, and individual customers.

18.     IBM designs, develops, and brings to market a portfolio of software products and services for customers in all industries, including Hybrid Cloud, which offers businesses and government entities infrastructure, services, and tools for integrated Cloud Computing.

19.     Cloud Computing is the delivery of on-demand computing resources -- everything from applications to data storage -- over the internet on a pay-for-use basis. Cloud Computing enables individuals and businesses to access, store and use data and software via the internet on computer servers owned and/or managed by third-party "Cloud" service providers -- such as IBM, AWS, Microsoft -- and pay for that service based on usage.

20.     IBM relies on trade secrets, other confidential information, and proprietary methods and processes in developing, implementing and marketing its product and services offerings, and each year it spends billions of dollars and dedicates extensive research efforts to the development of technological innovations supporting its hardware, software and services businesses. Among other things, IBM utilizes trade secrets, proprietary information and methods, confidential technical know-how, competitively sensitive customer and distribution information and confidential competitive strategies to design, develop, manufacture and bring to market a variety of products and services relating to computer systems.

21.     In order to protect its trade secrets, IBM asks a select group of some 1,700 of its approximately 380,000 employees to enter into noncompetition agreements.

**Jeff Smith**

22.     Smith started working at IBM in August 2014, as the CIO of the Company.

23.     Before joining IBM, Smith had been the CIO of Suncorp, a finance, insurance, and banking corporation headquartered in Brisbane, Australia.  Prior to that, he had served as the CIO for Telstra, an Australian telecommunications and media company; as CIO for Honeywell AlliedSignal, an aerospace, automotive and engineering company based in New Jersey that was acquired by commercial conglomerate company Honeywell International, Inc.; and as CIO for Schlage Lock Company, a hardware manufacturing company acquired by Ingersoll Rand, Inc.

24.     On March 28, 2017, Smith informed IBM that he intended to accept an offer to join AWS as Vice President, reporting directly to AWS's CEO.  IBM learned that Smith intended to commence employment with AWS on April 24, 2017.  In response, IBM raised concerns regarding the noncompetition agreement Smith entered into with IBM (attached hereto as **Exhibit A**) and his confidentiality obligations.  As a result of conversations among counsel, in which IBM expressed its concerns about Smith's joining a competitor like AWS, Smith decided to resign from IBM effective May 2, 2017, without accepting AWS's offer of employment.

25.     On June 13, 2017, Smith's counsel provided formal notice to IBM that Smith had, in fact, accepted a new offer to work as Vice President with AWS and intended to start working on August 7, 2017.

26.     On August 1, 2017, this Court entered an Order permitting Mr. Smith to join AWS's payroll on August 7, 2017, but prohibiting Smith from performing substantive duties for AWS pending the outcome of IBM's motion for a preliminary injunction in this case.  The Court's Order stated that Smith may not "speak, write or otherwise provide information or

opinions about business-related matters, or perform substantive functions or provide services" to AWS.

27.     The next day, on August 2, 2017, Smith violated the Court's Order by publicly announcing via his LinkedIn profile that he was a "Leader at Amazon Web Services" and that his employer was "Amazon Web Services."  After IBM became aware of Smith's LinkedIn activity, IBM reminded Smith by letter dated August 3, 2017 that the Court's Order prohibited from joining AWS until August 7, 2017, and even then prohibited him from either providing services to AWS in a position as a "Leader " at AWS or soliciting business or employees from AWS.  Smith removed the statements regarding AWS from his LinkedIn profile on August 3, 2017.

28.     Smith joined AWS on August 7, 2017 in a "listen and learn" mode only, subject to the Court's Order.

29.     As IBM's CIO, Smith was responsible for, among other things, devising and implementing IBM's competitive and proprietary strategies concerning developer tools; corporate data security; and cultural transformation, specifically Agile Culture.

30.     Smith also was a member of IBM's senior executive leadership team and technology development team, through which he was privy to confidential business information concerning IBM trade secrets, including the Company's ongoing plans to launch competitive products later in 2017 and 2018, as well as the Company's financial plans and competitive strategies.

31.     The IBM senior executive leadership team's meeting materials confirm that through his participation on this committee, Smith was privy to the Company's most sensitive information, including discussions about IBM's strengths and competitive strategies

against its major competitors, including in the Cloud Computing business in which AWS competes directly against IBM.  This information will remain relevant and competitively sensitive well into 2018.

32.     As he was required to do, Smith regularly participated in the senior technology development team's meetings, and the meeting materials confirm that Smith regularly received sensitive Company information, including information regarding competitive products that IBM has not yet launched or publicly announced.  These include new IBM offerings under development in Cloud Computing; a new offering called Agile Accelerate, which will help customers manage and optimize their corporate culture and organizational performance; and new suites of products and services in regulatory and compliance technology.

33.     Smith was also a frequent speaker on behalf of IBM at industry conventions and other gatherings.  In the past 18 months, he visited with over 200 customers or partners.  Through this role, Smith marketed IBM business across all of its product lines.  Smith developed close relationships with many important IBM customers and partners in his role as IBM's CIO.  By his own admission, he was recently involved directly in transactions with two important customers in the financial services industry.

34.     Smith also was responsible for directly supervising IBM's Chief Information Security Officer, who regularly reports to Smith on IBM's strategies and incidents regarding Information Security.  As a result, Smith has highly sensitive IBM confidential information regarding IBM's information security.  This IBM confidential information could cause the Company irreparable harm if it were disclosed to anyone outside the Company, especially to an IBM competitor.

35.     Smith was a "Band A" executive at IBM.  IBM employees with letter Bands (beginning at Band D and rising to Band A and AA) are IBM executives, and IBM employees with number Bands (beginning at Band 1and rising to Band 10) are non-executives. Band A and AA executives are the highest ranking executives in the Company.  And he was a member of IBM's selective Growth & Transformation Team ("G&TT"), a leadership group of about 300 high-level executives from all areas of IBM tasked with solving critical challenges and focusing on transforming the Company and its strategies.  As a G&TT member, Smith participated in executive strategy sessions concerning all of IBM's business, including the most recent G&TT session that occurred in January 2017 and featured presentations on IBM's Cloud Computing strategies for 2017 and 2018.

**IBM's Executive Leadership and Technology Development Teams**

36.     Smith became a member of IBM's senior executive leadership team not merely by virtue of his role as IBM's CIO, but also because of his unique role in developing Company-wide strategies and pursuing customer opportunities.  Prior to Smith, only one IBM CIO had been a member of IBM's senior executive leadership team; the current CIO (Smith's replacement) is not currently a member of that team.

37.     As a member of IBM's senior executive leadership team and participant in the quarterly meetings with the Company's senior officers, Smith was privy to the Company's most sensitive business secrets and confidential information, including discussions about IBM's strategies for competing against its major competitors, including specifically AWS.

38.     Smith's participation on IBM's senior executive leadership and technology development teams exposed him to highly sensitive, strictly confidential IBM information regarding product development and competitive strategies, including in connection with Cloud Computing business that competes directly against AWS.  The information concerns,

among other things, planned offerings that will combine new hardware and software to provide
Cloud Computing services to large enterprises (such as banks, insurance companies, and
government agencies) that are faster, more secure, and less expensive than before.  This
information is held closely secret even within IBM.  Smith's participation on IBM's senior
executive leadership and technology development teams also involved him in critical strategy
and decision-making discussions with the Company's most senior executives.

   39. Smith knows the proprietary and confidential components, capabilities,
and costs of IBM's forthcoming Cloud Computing products, as he received, reviewed, and
discussed materials outlining the project in detail.  Specifically, Smith was briefed in detail about
the enhanced speed and security of IBM's new Cloud Computing offering.  Smith also was told
what it will cost IBM (per server per month) to deliver this new Cloud Computing service to
customers, which is the most important competitive metric in setting prices to win business.
Smith attended meetings, received presentations and participated in discussion about IBM's
server costs, IBM's competitive cost targets, and IBM's technology strategies and roadmap for
achieving those targets.

   40. The confidential information Smith knows about the capabilities and cost
of IBM's new Cloud Computing offering under development would be very helpful to a
competitor, especially AWS, in attempts to counteract or compete against IBM -- if AWS knows
the costs to IBM of providing those services to customers, AWS could use that information to set
its pricing of potentially competitive services to a point that would undercut IBM's business.
AWS could also use what Smith knows to devise competitive marketing and sales strategies in
advance of IBM's launch.

41.     IBM's competitors and industry analysts are closely watching IBM's next moves in Cloud Computing.  In June, a report from technology analyst Gartner stated that "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date."[1]  That IBM is developing a next generation technology in the Cloud Computing business in which AWS and others compete directly against IBM is not a secret, but what that technology is, how it works, what it costs, and when it will be launched are trade secrets.

42.     This report illustrates the importance of the confidential information Smith knows about IBM's costs, and its usefulness to AWS.  The report compared offerings from IBM and AWS in the business area of "Cloud Infrastructure as a Service, Worldwide," with a focus on the costs of the competitors' Cloud Computing offerings.  The report stated that, "AWS is perceived as a cost leader" in the Cloud Computing market, but suggested that IBM's forthcoming Cloud Computing offerings could make IBM even more competitive on costs.  The report concludes: "The eventual rollout of [IBM's new Cloud Computing offerings] is likely to help IBM evolve beyond its current status as a hosting-scale provider, making it more viable for IBM to match the cost economics of the market leaders," including AWS.

43.     As one industry publication recognized, "the leak of *any information* pertaining to the launch" of IBM's next generation Cloud Computing offerings, "especially to rivals, could impact [IBM] commercially and competitively."

**IBM-AWS Competition**

44.     IBM and AWS market to the same enterprise and government customers hardware, software and services offerings that compete directly against each other in many

---

[1]     *See* Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519.

fields, especially in Cloud Computing.  Recent industry reports identify IBM and AWS as among the top competitors in Cloud Computing.[2]  IBM recently surpassed AWS in the area of cloud-computing revenue, making it the first enterprise-tech vendor to make over $15 billion in fully recognized cloud revenue for a 12-month period.[3]  As IBM noted in its SEC filings, IBM is now the global leader in the enterprise Cloud Computing market.[4]

45.    AWS is listed in IBM's SEC 10-K filing as among IBM's "principal competitors."[5]  IBM considers AWS a "Champion Competitor," publicly measures its services against those offered by AWS,[6] and reports publicly on instances when customers switch over from AWS to IBM.[7]  AWS likewise promotes articles describing IBM as its competitor.[8]

---

[2]    *See, e.g.,* Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (last visited June 29, 2017), https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519; *see also* Investor's Business Daily, *Amazon Cloud Services Under Growing Threat From Microsoft, Google, IBM* (last visited July 10, 2017) http://www.investors.com/news/technology/amazon-cloud-services-under-growing-threat-from-microsoft-google-ibm (identifying IBM and AWS as among the top competitors in Cloud Computing and stating that "IBM continues to lead in hosted private cloud" based on report from Synergy Research Group).

[3]    *IBM Beats Amazon in 12-Month Cloud Revenue, $15.1 Billion to $14.5 Billion* (last visited July 30, 2017), https://www.forbes.com/sites/bobevans1/2017/07/28/ibm-beats-amazon-in-12-month-cloud-revenue-15-1-billion-to-14-5-billion/#160b4ee939d6.

[4]    U.S. SEC, *IBM Form 10-Q For the Quarter Ended March 31, 2017* (last visited Aug. 16, 2017), https://www.sec.gov/Archives/edgar/data/51143/000110465917025881/a17-8917_110q.htm.

[5]    U.S. SEC, *IBM Form 10-K For the Year Ended December 31, 2015* (last visited June 29, 2017), www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

[6]    *See, e.g.,* IBM Advantage Blog, *Competitive Study of IBM Bluemix vs. AWS for Moving WAS Workloads to the Cloud* (Jan. 13, 2017), https://advantage.ibm.com/2017/01/13/competitive-study-of-ibm-bluemix-vs-amazon-aws-for-moving-was-workloads-to-the-cloud/; IBM Cloud computing news, *SoftLayer delivers a competitive edge in the fast-paced film industry* (Nov. 24, 2015), www.ibm.com/blogs/cloud-computing/2015/11/softlayer-delivers-a-competitive-edge-in-the-fast-paced-film-industry/; IBM Offering Information, *Evaluating Price And Performance of Cloud Providers SoftLayer vs. AWS and Microsoft* (Aug. 14, 2015), www-01.ibm.com/common/ssi/cgi-bin/ssialias?htmlfid=KUV12538USEN.

[7]    *See* IBM News Releases, *MutualMind Migrates From Amazon Web Services and Rackspace to IBM Cloud to Unlock the Power of Social Media Data* (Sept. 25, 2014), www-03.ibm.com/press/us/en/pressrelease/44977.wss.

[8]    *See* AWS Resources, *AWS named as a leader in the Infrastructure as a Service (IaaS) Magic Quadrant report for 6th consecutive year* (last visited June 29, 2017), https://aws.amazon.com/resources/gartner-2016-mq-learn-more/ (linking to TechRepublic, *Amazon still crushing cloud competition, says Gartner Magic Quadrant for*

46.     AWS has increased its competition against IBM by marketing new services in data, analytics, and applications in an attempt to gain a greater market share in the enterprise customer base.  Many large enterprise customers, including banks and insurance companies, have historically constituted IBM's customer base.  AWS is actively attempting to encourage certain enterprise customers to go to AWS, rather than IBM, for help with "digital transformation," such as migrating data to the Cloud.  In recent months, AWS also has recruited high-level executives with experience in selling and providing Cloud Computing services to such enterprise customers, including executives from IBM.  AWS's hiring of Smith appears to be part of this effort.

**Smith's Noncompetition Agreement with IBM**

47.     Precisely because of his exposure to highly confidential and commercially sensitive information, Smith was one of IBM's senior executives who the Company asked to sign a noncompetition agreement, to restrict the potential disclosure of confidential IBM information in the event that he left the Company.

48.     Smith executed his Noncompetition Agreement with IBM on June 7, 2014.

49.     In that agreement, Smith acknowledged and agreed that:

during [his] employment with IBM and for twelve (12) months following the termination of [his] employment . . . , [he] will not directly or indirectly within the "Restricted Area" "Engage in or Associate with" (a) any "Business Enterprise" or (b) any competitor of the Company, if performing the duties and responsibilities of such engagement or association could result in [his] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information to which [he] had access by virtue of [his] job duties or other responsibilities with

---

*IaaS* (Aug. 5, 2016)); AWS Media Coverage, *The Washington Post: Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013), https://aws.amazon.com/about-aws/media-coverage/2013/10/13/washington-post-amazon-web-services-wins-court-case-over-cia-cloud-contract/ (linking to The Washington Post, *Amazon Web Services wins court case over CIA cloud contract* (Oct. 13, 2013)).

IBM; [or] (ii) . . . solicit, for competitive business purposes, any customer of the Company with which [he was] directly or indirectly involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM. (Noncompetition Agreement § 1(e)(i), 1(e)(ii).)

50.     The Noncompetition Agreement provides the following definitions for the defined terms in the foregoing provision:

(a)     "Restricted Area" is defined as "any geographic area in the world in which [he] worked or for which [he] had job responsibilities, including supervisory responsibilities, during the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(f).)

(b)     "Engage in or Associate with" is defined to mean, among other things, acting as an "associate, employee, member, consultant, or contractor." (*Id.* § 2(c).)

(c)     "Business Enterprise" is defined as "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

(d)     "IBM Confidential Information" is defined as including, among other things, information about "the Company's selling, manufacturing, servicing methods and business techniques, implementation strategies . . . product information, customer and prospective customer lists, other customer and prospective customer information, client data, global strategic plans, marketing plans, information about the Company's management techniques and management strategies . . . information regarding the development status of specific Company products, assessments of the global competitive landscape of the industries in which the Company competes . . . [and] financial status and plans." (*Id.* § 2(d).)

51.     Thus, Smith agreed in the Noncompetition Agreement that, for a period of one year following the termination of his employment from IBM, he would not work for any

competitor of IBM in any geographic area in the world for which he had job responsibilities in the last twelve months of his employment with IBM if such employment could result in the intentional or unintentional use or disclosure of IBM Confidential Information to which he was exposed in his IBM employment.

52.     Additionally, in the Noncompetition Agreement, Smith agreed and acknowledged that:

(a)     "the business in which the Company is engaged is intensely competitive" (*Id.* § 1(c));

(b)     his "employment by IBM has required . . . that [he] have access to, and knowledge of, IBM Confidential Information" (*Id.*);

(c)     "the Company would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]" (*Id.* § 3.); and

(d)     "the restrictions set forth in [the noncompetition and the nonsolicitation covenants] are reasonable as to geography and duration."  (*Id.*)

**Smith Violates the Noncompetition Agreement
by Accepting Employment with AWS As Its Vice President**

53.     Notwithstanding the promises he made in his Noncompetition Agreement, Smith told IBM on March 28, 2017 that he intended to accept a job at AWS, with a proposed start date of April 24, 2017.

54.     As a result of discussions among counsel for IBM, counsel for Smith, and counsel for AWS, Smith announced his resignation from IBM on April 27, 2017, without accepting employment from AWS.  Smith informed IBM that he would pursue other opportunities, including offers he had received to join the boards of, and potentially receive employment from, companies that did not compete against IBM.  Smith's resignation from IBM

became effective May 2, 2017.  Shortly after his resignation, Smith informed IBM that he had been offered a consulting role at a non-competitive Australian bank.  IBM approved Smith's acceptance of this offer.

55.     Counsel for AWS eventually informed IBM that AWS intended for Smith to be Vice President for AWS and AWS's senior leader in managing the overall strategy and operations of major areas of its Cloud Computing business, including global marketplace, developer tools, and global support and managed services.

56.     AWS is on record in litigation it has brought itself to enforce its own non-compete agreements describing the role of AWS Vice Presidents:

- Directing the development of many of AWS's Cloud Computing business strategies;

- Participating in the highest levels of decision-making in the Cloud Computing business;

- Attending AWS Weekly Business Metrics Meetings, at which senior management discuss goals and metrics across all of AWS's products and services; and

- Participating in AWS's semi-annual formal operations planning processes.[9]

57.     The IBM confidential information and competitive business secrets Smith knows, and the IBM customers Smith knows by virtue of his responsibilities as IBM CIO, will all be relevant to these AWS strategy, planning and decision-making activities.

58.     Smith later informed IBM that the proposed role was Vice President of AWS, and would include responsibility for managing the overall strategy and operations of key segments of AWS's Cloud Computing business.  Smith represented to IBM and the Court that the role at AWS was "a very scoped role . . . in a narrow area of cloud services."  Specifically,

---

[9]     *See* Plaintiff Amazon.com Inc.'s Motion for Temporary Restraining Order, *Amazon.com Inc.* v. *Powers*, No. 2:12-CV-1911 (W.D. Wash., filed Oct. 30, 2012) [Docket No. 4] Ex. A pp. 6–8.

Smith represented that he would only have internal, managerial responsibilities for three

segments of AWS's Cloud Computing business: (1) AWS Marketplace, (2) AWS Developer

Tools, and (3) Global Support and Managed Services.

   59. IBM has since learned that Smith's representations were inaccurate and

deliberately intended to mislead IBM about the nature of Smith's intended competition with the

IBM Cloud Computing business he was involved in as a high-level IBM executive.  The CEO of

AWS has testified that, rather than a "very scoped" and "narrow" role, AWS has created for

Smith "one of the biggest leader roles in AWS," in which he will oversee the work of several

thousand AWS employees in multiple areas of AWS's Cloud business, representing more than a

fifth of AWS's entire workforce.  Indeed, AWS intends for Smith to be one of its top ten

executives.  AWS intends for Smith to participate in strategy meetings involving all aspects of

AWS's Cloud Computing business; to be involved in developing AWS's competitive strategies

to win business against competitors in the Cloud Computing industry, including IBM; to be

involved in discussions regarding AWS's product development, marketing, and pricing; and to

have customer-facing responsibilities.  And Smith's primary responsibilities will not be limited

to three discrete business areas, as he led IBM to believe, but will task him to be the leader of

five key segments of AWS's Cloud Computing business: (1) AWS Migration Services, (2) AWS

Service Catalog; (3) AWS Marketplace, (4) AWS Developer Tools, and (5) AWS Global

Support and Managed Services.  These are major revenue-driving business at AWS and key

features of AWS's Cloud Computing business.

   60. The job that Smith intends to take at AWS is thus in competition against

the job he held at IBM.  Smith intends to move from IBM's strategic leadership team to AWS's

strategic leadership team.  His proposed role at AWS would involve him in the development of

AWS products and competitive strategies to compete against IBM, including with respect to IBM's new offerings under development in Cloud Computing, Agile, and regulatory and compliance technology.

61.     Smith poses a particular competitive threat to IBM, not merely because he knows the Company's trade secrets, but because he developed relationships with significant IBM customers or potential customers on the strength of IBM's goodwill, products and services, and often served as the public face of IBM at major industry events as IBM's highest ranking customer goodwill representative.

62.     In addition, Smith was responsible for directly supervising IBM's Global Chief Information Security Officer.  In his role as CIO, Smith attended certain steering committee meetings to discuss IBM's most sensitive data.  This highly confidential information is kept closely secret within IBM, and it could cause the Company irreparable harm if this information were disclosed to anyone outside the Company -- especially a competitor like AWS.

63.     As AWS Vice President, Smith will report directly to Andrew Jassy, AWS's CEO.

**Smith Violates his Customer Non-Solicitation Obligations
by Assisting AWS's Solicitation of Actual or Prospective IBM Customers**

64.     Shortly after Smith resigned from IBM in May 2017, he continued his attempts to impress his prospective employer, this time by acting as AWS's agent.  In June 2017, Smith violated his non-competition and non-solicitation obligations to IBM by performing services for AWS and soliciting on AWS's behalf IBM customers with which he was involved in the last 12 months of his IBM employment.

65.     Smith met with these customers in June 2017, spoke with them about potential opportunities for doing business with AWS (and not IBM), and provided their contact information and the details of their Cloud Computing needs to AWS's CEO, Andrew Jassy.

**IBM's Right to Rescind Long-Term Incentive**
**Awards It Provided to Smith**

66.     As recently as June 2016, Smith accepted awards of IBM stock options, Restricted Stock Units, and Performance Share Stock Units under IBM's 1999 Long-Term Performance Plan, as amended through August 1, 2007 ("LTPP").  (The LTPP Prospectus is attached hereto as **Exhibit B**.)  Smith's equity awards also were governed by a document titled "Terms and Conditions of Your Performance Share Units (PSUs) – Growth Award: Effective June 8, 2016" (the "Terms and Conditions") (attached hereto as **Exhibit C**).

67.     The equity awards that Smith received under the LTPP were in addition to, and not part of, the salary he received for his work at IBM.

68.     Under the LTPP, equity awards are subject to cancellation and rescission in certain circumstances, and any exercise, payment or delivery pursuant to a rescinded award is subject to repayment.  In particular, the awards may be canceled and rescinded if the participant engages in "Detrimental Activity," as defined in the Plan.

69.     Detrimental Activity consists of eight categories of conduct, including, among others:

> (a)     the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company;
>
> (b)     the disclosure to anyone outside the Company, or the use in other than the Company's business, without prior written authorization from the Company, of any confidential information or material, as defined in the Company's Agreement Regarding Confidential Information and Intellectual Property, relating to the business of

the Company, acquired by the Participant either during or after employment with the Company;

(c)     any attempt directly or indirectly to solicit the trade or business of any current or prospective customer, supplier or partner of the Company; and

(d)     any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

70.     Smith's disclosure of IBM information to Jassy, his plan to work for AWS, and his solicitation of current and/or prospective IBM customers on behalf of AWS constitute Detrimental Activity under the LTPP, triggering IBM's right to rescind and recover awards granted to him in the prior twelve months.

71.     Smith had the choice each year whether to accept his equity awards. Upon acceptance of the awards in June 2016, he agreed that he understood that "IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period. You understand that the Rescission Period that has been established is 12 months." (A copy of Smith's "Long-Term Incentive Award Acceptance Information" is attached hereto as **Exhibit D**.)

72.     In the Terms and Conditions to the LTPP, Smith acknowledged and agreed that if he were to violate the prohibition on direct or indirect solicitation of IBM customers, "the Company would suffer irreparable harm" and that "the Company will be entitled to any appropriate relief including money damages, equitable relief and attorneys' fees." (Ex. C p. 5.)

21

73. The Terms and Conditions also require Smith to pay "all costs and expenses incurred by the Company" in a successful action to enforce the terms of the LTPP, "including reasonable attorneys' fees." (*Id.* p. 4.)

74. The stock options that Smith exercised and Restricted Stock Units that were released to him in the twelve months prior to his resignation and announcement of his intent to join AWS total approximately $1,714,800.

## COUNT I — Breach of Noncompetition Agreement

75. IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 74 above.

76. The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations.

77. IBM has complied with all material terms of this agreement.

78. Smith has breached the terms of that agreement by, among other things, accepting a position as Vice President of AWS without waiting for expiration of the one-year non-compete period to which he expressly agreed.

79. As Smith agreed in the Noncompetition Agreement, if he is not enjoined from working at AWS as Vice President until May 2, 2018, and thereby violating his Noncompetition Agreement, IBM will be irreparably injured.

80. In view of the similarity of Smith's job at AWS to his job at IBM, he will inevitably (if inadvertently) make use of and/or disclose IBM trade secrets and other confidential and proprietary IBM information in performing his job at AWS.

81. IBM will also be harmed if Smith violates the nonsolicitation covenants in the Noncompetition Agreement.

82.     In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury.  IBM is also entitled to recover money damages to the extent that Smith is not enjoined from violating his agreement.

## COUNT II — Misappropriation of Trade Secrets

83.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 82 above.

84.     IBM possesses certain trade secrets and confidential information with which Smith is familiar, and which Smith has a common law duty not to disclose outside of IBM.

85.     The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations, including the obligations of nondisclosure with respect to IBM's confidential information.

86.     If he is permitted to work for AWS, Smith will inevitably (if inadvertently) use and/or disclose IBM trade secrets for his own benefit and for the benefit of AWS.

87.     As an unavoidable result of Smith's impending misappropriation of IBM trade secrets in violation of his common law and contractual duties, IBM will be damaged.

## COUNT III — Breach of Customer Non-Solicitation Obligations

88.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 87 above.

89.     The Noncompetition Agreement is an enforceable agreement that imposes upon Smith contractual obligations.

90.     IBM has complied with all material terms of this agreement.

91.     The Terms and Conditions of Smith's equity awards is an enforceable agreement that imposes upon Smith contractual obligations.

92.     IBM has complied with all material terms of this agreement.

93.     Smith has breached the customer non-solicitation obligations of the Noncompetition Agreement and the Terms and Conditions by, among other things, soliciting business on AWS's behalf from current and/or actual IBM customers.

94.     As Smith agreed in the Noncompetition Agreement and the Terms and Conditions, any breach or threatened breach of the customer non-solicitation obligations in his agreements causes IBM irreparable harm and entitles IBM to appropriate relief including money damages, equitable relief and attorneys' fees.

95.     IBM also will be harmed if Smith commits further violations of the non-solicitation covenants in the Noncompetition Agreement and the Terms and Conditions.

96.     In these circumstances, IBM is entitled to an injunction to prevent such irreparable injury.  IBM is also entitled to recover money damages for any harm already caused by Mr. Smith's breaches and to the extent that Smith is not enjoined from violating his agreements.

## COUNT IV — Breach of Fiduciary Duty

97.     IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 96 above.

98.     As an employee of IBM up to and including May 2, 2017, Smith owed IBM fiduciary duties of loyalty and good faith.

99.     Smith breached his fiduciary duties to IBM from 2014 through 2017 by, among other things, disparaging IBM to IBM's direct competitor, promoting products from

IBM's direct competitor, and sharing inside IBM information with IBM's direct competitor, while Smith was an employee of IBM.

100.    IBM is therefore entitled to compensatory damages, including an amount at least equivalent to the compensation IBM paid to Smith.

### COUNT V — Declaratory Judgment: Rescission of Equity Award

101.    IBM repeats and realleges, as if fully set forth herein, the allegations of Paragraphs 1 through 100 above.

102.    By, among other things, accepting employment at AWS in competition against IBM, sharing IBM inside information with AWS, and soliciting actual or prospective IBM customers on behalf of AWS, Smith has engaged in "Detrimental Activity" under the LTPP agreement, triggering IBM's right to rescind and demand repayment of equity awards granted to him in the prior twelve months.

103.    The LTPP agreement is an enforceable agreement, and IBM has performed all of its material obligations under the agreement.

104.    IBM has informed Smith of this claim.  Smith has refused and, on information and belief, will continue to refuse to return and repay his equity awards, as required by the LTPP agreement.

105.    IBM does not have an adequate, alternative remedy in another form of action.

106.    Accordingly, IBM is entitled to a declaratory judgment confirming its right to rescind and demand repayment of Smith's equity awards.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff IBM demands judgment seeking relief against defendant

Jeff Smith as follows:

(a)     Imposing a preliminary and permanent injunction ordering Smith to refrain from:  (i) breaching the terms of his Noncompetition Agreement with IBM or the Terms and Conditions of the equity awards he accepted from IBM; (ii) continuing his employment with AWS in any capacity until May 2, 2018; or (iii) directly or indirectly soliciting, for competitive business purposes, any IBM customer with which Smith was directly or indirectly involved as part of his job responsibilities during the last twelve months of his employment with IBM;

(b)     Declaring that IBM is entitled to rescind and demand repayment of the equity awards granted to Smith in the twelve months prior to his accepting employment with AWS;

(c)     Declaring that IBM is entitled to recoup and demand repayment of all compensation paid to Smith;

(d)     Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action;

(e)     Awarding IBM monetary damages in an amount sufficient to compensate the Company for Smith's breaches of contract, together with rescission of any LTPP Awards Smith has received from IBM within the last twelve months and of any other compensation or benefits that IBM is entitled to rescind or recoup; and

(f)     Awarding IBM such further relief as the Court deems just and proper.

Dated:  New York, New York
        August 18, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: s/ Robert A. Atkins
        Robert A. Atkins
        Lorin L. Reisner
        Gregory F. Laufer

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com
lreisner@paulweiss.com
glaufer@paulweiss.com

*Attorneys for Plaintiff*
*International Business Machines Corporation*