UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

        v.

JEFF S. SMITH,

                Defendant.

Civil Action No. 17-cv-5808

---

## PLAINTIFF IBM'S POST-HEARING PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

Robert A. Atkins
Lorin L. Reisner
Gregory F. Laufer
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff*
*International Business Machines Corporation*

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

IBM'S PROPOSED FINDINGS OF FACT ........................................................................... 5

    A.      IBM ................................................................................................................. 5

    B.      AWS ............................................................................................................... 6

    C.      IBM Is Developing a "Next Generation" Cloud ████████████ ........... 7

    D.      Defendant Jeff Smith's Role as a Senior Executive and CIO of IBM .................. 11

    E.      Smith's Noncompetition and Non-Solicitation Agreement with IBM ................. 14

    F.      Smith's Direct Knowledge of IBM's
            Next Generation Cloud (Project Genesis) ............................................................ 16

    G.      Smith's Direct Knowledge of Other IBM Trade Secrets ...................................... 25

    H.      Smith's Covert Communications with AWS's CEO While at IBM ...................... 26

    I.      Smith's Resignation from IBM to Join AWS ....................................................... 33

    J.      Smith's Breach of His Non-Solicitation Agreement ............................................ 38

    K.      Smith's Anticipated Role as a Vice President of AWS ......................................... 39

    L.      The Temporary Restraining Order ....................................................................... 43

IBM'S PROPOSED CONCLUSIONS OF LAW .................................................................. 46

    A.      The Standard of Law for a Preliminary Injunction .............................................. 47

    B.      IBM Will Suffer Irreparable Harm Absent a Preliminary Injunction ................... 48

    C.      IBM Has Established a Likelihood of Success on the Merits ................................ 65

    D.      In the Alternative, Sufficiently Serious Questions Go to the Merits, and
            the Balance of Hardships Weighs in Favor of IBM .............................................. 73

    E.      Smith's Twelve-Month Noncompetition Agreement Should Be Enforced .......... 75

CONCLUSION ..................................................................................................................... 76

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Awards.com, LLC* v. *Kinko's, Inc.*,
834 N.Y.S.2d 147 (N.Y. App. Div. 2007) ...............................................................60

*Ayco Co., L.P.* v. *Feldman*,
No. 10 Civ. 1213, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ...........................65n

*BDO Seidman* v. *Hirshberg*,
93 N.Y.2d 382 (1999) ..........................................................64, 69, 71, 76n

*Bus. Intelligence Servs., Inc.* v. *Hudson*,
580 F. Supp. 1068 (S.D.N.Y. 1984) ....................................................68, 76n

*Career Placement of White Plains, Inc.* v. *Vaus*,
354 N.Y.S.2d 764 (Sup. Ct. 1974) ..........................................................75

*Cont'l Grp., Inc.* v. *Kinsley*,
422 F. Supp. 838 (D. Conn. 1976) (Newman, J.) ......................................49

*Cresswell* v. *Prudential-Bache Sec. Inc.*,
105 F.R.D. 64 (S.D.N.Y. 1985) ..............................................................73n

*Digital Equip. Corp.* v. *Sys. Indus., Inc.*,
108 F.R.D. 742 (D. Mass. 1986) .............................................................73n

*DoubleClick, Inc.* v. *Henderson*,
No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997) ...................69, 76n

*Estee Lauder Cos., Inc.* v. *Batra*,
430 F. Supp. 2d 158 (S.D.N.Y. 2006) .................................................. *passim*

*Gates Rubber Co.* v. *Bando Chem. Indus., Ltd.*,
9 F.3d 823 (10th Cir. 1993) ....................................................................60

*Global Switching Inc.* v. *Kasper*,
No. 06 Civ. 06 412, 2006 WL 1800001 (E.D.N.Y. Jun. 28, 2006) ......................63

*HMS Holdings Corp.* v. *Arendt*,
No. A754/2014, 2015 WL 4366681 (N.Y. Sup. Ct. July 14, 2015) ......................60

*Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) ..................................................................60

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

*IDG USA, LLC* v. *Schupp*,
No. 10 Civ. 76, 2010 WL 3260046 (W.D.N.Y. Aug. 18, 2010)...............65n, 69, 76n

*Ikon Office Sols., Inc.* v. *Usherwood Office Tech., Inc.*,
No. 9202–08, 2008 WL 5206291 (N.Y. Sup. Ct. Dec. 12, 2008)..........................65n

*Int'l Bus. Machs. Corp.* v. *Papermaster*,
No. 08 Civ. 9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ................................... *passim*

*International Business Machines Corp.* v. *Visentin*,
No. 11 Civ. 399, 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011) ....................58, 71, 72

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................64, 69, 76n

*Lumex, Inc.* v. *Highsmith*,
919 F. Supp. 624 (E.D.N.Y. 1996) ................................................................. *passim*

*Marcam Corp.* v. *Orchard*,
885 F. Supp. 294 (D. Mass. 1995) ...........................................................................55

*Marsh USA Inc.* v. *Karasaki*,
No. 08 Civ. 4195, 2008 WL 4778239 (S.D.N.Y. Oct. 31, 2008) ............68, 69, 76n

*Mendell In Behalf of Viacom, Inc.* v. *Gollust*,
909 F.2d 724 (2d Cir. 1990)....................................................................................73n

*Mister Softee, Inc.* v. *Tsirkos*,
No. 14 Civ. 1975, 2014 WL 2535114 (S.D.N.Y. June 5, 2014)..............................75

*Misys Int'l Banking Sys., Inc.* v. *TwoFour Sys., LLC*,
6 Misc. 3d 1004(A), 2004 WL 3058144 (N.Y. Sup. Ct. Nov. 23, 2004) ..................69, 75, 76n

*N. Atl. Instruments, Inc.* v. *Haber*,
188 F.3d 38 (2d Cir. 1999)........................................................................................65

*Nat'l Polymer Prods., Inc.* v. *Borg-Warner Corp.*,
641 F.2d 418 (6th Cir. 1981) ...................................................................................60

*Natsource LLC* v. *Paribello*,
151 F. Supp. 2d 465 (S.D.N.Y. 2001).......................................................................73

*Payment Alliance Intern., Inc.* v. *Ferreira*,
530 F. Supp. 2d 477 (S.D.N.Y. 2007)................................................................. *passim*

*PepsiCo, Inc.* v. *Redmond*,
54 F.3d 1262 (7th Cir. 1995) ...................................................................................55

*Pure Power Boot Camp, Inc.* v. *Warrior Fitness Boot Camp, LLC,*
   813 F. Supp. 2d 489 (S.D.N.Y. 2011)...................................................................76n

*Rayfield Aviation, LLC* v. *Lyon Aviation, Inc.,*
   No. 11 Civ. 274, 2012 WL 3095332 (M.D.N.C. July 30, 2012) ..........................73n

*Rhone-Poulenc Rorer Inc.* v. *Home Indem. Co.,*
   No. 88 Civ. 9752, 1991 WL 183842 (E.D. Pa. Sept. 16, 1991)............................73n

*Spinal Dimensions, Inc.* v. *Chepenuk,*
   847 N.Y.S.2d 905, 2007 WL 2296503 (Sup. Ct. Aug. 9, 2007).....................69, 76n

*Ticor Title Ins. Co.* v. *Cohen,*
   173 F.3d 63 (2d Cir. 1999)..........................................................................65, 65n, 66

*Tom Doherty Assocs., Inc.* v. *Saban Entm't, Inc.,*
   60 F.3d 27 (2d Cir. 1995)........................................................................................63

*USI Ins. Servs. LLC* v. *Miner,*
   801 F. Supp. 2d 175 (S.D.N.Y. 2011).....................................................66, 68, 76n

*Verizon Commc'ns, Inc.* v. *Pizzirani,*
   462 F. Supp. 2d 648, 659 (E.D. Pa. 2006) ...........................................................55

*Wal-Mart Stores, Inc.* v. *Mullany,*
   C.A. No. 6040-VCL (Del. Ch. Dec. 15, 2010) ......................................................55

*Youtie* v. *Macy's Retail Holding, Inc.,*
   653 F. Supp. 2d 612 (E.D. Pa. 2009) ...................................................................54

## INTRODUCTION

In exchange for millions of dollars in compensation as one of IBM's highest ranking executives, Defendant Jeff Smith committed to IBM that he would not, without waiting 12 months, take a position with a competitor that would risk disclosure of IBM's confidential information. The following facts are supported by a preponderance of the evidence and are more than sufficient grounds to grant IBM's motion for a preliminary injunction to prohibit Smith from commencing employment as an executive of AWS during the remaining eight months of his noncompetition and non-solicitation agreements:

1.      IBM and AWS are direct competitors in Cloud Computing.  All AWS does, in fact, is Cloud Computing.

2.      Jeff Smith was one of the highest-ranking executives of IBM before his resignation in May 2017, and has direct knowledge of IBM's secret product development plans ███████████████████████████████████████.

3.      As the Chief Information Officer of IBM and member of IBM's senior-executive ████████████, Smith had responsibilities for, and knowledge of confidential information relating to, IBM's next generation Cloud infrastructure (code named "Project Genesis") and IBM's software marketplace, developer tools, managed services and migration services for IBM's current Cloud and its yet-to-be-released Cloud, ███████████████ ████████████████.

4.      While an IBM executive, Smith ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████.  When he resigned, he wiped the data from his personal electronic (IBM-issued) devices ████████████████ ████████████████.

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

5.     While an IBM executive, and unbeknownst to IBM, Smith carried on a three-year secret email correspondence with the CEO of AWS (Andrew Jassy) about, among other things, Smith's inside-IBM views of IBM's Cloud business and software marketplace, ███ ███████████████████. In his messages to Jassy, Smith also:

- Disclosed internal discussions and decisions by IBM's CEO and senior management regarding ████████████████████████████.

- Shared internal IBM email exchanges among senior IBM executives about IBM's Cloud computing business.

- Reported on Smith's lobbying efforts within IBM to persuade IBM to ██████ ████████████████████████████████████████████████ ██████.

- Identified client opportunities for AWS to pursue for Cloud business in lieu of IBM.

- Denigrated IBM's Cloud products and services ████████████.

- Disparaged IBM's senior management as ███████████████████ ██████████.

6.     During the period of Smith's employment as a senior IBM executive, Smith ingratiated himself to Jassy with private emails ████████████████, while Jassy ████████████████████████████████████ ████████████████.

7.     By November 2016, Smith declared to Jassy his intention to quit IBM and to consider Jassy's offer to pursue a high-level position at AWS, ███████████████ ████. Rather than excusing himself from IBM's executive strategy sessions about competing

2

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

against AWS, Smith continued to participate and, in December 2016, specifically requested a copy of IBM's latest plans for its new (and unreleased) Cloud infrastructure ██████████ ██████ .

        8.     Despite claiming not to remember any of the trade secrets about the next generation Cloud infrastructure IBM ████████████████████ , Smith admittedly remembers extensive details about the very same ██████████ meetings where Project Genesis was discussed (October and December 2016), and other details about different IBM meetings that took place as much as 16 months ago (April 2016).

        9.     Contrary to assertions in Court that AWS created for Smith a "very scoped role" in a "narrow area of Cloud services," Jassy admitted that ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ Rather than having mere ministerial duties, Smith will be invited to participate with all of Jassy's direct reports and Vice Presidents in regular executive strategy sessions and planning meetings regarding all aspects of AWS's Cloud operations (its only business), including discussions about pricing and marketing. Smith will also supervise several thousand AWS employees in areas of AWS that compete directly with IBM.

       10.    The areas of AWS's Cloud business for which Smith will be responsible (if not enjoined) have not been narrowed to three discrete areas in light of IBM's objections, but actually expanded to at least five: Global Marketplace; Developer Tools; Global Support and Managed Services; Migration Services; and Service Catalogue. IBM competes against AWS in all five, and Smith possesses confidential IBM information in all five.

3

<strong>SUBMITTED UNDER SEAL<br>CONTAINS CONFIDENTIAL<br>INFORMATION</strong>

11.     Before being permitted to start at AWS even in a limited "listen and learn" mode on August 7, 2017, Smith referred to AWS at least two IBM customer opportunities, in direct breach of his non-solicitation agreement with IBM.

12.     AWS has █████████████████████████████████████████████████████████████████████. As Jassy admitted, if Smith chooses to tell him confidential information, ███████████████████████

In sum, Smith is switching sides in the competition between IBM and AWS knowing ████████████████████████. Those trade secrets include ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████. Given the direct competition between IBM and AWS, the overlap in Smith's executive responsibilities, and Smith's demonstrated disloyalty, dishonesty and disregard for IBM's interests and confidences, it is likely inevitable that he will make use of IBM's trade secrets (inadvertently or not) if he becomes an executive of AWS.

Smith already was conducting a secret three-year discussion with the CEO of AWS about IBM's Cloud and its software marketplace—and that was *while* Smith was an IBM senior executive and *before* he became an AWS executive. If he is allowed to join Jassy in the executive suite of AWS now, before the expiration of his noncompetition agreement, there is no reason to believe or trust that discussions about IBM's current and future (and still secret) Cloud will not continue. On the contrary, these facts demonstrate that Smith was not before, and will not now become, a trustworthy guardian of IBM's trade secrets and confidential information. The risk to IBM of disclosure or misuse of those secrets at AWS—including IBM's product

4

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

development plans and strategies for competing against AWS—is too great, and the burden on Smith of having to honor his noncompetition agreement is too small, to permit Smith to start as an executive of AWS during the remaining eight months of that agreement.

## IBM'S PROPOSED FINDINGS OF FACT

### A.    IBM

1.    International Business Machines Corporation ("IBM" or the "Company") is a leading technology company, with more than 380,000 employees worldwide. (Declaration of Arvind Krishna ("Krishna Decl."), Aug. 12, 2017, at ¶ 2.)

2.    IBM is a global business that offers information technology products and services to a wide range of business, public sector and individual customers. (*Id.* ¶ 11.) The Company's offerings include products in the "Cloud Computing" industry. (*Id.* ¶ 12.)

3.    Cloud Computing is the delivery of on-demand computing resources—everything from computing functions, to software and applications, to data storage—over the internet on a pay-for-use basis. (*Id.* ¶ 13.) Cloud Computing enables individuals and businesses to access, store and use data and software via the internet on computer servers owned or managed by third-party "Cloud" service providers—such as IBM, AWS, and Microsoft—and pay for that service based on usage, like a metered utility or on-demand television. (*Id.*) Rather than devoting real estate and employees to accomplishing these tasks in-house ("on premises"), a business often will move data and computing functions (*e.g.*, processing employee time sheets for payroll purposes) to the Cloud, use Cloud-based software to manage its data and computing functions, and run applications on the Cloud to analyze the data. (Declaration of John Considine ("Considine Decl."), Aug. 11, 2017, at ¶ 11; Krishna Decl. ¶ 13.)

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

**B.     AWS**

4.     Amazon Web Services ("AWS") is a Cloud Computing company, and is among the leading providers of Cloud Computing. (Declaration of Andrew Jassy ("Jassy Decl."), Aug. 8, 2017, at ¶ 3; Preliminary Injunction Hearing Transcript ("PI Tr."), Aug. 21 & 24, 2017, at 240:25–41:2; *id.* 250:11–13.) AWS is a subsidiary of Amazon, the online retailer. (Jassy Decl. ¶ 1.) ███████████████████████████████████████████. (Deposition Transcript of Andrew Jassy ("Jassy Tr."), Aug. 9, 2017, at 70:22–71:4.)

5.     IBM and AWS are direct competitors in the Cloud Computing market. (Krishna Decl. ¶¶ 57–64; Considine Decl. ¶ 14.) AWS's CEO acknowledged that █████████ ███, (Jassy Tr. 109:8–16), and identified IBM as ██████████████████ ████████████████. (*Id.* 152:12–23.) Smith's expert witness, Bernard Golden, also acknowledged that ███████████████████████████████████ ████████████████████. (PI Tr. 179:15–80:18; *see generally* Plaintiff's Exhibit ("P's Ex.") 1.) And, in both internal documents and public filings with the SEC and other government agencies, IBM tracks the performance of AWS, and benchmarks its own performance against AWS. (Krishna Decl. ¶¶ 58, 62, Ex. G, at 29, Ex. H, at 8–11, Ex. I, at 13, Ex. J, at 3.)

6.     Industry reports and analyses also identify IBM and AWS as among the top competitors in Cloud Computing. A recent market analysis categorized six companies as being among the "leaders" and "visionaries" in the Cloud Computing market, including AWS and IBM, along with Microsoft, Google, Alibaba and Oracle. (Krishna Decl. Ex. A, at 12.) Another report listed both IBM and AWS as among the top competitors in Cloud, noting that "IBM continues to lead in hosted private cloud." (*Id.* ¶ 57 n.1.) And *Forbes* recently reported that, "IBM Beats Amazon" in the "Cloud Wars," making IBM the first enterprise technology provider to surpass $15 billion in Cloud revenue for a twelve-month period. (*Id.* ¶ 57 n.2.)

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

7.    IBM and AWS compete with each other by marketing new services in data, analytics, software and applications, artificial intelligence and other computing functions for the Cloud, in an attempt to gain a greater market share.  (*Id.* ¶¶ 57, 60; *see also* PI Tr. 249:14–17

( ███████████████████████████████████████████████

███████████████████████████████████ ).)  Many large "enterprise" customers, such as banks and insurance companies, have long constituted IBM's customer base because of IBM's historical market leadership in computer mainframes, servers and storage. (Krishna Decl. ¶ 60.) ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ . (*Id.*) ██████████████████████████

████████████████████████████████████████████ . (*Id.*)

## C.    IBM Is Developing a "Next Generation" Cloud ██████████████████

8.    For ████████████ , IBM has been working to develop a suite of new Cloud Computing products and services, collectively known as IBM's "next generation" Cloud, and code named internally as "Project Genesis."  (*Id.* ¶¶ 35–36, 39.)  Project Genesis represents IBM's effort to ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ . (Considine Decl. ¶ 18.)  Where businesses once were satisfied with combinations of Cloud Computing products and services that took some time to build in order to run applications and manage data for long periods of time (six months to a year, for example), even large businesses now desire ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ . (*Id.*)

7

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

9.      For example, at the close of a fiscal quarter, a company's accounting office will require access to large amounts of data and will need to extract and analyze that data far more than in the course of an ordinary business day. (*Id.* ¶ 19.) IBM's next generation Cloud is designed to ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████. (*Id.*) This is intended to make IBM's next generation Cloud ███████████████████████████████ ██████████████████████████. (*Id.*)

10.     Project Genesis aims to accomplish this through ██████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████. (Krishna Decl. ¶ 38.) Project Genesis is intended to ████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████. (*Id*; *see* PI Tr. 91:21–92:7 (████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████); *id.* 146:3–7) (███████████████████████████████████████████████████████████████ ████████████████████████████████).) IBM expects to be ████████████████ ██████████████████████████████. (Krishna Decl. ¶ 38.)

11.     The enhanced features and new offerings that Project Genesis aims to provide IBM's next generation Cloud are ███████████████████████████████. These include ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.

8

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



▮▮▮▮▮▮▮▮▮▮▮. (Considine Decl. ¶ 20.) IBM also expects to provide customers with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. (*Id.*; *see also* PI Tr. 90:4–9 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).)

12.    IBM's competitors and industry analysts are closely watching IBM's next moves in Cloud Computing. (Krishna Decl. ¶ 39.) In June 2017, for example, a report from one technology analyst stated that "IBM is in the midst of a 'Next-Generation Infrastructure (NGI)' engineering project, but it has not announced a release date." (*Id.* Ex. A, at 22.) That IBM is developing a next generation Cloud is not secret, but what that technology is, how it works, what it costs and when it will be launched is closely guarded IBM confidential information. (*Id.* ¶ 39.)

13.    The development of IBM's next generation Cloud is supported by two additional, highly confidential product development projects. (*Id.* ¶¶ 48–49.) Project Athena is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 48.) It includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮. (*Id.*) The features of IBM's next generation Cloud that will be provided as a result of Project Athena will ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*)

14.    Project Armada is IBM's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 49.)

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

███████████████. (*Id.*) This new feature will give IBM customers ████████
████████████████████████████. (*Id.* ¶ 50.)

15.    IBM closely guards the launch plans for Projects Genesis, Athena and Armada, to ████████████████████████████████████
██████████████████. (*Id.* ¶ 51.) IBM anticipates introducing Project Genesis and Project Athena ████████████████████████. (*Id.*) IBM anticipates launching Project Armada ████████████████. (*Id.*)

16.    ████████████████████████████████████
████████████████████████████████
████████████████████████████████. (*Id.* ¶ 52.) Having advance knowledge of Projects Genesis, Athena or Armada would ███████████
████████████████████████████████████
████████████████████████████████
██████████████████████████. (*Id.*; *see also, e.g.*, PI Tr. 90:25–91:12 (████████████████████████████████
████████████████████████████████████
████████████████████).)

17.    AWS and other Cloud Computing competitors may develop offerings designed as alternatives or competitors to the products and services associated with Projects Genesis, Athena and Armada. (Krishna Decl. ¶ 53.) For example, the launch of Project Athena may cause other Cloud Computing competitors, such as AWS, to develop ████████
██████████████████. (*Id.*) A competitor could develop such an offering
████████████████████████████████████



10

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

█████████████████████████████████████████████

██████████████████████ . (*Id.*; *see also, e.g.*, PI Tr. 90:10–16 (████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████ ).) That information would be

highly valuable to a competitor, and particularly to AWS. (Considine Decl. ¶ 27; *see also, e.g.*,

PI Tr. 90:23–91:4 (███████████████████████████████████████

████████████████████████████ ).)

### D.    Defendant Jeff Smith's Role as a Senior Executive and CIO of IBM

18.    Jeff Smith was a senior executive and officer of IBM from June 2014

through his resignation on May 2, 2017. (Krishna Decl. ¶¶ 2, 17.) Smith's title was Chief

Information Officer ("CIO"), Transformation and Operations. (*Id.* ¶ 2; PI Tr. 241:6–7.) In this

capacity, Smith was one of the top 65 most-senior executives at IBM. (Krishna Decl. ¶ 2.)

19.    As IBM's CIO, Smith was a member of the ███████████████ , which is a

senior executive group that determines IBM's technology strategies. (PI Tr. 254:16–18; Krishna

Decl. ¶¶ 23, 31–32.) It is limited to 15 members, plus the CEO, and is chaired by the Director of

Research for IBM. (Krishna Decl. ¶¶ 1, 31.) It includes the Senior Vice Presidents of IBM

Cloud and Cognitive Solutions and IBM Research; the lead engineer for IBM's Watson group;

the lead architect for IBM's Cloud Computing strategies; the product head for IBM's integration

software business; and the product head for IBM's public Cloud Computing data platform.

(*Id.* ¶ 31.) The ████████████ meets approximately six times per year to discuss new

products in development, to decide what technologies and platforms IBM will launch, and to

discuss IBM's technological strengths and competitive strategies vis-à-vis its competition. (*Id.*)

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

20. ▓▓▓▓▓▓▓ materials at IBM are restricted to a very small number of people within the Company, comprising ▓▓▓▓▓▓▓ members and their Senior Vice Presidents, their assistants, their Executive Assistants and IBM's Corporate Technology team. (*Id.* ¶ 33.) IBM informed ▓▓▓▓▓▓▓ members in 2016, and reminded them in 2017, that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓. (*Id.*) In addition, because members of the ▓▓▓▓▓▓▓ receive sensitive trade ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓. (*Id.*)

21. Smith regularly attended ▓▓▓▓▓▓ meetings, and was an active participant. (*Id.* ¶ 32; PI Tr. 94:9–18 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).) Smith received and reviewed competitively sensitive IBM confidential information, including information regarding competitive products that IBM has not yet launched or publicly announced. (Krishna Decl. ¶ 32.)

22. Smith was also a member of IBM's ▓▓▓▓▓▓▓ (PI Tr. 253:17–18), a senior-level committee comprised of a select number of executives at the highest levels of IBM's corporate leadership, including the fifteen Senior Vice Presidents collectively responsible for running all of IBM's business lines, and the top geographic and industry leaders from around the globe. (Krishna Decl. ¶¶ 28–29.) Smith became a member of the ▓▓▓▓▓▓▓ not merely by virtue of his role as IBM's CIO, but also because of his unique role in developing Company-wide strategies and pursuing customer opportunities. (*Id.* ¶ 29.) Prior to Smith, only one IBM CIO had participated in the ▓▓▓▓▓▓▓; the current CIO (Smith's replacement) is not a member of the ▓▓▓▓▓▓▓. (*Id.*)

12

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

23.     Of IBM's 380,000 employees, only approximately 65 senior executives are members of the ███████████ . (*Id.* ¶ 30.) In-person attendance at the ███████████ quarterly meetings is mandatory. (*Id.*) The ███████████ meets in person at IBM's headquarters once each quarter to discuss the Company's competitive strategies, operational performance, financial targets, product development and launch plans, and all other major corporate topics. (*Id.*) As a member of the ███████████ and participant in the quarterly meetings with IBM's senior officers, Smith was privy to the Company's most sensitive business secrets and confidential information, including discussions about ███████████ ████████████████████████ . (*Id.*) This included a detailed presentation in October 2016, during which the ████████████████████████████████ ███████████████████████████████████████████ . (PI Tr. 290:16–92:5.) Smith separately acknowledged that being a member of the ███████████ at IBM is ███████████ (*Id.* 254:2–4.)

24.     In addition, as CIO, Smith was responsible for devising and implementing IBM's competitive and proprietary strategies concerning developer tools, corporate data security and cultural transformation. (Krishna Decl. ¶ 19.) In this role, Smith used IBM's cloud platform and, from time to time, ████████████████████████████ . (PI Tr. 252:19–25.) According to IBM's head of research, as CIO Smith ███████████ ████████████████████████████████████ ████████████████████████████████ (*Id.* 94:25–95:5; *see also* *id.* 126:1–7; *id.* 127:17–21.) In addition, as CIO, Smith's department was ███████████ ████████████████████████████████ . (*Id.* 97:11–98:22.)

13

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

Smith further acknowledged that ███████████████████████████████████████

███████████████████████████████████████████ (*Id.* 253:1–4.)

25.     In addition, in the 18 months before his departure from IBM, Smith met

with over 200 customers or partners. (Krishna Decl. ¶ 25.) Through this role, Smith marketed

IBM business across all of its product lines. (*Id.*) And, Smith developed close relationships with

many important IBM customers and partners in his role as IBM's CIO. (*Id.*)

**E.     Smith's Noncompetition and Non-Solicitation Agreement with IBM**

26.     On June 7, 2014, shortly after joining IBM, Smith executed a

Noncompetition Agreement with the Company, ████████████████████████████

██████████████. (PI Tr. 246:3–14.) In his two-and-a-half years at IBM, Smith received ████

███████████████████████████████████████████████████████████

███████████████████████████████. (P's Ex. 3, at 13293–94; P's Ex. 4.)

27.     In that agreement, Smith acknowledged and agreed that "the business in

which [IBM] is engaged is intensely competitive," and that, in his role as a senior executive and

the Chief Information Officer, his employment at IBM would require that he "have access to,

and knowledge of, IBM Confidential Information." (P's Ex. 5, § 1(c).)

28.     Smith further agreed that, for twelve months following termination of his

employment with the Company, he

> will not directly or indirectly within the "Restricted Area" "Engage in or
> Associate with" (a) any "Business Enterprise" or (b) any competitor of the
> Company, if performing the duties and responsibilities of such engagement or
> association could result in [his] intentionally or unintentionally using, disclosing,
> or relying upon IBM Confidential Information to which [he] had access by virtue
> of [his] job duties or other responsibilities with IBM.

(*Id.* §§ 1(e)(i), 1(e)(ii).) "Restricted Area" is "any geographic area in the world in which [Smith]

worked or for which [he] had job responsibilities, including supervisory responsibilities, during

14

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

the last twelve (12) months of [his] employment with IBM." (*Id.* § 2(f).) "Business Enterprise" means "any entity that engages in, or owns or controls an interest in any entity that engages in, competition with any business unit or division of the Company in which [he] worked at any time during the three (3) year period prior to the termination of [his] employment." (*Id.* § 2(a).)

29.    The Noncompetition Agreement protects all "IBM Confidential Information," including all "global strategic plans, marketing plans, information regarding long-term business opportunities, and information regarding the development status of specific Company products, as well as extensive assessments of the global competitive landscape of the industries in which the Company competes" and other sensitive business information and trade secrets. (*Id.* § 1(b).) ███████████████████████████████
████████████████████████████████. (PI Tr. 144:18–24.)

30.    As part of the Noncompetition Agreement, Smith agreed and acknowledged that IBM "would suffer irreparable harm if [he failed] to comply with [the noncompetition and the nonsolicitation covenants]," and that "the restrictions set forth in [the covenants] are reasonable as to geography, scope and duration." (P's Ex. 5, § 3.)

31.    Smith also agreed not to solicit business for a competitor of IBM for the twelve months after his departure from the Company. In his Noncompetition Agreement, Smith acknowledged and agreed that he "will not directly or indirectly solicit, for competitive business purposes, any customer of the Company with which [Smith was] directly or indirectly involved as part of [his] job responsibilities during the last twelve (12) months of [his] employment with IBM." (*Id.* § 1(e)(ii).)

32.    In addition, as part of IBM's long-term incentive program, Smith agreed that "for one year following the termination of [his] employment for any reason, [he] will not

15

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

directly or indirectly, solicit, for competitive business purposes, any customer of the Company with which [he was] involved as part of [his] job responsibilities during the last year of [his] employment with the Company." (Amended Complaint, Aug. 18, 2017, Ex. C, at 5.)

### F. Smith's Direct Knowledge of IBM's Next Generation Cloud (Project Genesis)

33. Smith is in possession of significant IBM trade secrets regarding Project Genesis, the Company's next generation Cloud, which ████████████████████ ████████████████. Project Genesis is designed to ████████████████ ████████████████████████████████████████ ████████████████████. (Considine Decl. ¶ 20; PI Tr. 71:1–72:10.) It is also projected to ████████████████████. (Considine Decl. ¶ 21.) IBM ████████ ████████████████████████████████████████ ████████. Smith knows how Project Genesis will ████████████████ ████████████████████████████████. (*See* Krishna Decl. Ex. B.)

34. Highly confidential presentations that Smith received, reviewed, requested and shared include IBM's ████████████████████████ ████████████████████████████████████ ████████████████████. (P's Ex. 7, at 2422; P's Ex. 15, at 7164; PI Tr. 289:17–90:4.) ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████. (Considine Decl. ¶ 20.) Smith acknowledged that ████████████ ████████ (PI Tr. 256:22–24; *id.* 298:22–25.)

35. Smith participated in a ████████████ meeting on October 19, 2016 devoted exclusively to ████████████████████████████

16

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

███ . (PI Tr. 256:5–15; *id.* 280:10–12; *id.* 289:4–6.) As described in the meeting agenda (originally scheduled for September 8, 2016), that presentation provided ███████

████████████████████████████████████████

████████████████████████████████ (P's Ex. 6, at 2443.)

36.     Smith took a keen interest in this ███████ presentation: He reviewed the materials in advance, (PI Tr. 289:24–90:4), and wrote to his immediate superior (IBM Senior Vice President James Kavanaugh) to say ████████████

████████████████████████████████████

████████████████████████████████ (P's Ex. 12, at 2858.) Smith was ███████████████████████████████

████████████████████ (PI Tr. 94:9–18.)

37.     The IBM trade secrets about Project Genesis that were disclosed and discussed at the ███████ meetings in October and December 2016, both of which Smith attended and participated in, include:

- ███████████████████████████ .
  (Krishna Decl. Ex. B, at 7.)

- █████████████████████████████ (*Id.*)

- ███████████████████████ (*Id.* at 11.)

- ██████████████████████████████ . (*Id.*)

- ████████████████ . (*Id.* Ex. C. at 23.)

17

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

- ███████████████████████████████████████████
  ████████████████. (*Id.* Ex. B, at 70.)
- ████████████████████████████████████████. (*Id.*
  at 69.)

38.    The following chart, which was presented to Smith for the ██████████
████ meeting in October 2016 shows ██████████████████████████:



(Krishna Decl. Ex. B, at 75.) This chart specifies ███████████████████████
███████████████████████. (PI Tr. 70:20–25.) IBM considers that information
to be a key trade secret. (*Id.* 102:2–7.) Another chart shown during the October ██████████
████ meeting illustrates ██████████████████████████████:

18

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



(Krishna Decl. Ex. B, at 69.) IBM plans to ███████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████. (*Id.*; PI Tr. 142:9–24.) This aspect
of Project Genesis was discussed in detail in the █████████████ meetings Smith attended.
(*Id.* 67:10–12; *id.* 144:9–14.)

      39.    The above chart also specifies ██████████████████████
███████████████. And, by virtue of having reviewed this material, Smith knows ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████. (Considine Decl. ¶ 21.)

      40.    Another significant improvement IBM expects Project Genesis to feature at
launch ██████████████████████████████████████. (PI Tr. 145:1–47:2.) ████████
████████████████████████████████████████████████████████████████
████████████████████████████████████. (*Id.*) ███████████████████

19

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

██████████████████████████████████████████

██████████████ (*Id.* 146:22–47:2.) IBM also expects Project Genesis to feature ██████

████████████████████████. (*Id.* 62:3-6.)

     41.    The ████████ associated with Project Genesis could also ████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████. (Considine Decl. ¶ 22.) This ████

████████ is a closely guarded IBM secret. (*Id.*; PI Tr. 68:9-15.) As this and other internal

IBM documents that Smith reviewed show, IBM is ████████████████████████

██████████████████████████████████████

████████████████████████████. (*Id.* 71:1–7.)

     42.    AWS's CEO admitted that Amazon's cost for its Cloud services is

████████████████████████ (Jassy Tr. 127:6–13), and acknowledged that he might ██

██████████████████████████████████████

████████████████████████ (*Id.* 154:13–55:2.) Even if the ████

████████ were one year old, AWS's CEO agreed that ████████████████████

████████████████████████ (*Id.* 33:18–25.)

     43.    John Considine, the architect of Project Genesis at IBM, presented an

update to the ████████████ in December 2016 ████████████. (PI Tr. 295:24–96:6; *id.*

300:10–15.) The December 2016 ████████████ meeting involved much of the same

confidential information ████████████████████████████:

20

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



(Krishna Decl. Ex. C, at 21.) Smith specifically requested that █████████████ ████████████████████████████████████████. (PI Tr. 296:19–97:20.) Smith testified that █████████████████████████████████████████████████████ █████████████████████████. (*Id.* 297:11–13.) He also recalled discussions about certain features of interest to Smith, such as █████████████████████████████████ ████████████████████████████████████. (*Id.* 419:25–20:24; *id.* 473:14–20.)

44. Moreover, the above chart from the December 2016 presentation that Smith reviewed shows that ██████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████. IBM expects that ████████ ████████████████████████████████████████████████████ █████████████████████████████. (*Id.* 89:24–90:3.) While IBM has publicly disclosed the projected Project Genesis networking speed of connections *between* the servers (600 gigabits per second, made up of six connections at 100 gigabits per second each), IBM has █████████████████████████████████████████████████ █████████████████████████████████. (*Id.* 145:5–46:7.)

21

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

45.    In another ███████ that Smith reviewed, the ████████████

presentation shows ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ :



(Krishna Decl. Ex. B, at 7.)  In the above chart, IBM ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████ . (Considine Decl. ¶ 23.)

46.    IBM uses ████████████████████████████████████

█████████████████████████████████████████████████████ .

(PI Tr. 71:1–7; Considine Decl. ¶ 25.)  Because he received and reviewed the material, (*see*

Krishna Decl. Ex. C), Smith was aware of ███████████████████████████

███████████████████████████████████ . (Considine Decl. ¶

25; PI Tr. 144:6-14.)  He also learned ███████████████████████████

█████████████████████████████████████████ .

(Considine Decl. ¶ 25.)  And he was informed of ██████████████████████

22

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

█████████████████████████████████████

█████████████████████████████████████

████████████ :



(Krishna Ex. B, at 11; PI Tr. 72:22–25; *id.* 73:11–74:1.)

47. The information in the presentations that Smith received while at IBM would be highly valuable to a competitor, and particularly to AWS. (Considine Decl. ¶ 27.) For example, ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████
████████████████████████████████████. (*Id.*; PI Tr. 73:23–74:1.)

Smith conceded that ████████████████████████████

23

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



███. (PI Tr. 260:20–61:5; *id*. 280:18–25; *id*. 281:6–20; *id*. 283:6–10; *id*. 284:5–7; *id*. 285:3–7; *id*. 285:24–86:5; *id*. 286:11–20; *id*. 300:25–01:2; *id*. 301:14–19; *id*. 302:17–21.)

48.    In addition to the ████████ presentations, Smith spoke with Considine, the architect of Project Genesis, as part of Smith's role as the decision-maker for what IBM's CIO's office would do with ████████████████████ ████████████████████████████. (Considine Decl. ¶ 13; PI Tr. 126:4–7; *id*. 127:17–24.) In this role, Smith was a customer for IBM's Cloud Computing products and services, and a sounding board for ideas regarding the features, functionality and overall business case for IBM's Cloud Computing products and services in development. (Considine Decl. ¶¶ 12–13.) Smith participated in conversations regarding ████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ███. (*Id*. ¶ 13.)

49.    Smith forwarded highly sensitive material regarding Project Genesis to others within IBM who were not on the ████████, and therefore not privy to the specific details regarding the next generation Cloud. (Krishna Decl. Exs. B–C; PI Tr. 257:5–10.) Smith did so despite knowing that ████████████████████████, and he told the recipients ████████████. (PI Tr. 257:17–22.) One of the recipients responded: ████████████████████████████████████████. (P's Ex. 8.) Smith himself also specifically called out to a colleague ████████████ ████████████████. (Krishna Decl. Ex. B.)

24

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

50. By forwarding these materials, Smith ████████████████████████
████████. Materials sent to the ████████████ were subject to a no-distribution rule.
(*Id.* ¶ 31.) Smith was aware of this rule, too, as he warned recipients █████████████████
████████ (*Id.* Ex. B.) Some of the materials were ████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████ (*Id.* Ex. D.) Smith ████████████
████████████, and also did not forward the instruction ██████████████████████
████████████████████████████████████████████. (PI Tr. 287:3–22.)

### G. Smith's Direct Knowledge of Other IBM Trade Secrets

51. Smith also was exposed to other highly confidential IBM information
through his position on the ████████████ and his role as the Company's CIO.

52. As an initial matter, Smith's role on the ████████████ gave him
access to extremely sensitive financial and strategic information. The ████████████ at IBM
is responsible for setting the Company's competitive strategies, including its plans to compete in
the Cloud market, and with AWS, (Krishna Decl. ¶¶ 28–30), and Smith attended, and received
sensitive information during, the January 2017 ████████████ meeting. (*Id.* ¶ 48.) Smith
also attended a ████████████ meeting concerning ██████████████████████████
████████████████████████████████████. (*See* PI Tr. 290:16–93:13.)
Smith was a regular participant in ████████████ meetings. (Krishna Decl. ¶ 24.)

53. Smith and his team were also responsible for developing and enhancing the
operating systems that support IBM's marketplace of software applications for users of its Cloud.
(*Id.* ¶ 20.) Customers of IBM's Cloud use the marketplace to purchase or "rent" applications for
use on the Cloud, such as applications that help customers organize stored data. (*Id.*) Smith's
team constructed code and operating systems, for example, that ██████████████████████

25

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



. (*Id.*) And, Smith was also aware

of a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, (*id.* ¶ 21), as well as IBM's highly confidential plans to

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮. (*Id.*)

54. In addition, Smith was responsible for an internal effort to ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*

¶ 22.) Smith was closely involved in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

(*Id.*) Following completion of the project, IBM plans to ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮. (*Id.*)

55. Finally, as CIO of IBM, Smith learned about several new products related

to regulatory and compliance technology. These products will assist customers, and, in

particular, large financial institutions, in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.* ¶ 54.) Smith participated in meetings

where these products, which are in development, were discussed. (*Id.*)

### H. Smith's Covert Communications with AWS's CEO While at IBM

56. Despite, and contrary to, his obligations of confidentiality and loyalty as a

senior IBM executive, Smith conducted a secret email correspondence with the CEO of IBM's

main Cloud competitor, Andrew Jassy of AWS, during the entire period of his IBM employment.

Jassy himself recognized that Smith discussed "a lot of stuff about IBM/Ginny [Rommety, IBM

CEO]" that "you could debate whether he should have shared." (P's Ex. 36, at 264.) Smith's

26

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

communications with Jassy were indiscrete, at best, and evidence a disregard for IBM's interests and the confidentiality of IBM's internal discussions and decision-making.

57.     Smith first publicly announced that he was joining IBM in June 2014. Within weeks, Andrew Jassy, the CEO of AWS, contacted Smith through Smith's personal (non-IBM) email to congratulate Smith on his new position at IBM, and to note his surprise that Smith had decided to join IBM. (P's Ex. 19.) Smith and Jassy had worked together at Smith's prior job as the Chief Information Officer of Suncorp, an Australian financial institution. (Jassy Decl. ¶ 5.) When he contacted Smith on July 3, 2014, Jassy told Smith to let him know if Smith ever considered "doing something different" from IBM, telling Smith that it "would be fun to discuss Amazon" as a future destination. (P's Ex. 19.)

58.     Over the next two-and-a-half years, Smith regularly emailed Jassy using his personal gmail account ▮▮▮@gmail.com), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (PI Tr. 306:23–07:10; *id.* 338:17–39:10; P's Ex. 30, at 14728.) Smith also te▮▮▮▮▮▮ ▮▮▮▮. (*Id.* 307:11–13.) The topic most often discussed between Smith and Jassy was Cloud Computing, and Smith's inside-IBM perspective about the quality, direction and strategies for IBM's Cloud. This secret dialogue about Cloud began, as far as the evidence shows, on November 12, 2014, when Smith sent this intelligence report to Jassy from within IBM: ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. (P's Ex. 20.) That comment to Jassy was made after Smith had been at IBM for several months, by which time he had begun to develop his own assessment of IBM's then-current Cloud. (PI Tr. 307:25–08:11.) Smith also informed Jassy that, in Smith's view, ▮▮▮▮▮▮▮▮▮▮. (P's Ex. 20, PI Tr. 310:4–5.)

27

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

59.    In the two years that followed, Smith sent frequent updates to Jassy about IBM's planning and strategies in Cloud—and his internal efforts at IBM to ███████████ ████████████████████████████████████████████████████ :

- In April 2015, Smith wrote to Jassy that ███████████████████████████ ███████████████████████████████████████████ ███████████ (P's Ex. 22.)  He also informed Jassy that ███████████████████████████ (*Id.*)

- In May 2016, Smith and Jassy discussed Smith's ongoing efforts to ███ ███████████████████████████ . (P's Ex. 25.)

- In June 2016, Smith wrote to Jassy that ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████ (P's Ex. 27, at 135.)

- In September 2016, Smith reported to Jassy that ███████████████████ ███████████████████ (P's Ex. 31, at 187.)

- In November 2016, Smith divulged to Jassy that, ███████████████████ ███████████ (P's Ex. 32, at 214.)

60.    Using his personal gmail account, Smith shared with Jassy internal and confidential discussions among IBM's senior executive leadership:

- On June 12, 2016, Smith reported to Jassy that ███████████████████ ███████████████████████████████████████████ (P's Ex. 27, at 135; PI Tr. 331:24–32:5.)

- On June 26, 2016, Smith forwarded to Jassy an email exchange he had with two IBM Senior Vice Presidents about IBM's Cloud. (P's Ex. 29; PI Tr. 336:3–21.)

- On July 20, 2016, Smith informed Jassy that ███████████████████ ███████████████████████████████████ (P's Ex. 31, at 188 (emphasis added); PI Tr. 344:9–21.)

28

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

61.    In addition to privately briefing the CEO of IBM's principal Cloud competitor about IBM's Cloud infrastructure and software, Smith routinely disparaged his fellow IBM executives—including those responsible for IBM's Cloud business.  In November 2014, Smith told Jassy that ███████████████████████ (P's Ex. 20.)  Showing no discretion, and no allegiance to his employer, Smith ████████████████████ ████ (P's Ex. 31, at 187), ███████████████████████████████ ████████████ (P's Ex. 27, at 135), ███████████████████ ████████████████████ (P's Ex. 28.)

62.    For his part, Jassy encouraged Smith's venting, and sought to deepen the relationship between the two men.  Before Smith even started work at IBM, Jassy sought out Smith for a meetup in New York, (P's Ex. 20), and regularly invited Smith to get together thereafter.  (*See, e.g.*, P's Ex. 21.)  And when a dispute arose between IBM and AWS, Jassy enlisted Smith to act covertly on AWS's behalf, emphasizing that he was contacting Smith (via Smith's personal email account) even though the senior leadership at AWS had encouraged Jassy to go directly to the CEO of IBM.  (P's Ex. 28.)  Smith responded by ████████████ ████████████████████████████████████████ ████ .  (*Id.*)

63.    Recognizing that Smith was operating outside the bounds of his duties to IBM, Jassy suggested that Smith keep their exchanges private, rather than use his IBM email to communicate.  (P's Ex. 22.)  Jassy admitted that ████████████████████████ ███████████████████████████ .  (Jassy Tr. 36:13–23.)  After he succeeded in luring Smith to AWS, Jassy told the Chair of Amazon (Jeff Bezos) that ████████ ███████████████████████ (*Id.* 36:10–16.)

29

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

64.    Smith served Jassy as more than just an AWS recruit. Smith became an advocate for AWS's interests inside of IBM. After telling Jassy that ███████████ ████████████████████████████████████████████. (P's Ex. 27, at 135.) In the area of Cloud Computing, in particular, Smith ████████████████████ ████████████████████████, (*id.*), despite knowing that ███████████ ████████████████████████. (P's Ex. 32, at 214.) He ████████████ ███████████████████████████████████████████████████████████ ████████████████████████ (P's Ex. 25.) Smith's stated goal (to Jassy) was to ████ ███████████████████████████████████████████████████████████ ████████████████████████ (P's Ex. 27, at 136.) And Smith kept Jassy regularly informed of his efforts. (*See* P's Ex. 31, at 187 (████████████████████ ███████████████████████████████████████████████ ████████████████████).)

65.    Smith also shared with Jassy nonpublic details about IBM's operations and strategies. Smith, for example, told Jassy of ██████████████████████████ ████████████, and identified for Jassy ██████████████████████████ ████████████████████. (*See, e.g.,* P's Ex. 21.) Smith informed Jassy about particular products that ████████████████████████. (PI Tr. 317:23–25.) Smith also provided Jassy with nonpublic information concerning ████████████████████. (P's Ex. 25.) In one instance, Smith disclosed to Jassy his belief that ████████████████████ ███████████████████████████████████████████. (P's Ex. 31, at 187.)

66.    In addition, Smith frequently shared with Jassy details of internal, highly confidential IBM deliberations. For example, Smith attended a ████████████ meeting with

30

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

the CEO and senior leadership of IBM in 2016, which he admitted ██████████. (PI Tr. 254:10–15.) That meeting included a ██████████████████████████, (P's Ex. 24), and Smith recalled that during the discussions in that meeting ██████████████████████

█████████████████████████████████████████████████████████

██████████████. (PI Tr. 321:21–23:7.) A month later, ████████████████████

██████████████, Smith conveyed the substance of this internal IBM discussion to Jassy using his personal gmail account. (*See* PI Tr. 325:7–12.) Similarly, Smith reported on his conversations with customers concerning ██████████████████████████████

██████████████████████. (P's Ex. 27.)

67. Smith also shared with Jassy highly sensitive information related to IBM's existing and prospective clients. In June 2016, for example, Smith emailed Jassy the day before Smith was scheduled to meet with ██████████████████████████. (P's Ex. 27, at 135.) In his email, Smith explained to Jassy that ████████████████████████

██████████████████████████. (*Id.*) Smith told Jassy that ████████████

██████████████████████████████. (*Id.*; *see* PI Tr. 333:6–9

(███████████████████████████████████████████████████████

████████████████████████████████████████████████████████). )

68. Smith did all of the above, moreover, using ████████████████████

██████████████████████. (PI Tr. 329:11–15.) By doing so, Smith ensured that his covert communications with Jassy remained ██████████████████████████. (*Id.* 330:2–6.) Smith's repeated use of his personal email to communicate █████████████████

██████████████████████████████. (*Id.* 338:17–39:10; P's Ex. 30.)

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

69. When pressed for his justification for sharing internal IBM deliberations and his own negative views of IBM—a company that employed Smith as a senior executive and paid him ███████████, (PI Tr. 320:25–21:4)—Smith had little to say other than ███████ ████████████████████████████████. (*See, e.g., id.* 310:14–20 (████████████████████████████████); *id.* 316:22–24 (██ ████████████████████████████████████ ███); *id.* 317:15–21 (████████████████████████ ███████); *id.* 318:21–22 (███████████████████████████ █████████); *id.* 319:18 –20:1 (██████████████████████ ██████████████████████); *id.* 320:13–18 ███ █████████████████████████████ █████████████████████████████ █████); *id.* 331:7–12 (███████████); *id.* 332:6 –14 (████████ ██████████████████████████ ████████████████████████); *id.* 339:25–40:8 (████████ ████████████████████████ ████); *id.* 340:20–21 (████████████████████ ████████████████████).)

70. After the fact, Jassy acknowledged that the information Smith shared with him during Smith's time as a senior executive of IBM was ████████. He acknowledged that █████████████████████████ (Jassy Tr. 97:13–98:15.) Jassy was also concerned that Smith "talks a lot," and had told Jassy "a lot of stuff" about IBM "that you could debate whether he should have shared." (P's Ex. 36.) Jassy also conceded that █

32

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



. (Jassy Tr. 97:13–99:12.)

71.     Through his covert communications with Jassy during his tenure at IBM, Smith demonstrated that he had little (if any) loyalty to IBM *while he was an IBM executive*, and has proven himself not to be a trustworthy guardian of IBM confidential information. He also exhibited little (if any) recognition that his communications with Jassy were wrong or inappropriate, repeatedly ██████████████████████████████████████████████ ██████████████████████████. (*See, e.g.*, PI Tr. 311:9–11 (████████ ████████████████████████); *id*. 318:10–20 (████████████████ ██████████████████████████████████); *id*. 320:13–18 (███ ██████████████████████████████); *id*. 330:23–31:6 (█ ██████████████████████); *id*. 335:13–17 (████████████ ████████████); *id* 340:5–9 (██████████████████████████ ██████); *id*. 341:5–10 (████████████████████████████ ██████████) (emphasis added throughout).) While Smith may, in fact, have been frustrated at IBM, disclosing IBM's internal and confidential discussions, debates and decisions regarding the IBM's Cloud strategy and direction evidences that he cannot be depended upon to safeguard IBM's confidential information and trade secrets.

I.     **Smith's Resignation from IBM to Join AWS**

72.     In October 2016, Smith attended a ██████████████ meeting for an in-depth presentation about ██████████████████████████████████ ██████████████████████████. (*Id*. 256:5–15; *id*. 280:10–12.) The next month, Smith wrote to Jassy to tell him that he had decided to leave IBM, citing his inability "to

33

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

move the needle in IBM's strategy." (P's Ex. 32, at 214.) Smith explained to Jassy that █████

███████████████████████████████████████████████████████████

███████████████████████████████████ (*Id.*)

73.    Jassy wrote back on November 18, 2016 to offer to help Smith find a new job, and to ask if Smith had any interest in AWS. (*Id.* at 213) The next morning, Smith responded that he would be "interested in exploring Amazon." (*Id.*; PI Tr. 347:4–15.)

74.    Though he decided in November 2016 to leave IBM, and though he had privately expressed to Jassy his interest in joining AWS, IBM's direct competitor ████████

██████████, Smith did not stop ████████████████████████████████████

█████████████████████████████. (PI Tr. 347:24–48:8.) To the contrary, he retained a copy of the September 2016 Project Genesis plans and specifications, which had been presented on October 19, 2016, contrary to explicit instructions. *See supra*. Then:

- On November 18, 2016, Jassy asked Smith if he might have an interest in joining AWS. (P's Ex. 32. at 213.)

- On November 19, 2016, Smith wrote back that he would be interested in exploring a role at AWS. (*Id.*)

- On December 8, 2016, Jassy emailed Smith: "Great, let's explore it." (*Id.*)

- Two hours later, at 12:59pm on December 8. 2016, Smith wrote to Jassy that he would be available to meet. (*Id.* at 212)

- Two hours after that, at 3:07pm on December 8, 2016, Smith emailed John Considine, the architect of Project Genesis, to █████████████████████████
  ████████████████████████████ (Krishna Decl. Ex. C; *see also* PI Tr.
  299:24–300:2 (██████████████████████████████████████████
  ████████████████████████).)

75.    Smith continued to attend senior IBM executive sessions over the ensuing months, and received further updates on Project Genesis and presentations about Project Athena

34

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

and other highly sensitive IBM developments. (Krishna Decl. ¶ 48.) At no time prior to March 2017 did Smith inform his supervisors at IBM that he had decided to leave. or that he was exploring a senior position at AWS ████████████████████████.

      76.    In January 2017, Smith ████████████████████████. (PI Tr. 349:2–3.) Smith ████████████████████████████████████. (*Id.* 349:16–52:14; P's Ex. 34.) And, ████████████████████████████████



████████████████████████████ (P's Ex. 33, at 373.)

      77.    By the next month, AWS had decided to offer Smith a position. On March 28, 2017, Smith ████████████████████████. (PI Tr. 210:1–3.) Smith told IBM that his new role would be as a Vice President of AWS. Smith resigned from IBM on May 2, 2017 without, however, telling IBM that he intended to accept a position at AWS. (*Id.* 391:10–14.) Smith could have found other employment: When he first told Jassy he intended to leave IBM, Smith stated that he ████████████████████████████████████████████████. (PI Tr. 390:3–17.)

      78.    In the course of his negotiations with AWS, Smith falsely represented to AWS that ████████████████████████████████████████████. (P's Ex. 35, at 382.) That was not true. (PI Tr. 354:9–55:23.) Smith's compensation when he began at IBM consisted ████████████████████, (*id.* 242:3–5; *id.* 243:22–44:4) and in 2016 Smith's total

35

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

annual compensation remained ███████████. (*Id.* 244:14–20; *id.* 245:3–8; P's Ex. 4.) Moreover, Smith's initial equity award was ███████████. (PI Tr. 243:16–18; P's Ex. 3, at 13293.) Upon questioning during prior testimony, Smith did not deny that ████████████. (*See* PI Tr. 358:12–18; *id.* 359:10–19.)

79. Smith also provided to AWS false information regarding ███████ ███████████████████████. Specifically, Smith told AWS that ████████████████████████████, (P's Ex. 38, at 580); in fact, Smith received ████████████████ ██████████. (P's Exs. 40–42.) Smith suggested that ███ ████████████████████████████████████ ███████████████. (PI Tr. 365:21–66:23.) Moreover, Smith testified that ████████████████████████████ █████████████████, (*id.* 367:23–25)—████████████████████████ ████████████████████. (*Id.* 243:16–44:4.)

80. At the time of his resignation, IBM ████████████ ███████████████████. (*Id.* 221:22–25.) Before doing so, Smith ████████████████. (*Id.* 237:24–38:3.) By wiping these devices, Smith ensured that ████████████ ████████████████████████████ ████████████. (Declaration of Kevin Faulkner ("Faulkner Decl.") ¶¶ 26–27.) This included ████████████, (PI Tr. 401:5–04:18), including ████████████████. (*Id.* 467:5–15.)

36

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

81.     At the time Smith wiped his devices, he admittedly understood that

█████████████████████████████████████████████████████████████████

█████████████████ . In particular, Smith ███████████████████████████

███████████████████████████████████ . (*Id.* 397:21–24.)  Smith

conceded that ███████████████████████ (*Id.* 238:13–15.)  At the time, Smith was

████████████████████████████ , (*id.* 239:14–16), and understood that █████

████████████████████████ . (*Id.* 240:7–9; *id.* 398:7–10.)  Regardless,

Smith wiped his devices ██████████████████████████████████████

████████████████████████████████ . (*Id.* 398:16–24.)

82.     Smith defended his actions by pointing to ████████████████████

█████████████████████████████████████████████████████████████

████████████████████ . Smith conceded, however, that the guidance he purportedly relied

upon ███████████████████████████████████████████████████████

████████████ . (*Id.* 402:6–9.)  That guidance, moreover, was ████████████████

████ . (PI Tr. 222:21–23:8; *id.* 224:9–18.)  Smith further testified that ██████████

█████████████████████████████████████████████████████████████

████████████████████ . (*Id.* 217:10–17.)

83.     A little more than a month after his resignation, Smith, through his counsel,

informed IBM that ██████████████████████████████████████████████

████████████████████ . (PI Tr. 394:3–17.)  Smith scheduled his start date at AWS for

August 7 because ████████████████████████████████████████████████

████████████████████████ . (*Id.* 395:22–96:5.)

37

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

### J.  Smith's Breach of His Non-Solicitation Agreement

84.  In June and July of 2017, Smith ( ████████████████ ) consulted on information technology matters for the Cleveland Clinic in Ohio, a $10 billion business and IBM client. (P's Ex. 53, at 953.)  While in Ohio, Smith met with the Chief Technology Officer of Keybank, another IBM client.  (*Id.*)  Following his meeting, Smith texted Jassy to inform him that Keybank's CTO "was disappointed AWS hasn't approached to help" with Keybank's Cloud Computing needs.  (*Id.*)  Following Jassy's request, Smith sent him the contact for Keybank's CTO, telling Jassy it was "ok to mention" Smith's name in future discussions.  (*Id.* at 955.)

85.  This was a breach of Smith's non-solicitation obligations to IBM.  While at IBM, Smith, in his capacity as an employee, had ██████████████████████████ ██████████.  (PI Tr. 237:11–18; *see also id.* 385:3–8 ( ████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████ ).)  In those communications, Smith ████████████████████████████████.  (*Id.* 237:19–21.)  Under Smith's non-solicitation agreements with IBM, *see supra*, he was not permitted to solicit Keybank's business, directly or indirectly, by introducing senior management of Keybank to the CEO of AWS.

86.  Similarly, Smith also told Jassy that the Cleveland Clinic had an "awful IT" situation but "no exposure to AWS."  (P's Ex. 53, at 953.)  He informed Jassy that ████████ ████████████████████████████████ (*Id.* at 954; PI Tr. 389:3–6.)  At Jassy's request, Smith ████████████████████████████████.  (P's Ex. 53, at 955; PI Tr. 388:24–89:2.)

87.  This, too, was a breach of Smith's non-solicitation obligations.  Like Keybank, Smith ████████████████████████████████████████████

38

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

████████████████████████. (PI Tr. 385:15–19.) Specifically, Smith ████

████████████████████████████████████████████████

██████████████████████. (*Id.* 230:19–31:12.) He also █████████████

████████████████████████████████████████████████████

████. (*Id.* 231:19–32:6.)

### K. Smith's Anticipated Role as a Vice President of AWS

88. AWS intends to hire Smith as a Vice President, (Jassy Decl. ¶ 18), and he

will ████████████████████████████. (Jassy Tr. 44:14–45:11.) Jassy, the

CEO of AWS, described Smith's anticipated role as ████████████████████

(*Id.* 42:22–23:3.) In his letter welcoming Smith to AWS, Jassy wrote that ████████

████████████████████████████████████ (P's Ex. 47.)

Smith ████████████████████████████████████

████████████████████████. (PI Tr. 372:5–14.)

89. Smith will report directly to Jassy. (Jassy Decl. ¶ 18.) Jassy himself stated

that ████████████████████ (Jassy Tr. 38:7–12), that █████████████████

████████████, (*id.* 42:22–43:7), and that ██████████████████████████

████████████. (*Id.* 43:8–10.) Smith's anticipated position was █████████

████████████████████████. (*Id.* 46:7–10.) AWS did n████████

████████████████████. (*Id.* 46:17–23.)

90. As a Vice President of AWS, Smith will be expected to participate in

meetings and strategy sessions with the CEO and AWS's most-senior executives. These include:

- ████████████████████████████████████████
  ████████████████████. (Jassy Tr. 17:18–19:19.)

39

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



- ████████████████████████████. (*Id.* 23:18–25:18.)

- ████████████████████████████ (*Id.* 25:19–27:19.)

91.    Topics at these executive strategy sessions include ████████████ ███████████████████████████████████████. (*Id.* 17:18–19:19; *id.* 23:18–25:18; *id.* 25:19–27:19.) At these meetings, individuals with anything relevant to say on any of these topics ██████████████. (*Id.* 21:7–10.) And were topics such as pricing and marketing to arise, Smith will ██████████. (*Id.* 135:19–23.) At the Staff Meetings, Jassy explained, he and his top executives ████████████████ (*Id.* 19:3–9.)

92.    Since August 7, 2017, Smith ██████████████████████ ███████████████████████. (*Id.* 73:9–14.) Already, Jassy testified, Smith ██████████████████████████████████ (*id.* 73:21–74:3)— ████████████████████████████████████████.

93.    AWS has ████████████████████████ ████████████████████████████████████████ ████████████████████████████████. (*Id.* 87:23–89:7.) For example, Smith will ████████████████████████████ ████████████████████████. (*Id.* 88 –13–89:2.) Indeed, Jassy conceded that ████████████████████████████████ ████████████████████████████████████████ ██████████████████. (*Id.* 89:8–14.)

94.    In addition to his role as a senior leader of AWS, Smith will be the "Leader" of these areas of the AWS Cloud business:  Migration Services; Service Catalogue;

40

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Global Marketplace; Developer Tools; and Support and Managed Services. (Jassy Decl. ¶ 17; Jassy Tr. 55:10–15.) Rather than being "narrow" or limited in scope, Jassy testified (and AWS's internal documents confirm) that ███████████████████████████ (Jassy Tr. 38:13–21), or that ████████████████████ (P's Ex. 43, at 356.) In Jassy's "launch plan" for Smith's arrival at AWS, he told Smith that, ████████████████████████████ ████████████████████ (P's Ex. 47, at 981.)

95.    Migration Services is the group at AWS responsible for ████████████ ████████████████████████████████████████████ ████. (Jassy Tr. 53:13–54:7.) Jassy refers to this ████████████████████ (id. 40:18–41:23), and in his launch plan for Smith's arrival, Jassy described AWS "Migration Services" like this: ████████████████████████████████████ (P's Ex. 47, at 975.) Smith will ████████████████████████████ ████████████████████████████████████████████ ████████████████████ (Jassy Tr. 91:17–92:6.)

96.    Thus, Smith's responsibilities at AWS will require him to have an understanding of, and to work with, the AWS Cloud "infrastructure"—the very subject of Project Genesis at IBM. As CIO of IBM, Smith was very familiar with IBM's current Cloud infrastructure because ████████████████████████████████████ ████████████████. (Considine Decl. ¶ 12; PI Tr. 94:19–95:5, 97:19–98:4, 126:1–7.) In addition, Smith gained substantial knowledge regarding the features and functionality of IBM's next generation Cloud infrastructure, Project Genesis. (Considine Decl. ¶ 13.) Smith's responsibilities and knowledge of confidential information at IBM involved Cloud infrastructure and Smith's responsibilities at AWS will involve Cloud infrastructure.

41

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

97.     Smith will also oversee the AWS Marketplace, which is ███████████

████████████████████████████████████████████████████████.

(Jassy Tr. 139:15–20.) During his tenure as CIO of IBM, Smith and his team ████████

████████████████████████████████████████████████████████████

███████████. (Krishna Decl. ¶ 20.) As a result of this work, Smith ██████████

████████████████████████████████████████████████████

██████████████████████████████. (*Id.*) Smith was also

aware of IBM's strategic thinking regarding ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. (*Id.* ¶ 21.)

98.     As described by Jassy, Smith will ████████████████████████████

████████████████████████████████████████

(Jassy Tr. 92:7–16.) IBM is competing against AWS to attract software providers to its Cloud,

and Smith knows the Company's target providers and plans. (Krishna Decl. ¶ 69.)

99.     A third area of proposed responsibility for Smith at AWS is Developer

Tools, which is ████████████████████████████████████████████

████████████████████████████████. (Jassy Tr. 140:17–41:20.) At IBM,

Smith was ████████████████████████████████████████████████████

██████████████████████. (Krishna Decl. ¶ 22.) In this capacity, Smith was closely involved

in ████████████████████████████████████████████████████████

████████████████████████████████. (*Id.* ¶ 70.)

100.    The final proposed responsibility for Smith at AWS is the Global Support

and Managed Services group, through which AWS ████████████████████████████

42

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



. (Jassy Tr. 151:24–52:6.) IBM offers this same service, and competes with AWS in this aspect of Cloud Computing. (Considine Decl. ¶ 14.)

101.  In connection with his proposed employment at AWS, ████████████ . (PI Tr. 382:9–21; P's Ex. 52.) That agreement ████████████

████ . (PI Tr. 383:1–13.) ████████████

████████████ . (*Id*. 383:14–18.) ████████████

### L.  The Temporary Restraining Order

102.  On August 1, 2017, the Court held a hearing on IBM's request for a temporary restraining order and preliminary injunction barring Smith from beginning work at AWS. During that hearing, Smith argued to the Court that no injunction was necessary because AWS "proposed a very scoped role for Mr. Smith, in a narrow area of cloud services." (Hearing Transcript, Aug. 1, 2017, at 8:12–15.) Smith further represented that his role at AWS would "keep[] him out of sales, it keeps him out of pricing [and it] prevents him from soliciting customers that he engaged with at IBM." (*Id*. 8:16–21.) In describing the role, Smith identified three areas he would oversee: "marketplace, developer tools, and support and managed service provider offerings." (*Id*. 8:23–25.)

103.  One week after the TRO hearing, AWS's CEO testified that ████████ . (Jassy Decl. ¶ 17.) He also testified that ████

43

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



. (Jassy Tr. 51:19–52:25.) The fifth group that Smith

would oversee at AWS—Migration Services—was added to Smith's role on July 31, 2017, (P's

Ex. 53, at 959)—the day before the TRO hearing at which Smith claimed he would be

responsible for only three areas at AWS.

104.   While Smith represented to the Court that AWS had made an effort to

"narrow" his expected role in response to IBM's confidentiality concerns, Smith's role ████

████████████, (Jassy Tr. 55:10–21; PI Tr. 370:15–22), and is, in the words of AWS, ████

████████ (P's Ex. 43, at 356.) AWS's only source of knowledge as to what Smith did at

IBM, or what he knew from his time at IBM, was ██████████████. (Jassy Tr.

48:11–16; id. 84:5–85:3.) AWS did ████████████████████████████

████████████████████████████████████████████

████. (Id. 83:2–9; PI Tr. 374:6–12.)

105.   Moreover, Smith also did ████████████████████

████████████████████████████████████████

████████████████████████████████████

████. (Jassy Tr. 155:11–56:7.) Smith's role has ████████████████

████████████████████████████ (PI Tr. 371:1–12.) Smith himself

acknowledged that ████████████████████████████████

████████████████████████████████ (Id. 377:13–23.)

106.   Following the hearing on August 1, 2017, the Court entered a temporary

restraining order enjoining and restraining Smith from "working at, or providing services for,

AWS." ECF No. 4. That order was subject to a separate "listen and learn" order, under which

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Smith was permitted to begin working at AWS "on August 7, 2017" so that he could "go through AWS's general onboarding process, including any and all employee training." ECF No. 6, ¶¶ 1–2. Under that order, however, Smith was required to operate "in 'listen and learn' mode only," and was not permitted to "speak, write or otherwise provide information or opinions about business-related matters, or perform substantive functions or provide services." *Id.* ¶ 3.

107. After this litigation was filed, and during the course of discovery in preparation for the hearing on IBM's motion for a preliminary injunction, Smith . (PI Tr. 404:20–05:23.) Smith's access to IBM's email system had been cut off since he announced his resignation on March 28, 2017, and he understood that ████ ██████████████████████████████████. (*Id.* 211:24–13:17.) Smith nonetheless ██████████████████████████████████. (*Id.* 405:13–23.)

108. Smith ██████████████████████████████████████. (Smith Proposed Findings of Fact, Aug. 14, 2017, at ¶ 13; Declaration of Jeff P. Smith ("Smith Decl."), Aug. 13, 2017, ¶ 26.) Smith ████████████████████████████████████. (P's Ex. 55; PI Tr. 404:24–25.) In short, up to the week before the preliminary injunction hearing,

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Smith continued to disrespect and disregard the confidentiality of IBM documents and information by misappropriating internal IBM emails to try to fortify his defense against IBM.[1]

### IBM'S PROPOSED CONCLUSIONS OF LAW

Smith already has violated his noncompetition, non-solicitation and confidentiality obligations to IBM, and has been less than forthright with IBM and the Court about the scope of his proposed role at AWS, his knowledge of IBM's trade secrets, and his secret email correspondence with AWS's CEO. Yet, Smith contends that he should not be enjoined from being employed by AWS prior to the expiration of his non-compete agreement because he can be trusted to protect the IBM confidential information he possesses regarding IBM's Cloud Computing products in development and strategies to compete against AWS. In light of the record here, and especially given Smith's failure to honor his obligations to IBM to date, IBM should not have to rely on Smith's word that he will not use or disclose IBM confidential information, intentionally or not, in the course of performing his proposed duties as a ███████ executive in AWS's Cloud Computing business.

Moreover, the IBM trade secrets and confidential information Smith knows are █ ████████████████████████████████████████, and the role Smith intends to take at AWS will involve him in discussions and decision-making at the highest executive levels of AWS's Cloud Computing business. Even if there were no reason to doubt Smith's fidelity to IBM's interests and secrets, and even assuming the utmost good faith on Smith's part, it would still be doubtful that Smith could completely divorce his knowledge of IBM's trade secrets and confidential information from any work he might engage in leading

---

[1] Smith also tried to use the emails to obtain additional discovery from IBM. (*See* Smith Ltr. to Judge Davison, Aug. 14, 2017, at 2 (describing email contents).) Judge Davison, however, ██████████████████████████████████ (Aug. 14, 2017 Hearing Tr. 29:24–30:4.)

46

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

broad segments of AWS's Cloud Computing business, reporting to and meeting one-on-one with AWS's CEO, and participating in senior executive strategy and planning sessions at AWS.

Smith stipulated to the remedy for this risk when he accepted his prestigious and highly lucrative position at IBM: he committed to wait 12 months before accepting another job that would risk disclosure of IBM confidential information, and agreed that his failure to do so would cause IBM irreparable harm. That Noncompetition Agreement is limited by its terms to the protection of confidential information and, therefore, should be enforced pursuant to those terms. Requiring Smith to wait the remaining eight months of his agreement before becoming a senior executive of AWS is reasonable to ensure the continued secrecy of IBM's product development plans so that IBM will have the time to *both* launch its next generation Cloud infrastructure and gain traction in the market before AWS and its other competitors catch on and catch up. That was the protection IBM bargained for and Smith agreed to. There is no legal precedent for crafting an alternative, non-contractual remedy (*e.g.*, limits on Smith's executive duties at AWS) and no basis in the factual record for shortening the waiting period Smith accepted—and for which he was well paid.

IBM accordingly is entitled to a preliminary injunction preventing further breaches of Smith's noncompetition, non-solicitation, and confidentiality obligations to the Company.

A. **The Standard of Law for a Preliminary Injunction**

The Court may grant a preliminary injunction if the moving party shows "'(1) that [it] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor.'" *Int'l Bus. Machs. Corp.* v. *Papermaster*, No. 08 Civ. 9078, 2008 WL 4974508, at *6 (S.D.N.Y. Nov. 21,

47

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

2008) ("*Papermaster*") (quoting *Lusk* v. *Vill. of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007)).

IBM has established each element, and is entitled to injunctive relief.

**B.    IBM Will Suffer Irreparable Harm Absent a Preliminary Injunction**

The record establishes that Smith is in possession of IBM's trade secrets and that

Smith cultivated relationships with actual and prospective IBM customers using IBM's resources

and goodwill. *Supra* Findings of Fact ¶¶ 33–55 (hereinafter, "¶¶ __"). The risk that Smith may

use or disclose his IBM confidential information or exploit or leverage his customer relationships

in his proposed new role at AWS is not only likely, but inevitable, because the proposed role as

████████████████████████ will involve Smith in the same business he was responsible

for at IBM. *Supra* ¶¶ 88–93. The business area is the same, the potential customers are the

same, and the competition is the same, except that now Smith would be on AWS's side instead

of IBM's. *Supra* ¶¶ 94–101. IBM is at risk of irreparable injury if Smith is permitted to start as

a ████ executive in AWS's Cloud Computing business prior to the expiration of his

Noncompetition Agreement with IBM.

**1.    The Risk of Disclosure of Trade Secrets Constitutes Irreparable Harm**

*(a)    Under New York law, a movant is entitled to injunctive relief to prevent inevitable disclosure of trade secrets*

Courts find irreparable harm where there is a "likely risk of inevitable disclosure"

(*Papermaster*, 2008 WL 4974508, at *10 n.11) of a former employer's trade secrets because

"'the movant competes directly with the prospective employer and the transient employee

possesses highly confidential or technical knowledge concerning . . . marketing strategies, or the

like.'" *Estee Lauder Cos., Inc.* v. *Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (quoting

*EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)). The nonexclusive factors

that guide courts in determining whether there is a risk of inevitable disclosure include

48

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

> (1) the extent to which the new employer is a direct competitor of the former
> employer; (2) whether the employee's new position is nearly identical to his old
> one, such that he could not reasonably be expected to fulfill his new job
> responsibilities without utilizing the trade secrets of his former employer; (3) the
> extent to which the trade secrets at issue would be valuable to the new employer;
> and (4) the nature of the industry and its trade secrets.

*Papermaster*, 2008 WL 4974508, at *7 (quoting *Payment Alliance Intern., Inc.* v. *Ferreira*,

530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007)).

      The "inevitable disclosure" test is based on the likely *risk* of disclosure. It does

not require proof that the new employer will for certain use the trade secret in the same way as

the former employer, or that the prospective employer will necessarily use trade secrets if

disclosed. As one court held,

> the nature of the subsequent employer's work is relevant to determining the risk
> of disclosure. But [the court] finds no requirement in the New York decisions
> that the first employer's secrets be readily usable by the second employer. <u>It is
> enough if the second employer's work is sufficiently similar to that of the first
> employer to make likely the risk of disclosure</u> by the employee in the course of
> his subsequent employment.

*Cont'l Grp., Inc.* v. *Kinsley*, 422 F. Supp. 838, 845 (D. Conn. 1976) (Newman, J.) (emphasis

added). The court likewise held in *Estee Lauder* that: "Even where a trade secret has not yet

been disclosed, irreparable harm may be found based on a finding that trade secrets will

inevitably be disclosed where, as here, 'the movant [IBM] competes directly with the prospective

employer [AWS] and the transient employee [Smith] possesses highly confidential or technical

knowledge concerning[] marketing strategies, or the like.'" 430 F. Supp. 2d at 174 (quoting

*EarthWeb, Inc.* v. *Schlack*, 71 F. Supp. 2d 299, 309 (S.D.N.Y. 1999)).

      Thus, the law does not require proof that the defecting employee intends to

disclose trade secrets prior to issuance of an injunction. As the court in *Papermaster* observed:

> [T]he Court has no evidence before it that Mr. Papermaster has disclosed any
> IBM trade secrets to date. <u>The harm to IBM, however, is more likely to derive
> from inadvertent disclosure of the IBM trade secrets that have defined</u>

49

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

<u>Mr. Papermaster's long career.</u> . . . Thus, while the Court ascribes no ill-will to Mr. Papermaster, the Court finds that the likely inevitability of even inadvertent disclosure is sufficient to establish a real risk of irreparable harm to IBM.

2008 WL 4974508, at *10 (emphasis added).

Courts are even more likely to find a risk of inevitable disclosure where the employee "has not proven the most trustworthy in the fulfillment of his obligations owed" to his former employer. *Estee Lauder*, 430 F. Supp. 2d at 176 (citing *PepsiCo, Inc.* v. *Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (holding that former employee's "lack of forthrightness" and "out and out lies" were relevant to the determination of whether disclosure was inevitable)). Where an employee, like Smith in this case, "no longer feels allegiance to his former employer," the former employer need not rely on the employee's representations that he will protect the confidential information he possesses. *Id.*

> *(b)    Smith's conduct demonstrates there is a substantial risk of inevitable disclosure*

Smith's conduct to date already demonstrates a lack of loyalty to IBM and a disregard for the interests and confidences of IBM, thus making it likely that he does not have the willingness or frame of mind to act as a reliable guardian of IBM's trade secrets and confidential information. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████.

*Supra* ¶¶ 49–50. Then, in December 2016, within just two hours of agreeing to meet Jassy to discuss leaving IBM for AWS, Smith ████████████████████████

████████████████████████████████████

███. *Supra* ¶¶ 43, 74.

50

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

Smith's claim that there is no risk he will disclose or use the Project Genesis trade secrets because he does not remember the product development presentations from the October and December 2016 ▮▮▮▮▮▮ meetings is neither credible nor a sufficient basis on which to give Smith the benefit of the doubt. Smith had a strong, even emotional, interest in IBM's Cloud services and strategies. *Supra* ¶¶ 53–55, 59. He claimed to be ▮▮▮▮▮ by the direction of IBM's Cloud business, so much so that he vented his feelings—and confidential IBM discussions and decisions—to the CEO of IBM's main Cloud competitor for more than two years. *Supra* ¶¶ 59–69. He not only received and reviewed the Project Genesis presentation materials, he retained them and shared them with his colleagues, and specifically requested a copy of the Project Genesis update in December 2016. *Supra* ¶¶ 43, 49–50.

Furthermore, Smith does recall in significant detail the ▮▮▮▮▮▮ meetings at which the IBM Cloud and Project Genesis were the focus, including: (a) ▮



▮▮▮, (Smith Decl. ¶ 48); (b) ▮▮▮▮▮▮▮▮▮▮▮, (*id.*); (c) the fact that ▮▮▮▮▮▮▮▮▮▮, (PI Tr. 473:14–20); (d) ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮, (*id.* 419:25–20:24); and (e) that ▮▮▮▮▮▮▮▮ ▮▮▮▮. *Supra* ¶ 43. He admittedly remembers one of the main secrets of Project Genesis: ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (Smith Decl. ¶ 49.) He also remembers, in detail, another executive meeting about IBM's Cloud business, even further back in time: the April 2016 ▮▮▮▮ meeting, 16 months ago. (*Id.* ¶ 48.) The cumulative weight of all

51

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

this evidence makes it difficult to credit Smith's claimed forgetfulness, especially with respect to such prominent figures as █████████████████████████████████████.

The "likely risk of disclosure" is demonstrated (and heightened) by the fact that Smith revealed inside IBM information to Jassy about IBM's Cloud business and strategies, while Smith was still an IBM employee. *Supra* ¶¶ 56–71. To cultivate his relationship with Jassy, Smith ███████████████████████ even while he was still an IBM employee—acts which cast serious doubt upon any promises by Smith to safeguard IBM's confidential information. *Supra* ¶¶ 64–67. And a major topic of Smith's covert correspondence with Jassy was Cloud Computing and Smith's inside-IBM perspective about ████████████████████ ██████████. *Supra* ¶¶ 56–60. It is only natural that Smith will continue that dialogue with Jassy, now with all the confidential information he knows about Projects Genesis, Athena and Armada in his head. In November 2014, after less than six months at IBM, Smith ████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████. *Supra* ¶¶ 58–59.

There is no evidence to suggest that if Smith becomes one of AWS's ██████ executives, he will suddenly be seized by a sense of duty and discretion when it comes to IBM, or turn mute on the subject of IBM's Cloud. Indeed, Jassy himself testified that ███████ ███████████████████████████████████████████████████ ████████ (Jassy Tr. 93:4–7; *id.* 93:8–11; *id.* 97:13–98:15.)

Also, upon resigning and prior to returning his IBM-issued mobile devices, Smith wiped all data from his IBM-issued mobile devices, preventing IBM from determining through a forensics review whether Smith had copied, downloaded, or transferred any IBM confidential

52

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

information from his work-issued mobile devices to another location. *Supra* ¶¶ 80–81. Then, after resigning from IBM but before he became an AWS employee, Smith assisted AWS in soliciting business from at least two IBM customers with which Smith was involved as part of his job responsibilities at IBM. *Supra* ¶¶ 84–87.

Smith's pattern of disloyalty and dishonesty to IBM, his private correspondence with the CEO of IBM's direct competitor (and his future employer), and his willingness to violate his noncompetition, non-solicitation, and confidentiality obligations to IBM support the conclusion that it is likely inevitable that Smith would use or disclose his IBM confidential information, intentionally or not, as a senior executive at AWS.

> **(c)** *Smith is likely to use or disclose his IBM confidential information in his proposed role at AWS*

The nature of Smith's IBM confidential information and the scope of his proposed role at AWS also create a serious risk of inevitable disclosure, even if Smith did have the best intentions and a track record of commitment to IBM.

Smith's knowledge of IBM's next generation Cloud and related projects, ▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, warrants trade secret protection. *See, e.g., Estee Lauder*, 430 F. Supp. 2d at 163–64 (new product and business development plans); *Lumex, Inc.* v. *Highsmith*, 919 F. Supp. 624, 629–30 (E.D.N.Y. 1996) (products in development).[2] Courts in this district have previously enforced an IBM noncompetition agreement to protect this sort of material. *See, e.g., Papermaster*, 2008 WL 4974508 at *3 (enforcing noncompetition agreement where defendant had "access to highly

---

[2]     Under New York law, a trade secret may consist of "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Payment Alliance*, 530 F. Supp. 2d at 481 (quotation marks omitted). "[A] trade secret once lost is, of course, lost forever and, therefore, such a loss 'cannot be measured in money damages.'" *Estee Lauder*, 430 F. Supp. 2d at 174 (quoting *FMC Corp.* v. *Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)); *accord Papermaster*, 2008 WL 4974508 at *7.

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**

confidential information, including strategic plans, marketing plans, product development, and long-term business opportunities for IBM"). AWS's own CEO testified that ███████████ ██████████████████████████████████████. (Jassy Tr. 17:9–17.) Jassy also testified that ██ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████. (Jassy Tr. 32:4 –33:25.)

Smith argues that he is not a "technical" expert and does not have the ability to explain to AWS the scientific details of IBM's next generation Cloud (Project Genesis). Smith's professed lack of technical expertise, however, "says nothing about whether or not [he] possesses trade secrets and/or protected confidential information." *Estee Lauder*, 430 F. Supp. 2d at 175; *see also Payment Alliance*, 530 F. Supp. 2d at 481 n.2. In *Estee Lauder* a court enjoined a brand manager from working for a cosmetics rival because the harm to his ex-employer was "not limited to a potential replication of its products, but rather could manifest as competitive advantage from knowing the when and how of Estee Lauder's future product introductions." 430 F. Supp. 2d at 176. Even general information can constitute a trade secret where it concerns highly sensitive data such as costs or release dates for new products. *See, e.g., Lumex*, 919 F. Supp. at 630–31 (enjoining employee who had access to highly sensitive information concerning costs and new products); *see also Youtie* v. *Macy's Retail Holding, Inc.*, 653 F. Supp. 2d 612, 623 (E.D. Pa. 2009) (manufacturer's costs constituted trade secret information under the Pennsylvania Uniform Trade Secrets Act).

Smith conceded that ████████████████████████████████████ ██████████████████████████. (PI Tr. 470:1–71:10.) His executive responsibilities at AWS will likely require him to draw upon those trade secrets that he learned while at IBM. Smith will report to Andrew Jassy, the CEO of AWS responsible for its entire Cloud Computing

54

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

business, including its competition with IBM. (Jassy Decl. ¶ 18.) As Jassy admitted, ██████

██████████████████████████████████ *Supra* ¶¶ 88–89. In this role,

Smith will ████████████████████████████████████████████████████

████████████████████████████████████. *Supra* ¶¶ 90–91. Under these

circumstances, it is difficult to see how Smith "will not consciously or unconsciously share or

draw on insights gained from his work as a senior executive" overseeing the next generation

Cloud at IBM. *Verizon Commc'ns, Inc.* v. *Pizzirani*, 462 F. Supp. 2d 648, 659 (E.D. Pa. 2006);

*see also Lumex*, 919 F. Supp. at 631 (observing that a former employee "cannot eradicate these

trade secrets and this confidential information from his mind").

Moreover, as a senior executive and member of management, Smith will be a

regular participant in strategy meetings of leadership at AWS. *Supra* ¶¶ 90–91. As one court

has observed, "[i]f noncompetes apply effectively anywhere, they apply to the senior, big dog,

alpha male and female individuals who are actually running the corporation, and have knowledge

of its strategies and tactics and deepest secrets." *Wal-Mart Stores, Inc.* v. *Mullany*, C.A. No.

6040-VCL (Del. Ch. Dec. 15, 2010) (Transcript). During these sessions—as he was at IBM—

Smith will be asked for his input on major questions facing AWS, such as how to price AWS's

Cloud products, which future developments to emphasize, and how best to compete in the

market, including with IBM. Under such circumstances, "[i]t is difficult to conceive how all of

the information stored in [defendant's] memory can be set aside as he applies himself to a

competitor's business and its products. On the contrary, what [defendant] knows about [his

former employer] is bound to influence what he does for [his new employer], and to the extent it

does, [his former employer] will be disadvantaged." *Marcam Corp.* v. *Orchard*, 885 F. Supp.

294, 297 (D. Mass. 1995); *see also PepsiCo*, 54 F.3d at 1269.

55

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

The segments of the AWS Cloud business for which Smith will have responsibility provide little or no protection against the risk of disclosure. As the leader of AWS's Migration Services, Smith will ███████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████. (Jassy Tr. 53:13–54:7.) Smith will be able to use his in-depth knowledge of confidential information regarding IBM's next generation Cloud in these efforts, either in competitive marketing and sales strategies or in assisting AWS to devise or prioritize product development plans to best compete against IBM's forthcoming cloud launch.

Smith also will be placed in charge of AWS's Marketplace, (Jassy Decl. ¶ 17), through which AWS ████████████████████████████████████████. (Jassy Tr. 139:15–40:9.) At IBM, Smith learned of several of the potential new applications and features that the Company is developing for its next generation Cloud. (Krishna Decl. ¶¶ 9–10; Considine Decl. ¶ 9.) In overseeing the division at AWS that determines which applications to offer AWS customers, it is likely that Smith will be influenced by his knowledge of what new applications and features AWS's competitor is developing. Similarly, Smith was ███████████ ████████████████████████████████████████████████████ █████████████████████, (Krishna Decl. ¶ 22)—information he is likely to draw upon when running AWS's developer tool group.

    (d)    *Courts applying New York law have enforced noncompetition agreements and enjoined employees under similar circumstances*

In *Estee Lauder*, 430 F. Supp. 2d at 182, the court enjoined a product marketing manager at Estee Lauder from working for a cosmetics rival on the basis that the executive knew about his former employer's products in development. The defecting employee was responsible

56

for developing marketing strategies, and had "a general idea of the plans for launch of new products, including the marketing and geographic plans and the channels of distribution for these products." *Id.* at 163. Rejecting the argument that the plaintiff-employer could not suffer irreparable harm because the employee had no "technical expertise" and "was not the scientist behind the formulas and the development of new products," the court in *Estee Lauder* granted a preliminary injunction based upon the risk of inevitable disclosure of marketing trade secrets— specifically, information about upcoming product launches. *Id.* at 175–76. The court's concerns about inevitable disclosure were heightened in *Estee Lauder* because there, as with Smith, the former employee had demonstrated a lack of trustworthiness through his breach of contractual and fiduciary duties to his former employer. *Id.* at 176. Like the defendant in *Estee Lauder*, Smith "has not proven the most trustworthy in the fulfillment of his obligations." *Id.*

In *Lumex*, the court issued a preliminary injunction enjoining a former product manager for a manufacturer of weightlifting equipment from going to work for a competitor. 919 F. Supp. at 636. The court found that the employee's confidential information, including information about the costs to Lumex of providing products to customers, was "confidential and constituted trade secrets" and that "the disclosure of these trade secrets and confidential information would seriously and irreparably damage the future interests of Lumex." *Id.* at 630. The court also noted that the employee "was a member of the elite strategic planning committee together with the top personnel of [his business unit] and attended high level meetings in which future restructuring of [the business unit] was discussed, together with detailed financial information, including costs and . . . profit margins." *Id.*

In *Payment Alliance*, the court issued a preliminary injunction to bar violation of a noncompetition agreement by an executive who was knowledgeable about the marketing of a

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

software application that his former employer had launched. 530 F. Supp. 2d at 482, 485. The

court explained, "even if [the employee] acted with the best of intentions, he may unintentionally

transmit information gained through his association with [his former employer] during his day to

day contact with his new employer." *Id.* (quotation marks omitted).

Smith relies on *International Business Machines Corporation* v. *Visentin*, in

which another court in this district declined to enforce a different IBM noncompetition

agreement against a former manager in IBM's services business. No. 11 Civ. 399, 2011 WL

672025 (S.D.N.Y. Feb. 16, 2011). In *Visentin*, the court found that the employee's primary job

at IBM was to be a "general manager," and that, although "trade secrets may have lurked

somewhere on the periphery, the real thrust of his position was to manage his teams to make

them as efficient as possible." *Id.* at *8. Here, in contrast, trade secret and confidential

information was at the very center of Smith's job as the CIO of IBM and as a member of the

████████████ and the ████████████. *Supra* ¶¶ 33–55.

The *Visentin* court also relied upon the former employee's testimony that he did

not intend to disclose any confidential information, but only after finding that there was "no

evidence of any prior wrongdoing" by the employee. 2011 WL 672025 at *20. The same is not

true of Smith, who: (a) while employed at IBM, regularly acted against IBM's interests in

correspondence with AWS's CEO, *supra* ¶¶ 56–71; (b) while employed at IBM, ████████



████████████, *id.*; (c) while employed at

IBM, ████████████████████████████

████████, *supra* ¶ 58; (d) while employed at IBM, ████████████████

████████████████, *supra* ¶¶ 49–50; (e) before returning IBM-provided

devices following his resignation, electronically wiped them, *supra* ¶¶ 80–82; and (f) shortly

58

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

after resigning from the Company, violated his noncompetition and customer non-solicitation obligations by assisting AWS in soliciting business from IBM customers with which he had been involved at IBM. *Supra* ¶¶ 84–87.

The decision in *Papermaster* also is instructive here. In *Papermaster*, this Court preliminarily enjoined another IBM employee from working for another competitor, Apple, based on the prospective violation of his noncompetition agreement. *See* 2008 WL 4974508, at *7–9. Even though, in that case, the ex-employee had not yet disclosed any confidential information to the rival, professed no intention to make such disclosure, and did not act in bad faith in any way, the court found that "it is likely that Mr. Papermaster inevitably will draw upon his experience and expertise" at IBM. *Id.* at *9.

Here, Smith is knowledgeable about IBM's confidential information and trade secrets, including its confidential product development plans ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇. *Supra* ¶¶ 33–50. Like Papermaster, Smith agreed that IBM would suffer irreparable harm if he violated his Noncompetition Agreement. *Id.* (quoting *Lumex* for the proposition that risk of irreparable harm exists "where employee was a 'member of the elite strategic planning committee' and therefore 'privy to discussions' involving marketing strategy and product lines"). And like Papermaster, since Smith has been "inculcated" with IBM trade secrets concerning the Company's plans in the growing and highly competitive Cloud Computing market, "it is no great leap for the Court to find that [IBM] has met its burden of showing a likelihood of irreparable harm." *Id.* at *8. But *unlike* Papermaster, there is substantial evidence and reason to believe that Smith cannot be counted on to protect IBM's trade secrets.

59

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Smith argues that even assuming IBM has any trade secrets to protect, IBM waived those protections by showing to Smith at his deposition and at the preliminary injunction hearing documents that IBM had designated as "highly confidential." The Court asked the parties to provide any legal authority on the question of whether, in the context of a trade secret case, IBM could be deemed to have waived trade secret protections by showing Smith confidential documents IBM contends he saw while he was an IBM employee. Smith submitted no such authority.[3]

Under New York law, whether information constitutes a trade secret turns on factors that include, as relevant here, "the extent of measures taken to safeguard the information and the ease or difficulty with which the information could be properly acquired or duplicated by others." *HMS Holdings Corp.* v. *Arendt*, No. A754/2014, 2015 WL 4366681, at *9 (N.Y. Sup. Ct. July 14, 2015). The "ultimate focus must be on whether the alleged trade secrets have become generally known or readily ascertainable through proper means." *Id.* Accordingly, in determining whether a party has waived a trade secret claim, courts ask whether the party has publicly disclosed the information or failed to take steps to protect it. *See, e.g., Awards.com, LLC* v. *Kinko's, Inc.*, 834 N.Y.S.2d 147, 156 (N.Y. App. Div. 2007), *aff'd*, 14 N.Y.3d 791 (2010); *Hoechst Diafoil Co.* v. *Nan Ya Plastics Corp.*, 174 F.3d 411, 417–19 (4th Cir. 1999); *Gates Rubber Co.* v. *Bando Chem. Indus., Ltd.*, 9 F.3d 823, 848–49 (10th Cir. 1993); *Nat'l Polymer Prods., Inc.* v. *Borg-Warner Corp.*, 641 F.2d 418, 421 (6th Cir. 1981).

---

[3] Smith argues that IBM also waived any trade secret protections by showing his expert witness, Golden, email communications between Smith and AWS's CEO during Golden's deposition. Smith did not, however, present any evidence to the Court as to what Golden was or was not shown during his deposition.

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Under these authorities, and in the circumstances of this case, IBM has not waived any trade secret protections. In particular, IBM and Smith negotiated a Confidentiality Stipulation and Protective Order (the "Protective Order") that prohibited IBM from disclosing to Smith material IBM had designated "highly confidential." However, the Protective Order also explicitly authorized IBM to disclose such material to Smith under certain circumstances. Specifically, IBM was permitted to disclose such material to Smith if: "from the face of the material . . . or from the source information provided by [IBM], he appears to have received it prior to the date such material [was] produced in this action"; or the material "concerns [Mr.] Smith's employment by [IBM] or the termination thereof"; or the material "is produced in response to [Mr.] Smith's discovery demands concerning [IBM's] trade secrets and confidential information that [Mr.] Smith allegedly possesses." (ECF No. 36, ¶ 7(e).)

The purpose of implementing and following the safeguards set forth in the Protective Order was to enable IBM to preserve its trade secret protections, while also seeking to prove that its confidential information constitute trade secrets and that Smith already knows them. Pursuant to the procedures and protections set forth in the Protective Order, IBM examined Smith at his deposition about "highly confidential" documents that (a) he had requested be produced in discovery, and (b) he had received as a member of the IBM ███████████.

Not only did IBM follow the parties' agreed-upon, and court-approved, procedures in its questioning of Smith, IBM otherwise took appropriate measures to protect its confidential information. IBM asked the Court to exclude AWS personnel from the courtroom when confidential IBM information was being discussed. IBM also successfully sought to

61

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

preclude Smith's expert witness, Golden, from reviewing IBM's "highly confidential" information because of Golden's ongoing work for an IBM Cloud Computing competitor.

Smith has identified no case law that would support a waiver finding under these circumstances.[4]

> (f)    Smith's "expert" did not disprove or
> refute the risk of inevitable disclosure

In an effort to support his position that he will not need to rely on confidential IBM information, Smith advanced testimony from Bernard Golden, who presented himself as having "specialized knowledge of cloud computing." (Declaration of Bernard Golden ("Golden Decl.") ¶ 2.) Golden offered his opinion that Smith would not need to rely on any IBM confidential information he may have been exposed to while employed at IBM. (Golden Decl. ¶ 64.) That opinion is not entitled to much, if any, weight.

To start, Golden does not have the qualifications to testify as an expert on the subjects on which he was proffered as an expert. He has a bachelor of arts degree and an M.B.A. (*Id.* ¶ 4.) He ████████████████████████████████████████

████████████████████████████████████████

██ . (PI Tr. 162:13–20.) Golden's expertise, if any, in the area of Cloud Computing appears ██

████████████████████████████████████████

---

4    In his letter-brief to the Court on this issue, Smith cited case law that generally stands for the proposition that a party seeking to protect trade secrets must take appropriate measures to ensure that its confidential information remains confidential. That general proposition, however, is neither disputed nor directly supportive of the waiver argument Smith has raised.

Smith also cited cases that found a waiver where a party publicly disclosed its trade secrets by, for instance, filing them on a court docket or disclosing them in open court. Those cases, however, are not relevant here because IBM has done neither of those things. To the contrary, in addition to seeking and negotiating a protective order in this case, IBM took multiple reasonable steps to ensure that its confidential information was protected, including filing its materials under seal and ensuring that AWS personnel were not present in the courtroom when confidential IBM information was discussed.

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

█████████████████. (*Id.* 185:12–86:18.) Golden has no specialized or technological knowledge of Cloud Computing.

Golden's opinions are not reliable. He testified that █████████████

███████████████████████████████████████████████████. (*Id.*

170:14–17.) His opinions are ██████████████████████████████

█████████. (*Id.* 168:11–19.) In particular, Golden did ███████████████

███████████████████████████████████████████████████████

██████████████████████████ (*Id.* 167:3–8.) Golden also

admitted that ██████████████████████████████████████ (*id.*

166:24–67:2);███████████████████████████████████

██████████████████████████████████ (*id.* 167:15–19);███████

███████████████████████████████████████████████████

████████████████████████ (*id.* 176:1–9; *id.* 181:9–16.);█████████

███████████████████████████████████████████████████

███████████████████████████████████████████████. (*Id.*

176:10–18; *id.* 183:11–18.)

### 2. The Risk of Exploiting Customer Goodwill Constitutes Irreparable Harm

Courts also find irreparable harm where there is a risk that a former employee might exploit or expropriate the goodwill of client or customer relationships cultivated through the former employee's job responsibilities. *See, e.g.*, *Tom Doherty Assocs., Inc.* v. *Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("[A] loss of prospective goodwill can constitute irreparable harm."); *Global Switching Inc.* v. *Kasper*, No. 06 Civ. 06 412, 2006 WL 1800001, at *13 (E.D.N.Y. Jun. 28, 2006) ("The loss of customer goodwill constitutes an irreparable injury.");

63

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

*Johnson Controls, Inc.* v. *A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) (finding that employee's "actions threaten to cause [employer] irreparable harm by luring away the business of a number of long-term [] clients" of employer).

Smith nurtured close personal relationships with major IBM customers in his two and a half years as IBM's CIO. (*See* Krishna Decl. ¶ 25.) As CIO of the Company, Smith attended numerous industry events as IBM's highest ranking customer goodwill representative, driving sales opportunities to all of IBM's business lines. In addition to these industry events, Smith met with over 60 of some of IBM's most important customers on a one-on-one basis in the last 12 months of his employment with Company alone. (*Id.*)

Smith already exploited some of these relationships for the benefit of AWS and to the detriment of IBM—before he even became an AWS employee. *Supra* ¶¶ 84–87. By planning to become a ▇▇▇▇ executive in AWS's Cloud Computing business, Smith threatens further to exploit and/or expropriate the customer relationships he cultivated on IBM's time and with the benefit of IBM's resources, all to the detriment of IBM. IBM thus is entitled to an injunction protecting the customer goodwill that Smith developed throughout his tenure as IBM's CIO. *See, e.g., BDO Seidman* v. *Hirshberg*, 93 N.Y.2d 382, 392 (1999) ("The employer has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client or customer, which has been created and maintained at the employer's expense, to the employer's competitive detriment.").

### 3. Smith Stipulated That a Violation of His Noncompetition or Nonsolicitation Obligations Would Irreparably Harm IBM

Smith acknowledged in the Noncompetition Agreement that he had access to confidential information and that he developed relationships with IBM customers, at IBM's time and expense. (*See* P's Ex. 5, § 1(e)(ii).) He also acknowledged that a breach or threatened

64

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

breach of his noncompetition or customer non-solicitation obligations would cause irreparable

injury to IBM, and that an injunction is the appropriate remedy for that threat. *(See id.* § 5.)

Smith also agreed that IBM would "suffer irreparable harm" if he failed to comply with his

noncompetition or customer non-solicitation obligations, and that those obligations were

"reasonable as to geography, scope and duration." *(Id.* § 3.) Smith expressly consented to an

injunction in the event of breach: "you further consent and stipulate to the entry of such

injunctive relief in such a court prohibiting you from breaching this Agreement." *(Id.* § 5.)

Courts have held that contractual admissions like Smith's support a finding of

irreparable harm and the issuance of an injunction. According to the Second Circuit, contractual

provisions that acknowledge such harm "might arguably be viewed as an admission by [the

defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-

compete provision." *Ticor Title Ins. Co.* v. *Cohen,* 173 F.3d 63, 69 (2d Cir. 1999); *cf. N. Atl.*

*Instruments, Inc.* v. *Haber,* 188 F.3d 38, 49 (2d Cir. 1999) (relying on similar clause in

confidentiality agreement in finding irreparable injury to support injunctive relief). In

*Papermaster,* this Court found that "the explicit provision in the agreement" by which another

IBM employee "acknowledged that IBM would suffer 'irreparable harm' if he violated the

Noncompetition Agreement" made "the likelihood of irreparable harm to IBM more than mere

speculation." 2008 WL 4974508, at *9 (quotation marks omitted).[5]

### C. IBM Has Established a Likelihood of Success on the Merits

IBM is likely to prevail on its claims for breach of the noncompetition and non-

solicitation obligations and for misappropriation of trade secrets. The same facts that support a

---

[5] *Accord Ticor Title,* 173 F.3d at 68–69; *Ayco Co., L P* v. *Feldman,* No. 10 Civ. 1213, 2010 WL 4286154, at *8 (N.D.N.Y. Oct. 22, 2010); *IDG USA, LLC* v. *Schupp,* No. 10 Civ. 76, 2010 WL 3260046, at *9 (W.D.N.Y. Aug. 18, 2010), *aff'd in part, vacated in part and remanded on other grounds by* 416 F. App'x 86 (2d Cir. 2011); *Estee Lauder,* 430 F. Supp. 2d at 174; *Ikon Office Sols., Inc* v. *Usherwood Office Tech., Inc.,* No. 9202–08, 2008 WL 5206291, at *17 (N.Y. Sup. Ct. Dec. 12, 2008).

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

finding of irreparable harm in the absence of a preliminary injunction also demonstrate IBM's

likelihood of success on the merits. "'In non-compete cases, such as this one, the irreparable

harm analysis and the likelihood of success on the merits analysis are closely related and often

conflated.'" *Papermaster*, 2008 WL 4974508, at *6 (quoting *Int'l Creative Mgmt., Inc.* v. *Abate*,

No. 07 Civ. 1979, 2007 WL 950092, at *2 (S.D.N.Y. Mar. 28, 2007)).

> **1.    The Noncompetition Agreement Is Reasonable in Scope and Should Be Enforced to Protect Trade Secrets and Prevent Customer Solicitation**

Under New York law, "restrictive covenants will be enforceable to the extent

necessary to prevent the disclosure or use of trade secrets or confidential customer information."

*Estee Lauder,* 430 F. Supp. 2d at 177 (quotations marks omitted). The validity of a

noncompetition agreement "depends in the first place upon whether [it] is reasonable in time and

geographic area." *Ticor Title*, 173 F.3d at 69. If it is, "enforcement will be granted to the extent

necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent

an employee's release of confidential information regarding the employer's customers, or (3) in

those cases where the employee's services to the employer are deemed special or unique." *Id.* at

70. Customer non-solicitation agreements are enforceable under New York law so long as they

are reasonable in scope and duration. *See, e.g., USI Ins. Servs. LLC* v. *Miner*, 801 F. Supp. 2d

175, 186–88 (S.D.N.Y. 2011).

IBM has established that the scope and duration of Smith's Noncompetition

Agreement and customer non-solicitation obligations are reasonable, and that the Company has a

legitimate interest in enforcing Smith's obligations.

*First*, the duration of the noncompetition period for Smith—one year—is

reasonable. The "durational reasonableness of a non-compete agreement is judged by the length

of time for which the employer's confidential information will be competitively valuable." *Estee*

66

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

*Lauder*, 430 F. Supp. 2d at 180. Here, the evidence shows that the trade secrets in Smith's

possession include information about new products in development that is current and will

continue to be competitively valuable over the next eight months, ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. *Supra* ¶¶ 8–17, 33–48. IBM is entitled to the commercial

and competitive advantage of ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████. IBM's next

generation Cloud is ████████████████████████████. *Supra* ¶ 15. Requiring

Smith to honor the balance of his noncompete period—*i.e.*, until May 2, 2018—is reasonable

because ██████████████████████████████████████████

███████████████████████████████████████████████████████.

      AWS's own CEO testified that ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████. *Supra* ¶ 42. A one-year noncompetition agreement is reasonable in these

circumstances. *See Papermaster*, 2008 WL 4974508, at *11 (upholding one-year period where

"the trade secrets that [the employee] has been exposed to during his long tenure at IBM are

likely to remain competitively valuable to IBM and its competitors for more than a year").

      With respect to Smith's customer non-solicitation obligations, under New York

law "there are no per se lines demarcating what constitutes an unreasonable durational or

geographic scope" in a noncompetition agreement. *See Estee Lauder*, 430 F. Supp. 2d at 180. In

67

**SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION**

the *Papermaster* case, the court found that the same one-year prohibition on customer solicitation that Smith agreed to was "'very limited in time.'" 2008 WL 4974508, at *11 (quoting *Natsource LLC* v. *Paribello*, 151 F. Supp. 2d 465, 471–72 (S.D.N.Y. 2001)). Other courts applying New York law have upheld customer non-solicitation periods of two years. *See, e.g., USI Ins. Servs.*, 801 F. Supp. 2d at 186–88 (upholding two-year non-solicitation provision).

*Second*, the geographical scope of Smith's Noncompetition Agreement, which is worldwide, is also reasonable. The record demonstrates that IBM and AWS compete in the Cloud Computing market worldwide. *Supra* ¶¶ 5–7. Thus, as in *Papermaster*, "the nature of IBM's business requires that the restriction be unlimited in geographic scope." 2008 WL 4974508, at *11 (quotation marks omitted). Other courts have upheld worldwide limits on post-employment competition in similar circumstances. *See, e.g., Estee Lauder*, 430 F. Supp. 2d at 181; *Bus. Intelligence Servs., Inc.* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984).

The geographical scope of Smith's customer non-solicitation restriction is worldwide, which, too, is reasonable because the employer (IBM) and the competitor (AWS) compete globally and Smith's job responsibilities (at IBM and AWS) are global. In *Papermaster*, the court found that "the nature of IBM's business 'requires that the restriction be unlimited in geographic scope.'" 2008 WL 4974508, at *11 (quoting *Natsource*, 151 F. Supp. 2d at 471–72). Other courts have upheld worldwide limits in post-employment customer non-solicitation provisions. *See, e.g., Marsh USA Inc.* v. *Karasaki*, No. 08 Civ. 4195, 2008 WL 4778239, at *15–18 (S.D.N.Y. Oct. 31, 2008) (upholding one-year worldwide customer non-solicitation provision).

*Finally*, an employer has a "legitimate interest" in "safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial

68

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

piracy." *Estee Lauder*, 430 F. Supp. 2d at 177 (quoting *Reed, Roberts Assocs., Inc.* v. *Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976)). Here, IBM risks having its detailed plans for the development of a next generation Cloud revealed to a competitor in the Cloud Computing market. Numerous cases confirm that IBM has a "legitimate interest" in protecting that sort of information. *See, e.g.*, *IDG USA*, 2010 WL 3260046, at *10 ("knowledge of pricing strategy or policy"); *Payment Alliance*, 530 F. Supp. 2d at 482 (knowledge of confidential software application); *Estee Lauder*, 430 F. Supp. 2d at 176 (knowledge of confidential brand strategies, pipeline products, and planned innovations); *Lumex*, 919 F. Supp. at 629–30 (knowledge of confidential strategic plans, future product offerings and projected release dates, and costs and pricing structure); *Misys Int'l Banking Sys., Inc.* v. *TwoFour Sys., LLC*, 6 Misc. 3d 1004(A), 2004 WL 3058144, at *9 (N.Y. Sup. Ct. Nov. 23, 2004) (knowledge of confidential pricing and consulting rates); *DoubleClick, Inc.* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4 (N.Y. Sup. Ct. Nov. 7, 1997) (knowledge of revenue projections, future project plans, pricing, and product strategies).

IBM also "has a legitimate interest in protecting client relationships developed by [Smith] at [IBM's] expense." *Johnson Controls*, 323 F. Supp. 2d at 534; *see also Marsh*, 2008 WL 4778239, at *15–17; *Spinal Dimensions, Inc.* v. *Chepenuk*, 847 N.Y.S.2d 905 (Table), 2007 WL 2296503, at *6 (Sup. Ct. Aug. 9, 2007) (holding that the employer's legitimate interest in protecting its client relationships extended to clients of sales representatives whom the defendant supervised); *BDO Seidman*, 93 N.Y.2d at 391 (employer has a "legitimate interest" in preventing the "competitive use, for a time, of . . . *relationships* which pertain peculiarly to the employer and which the *employee acquired* in the course of the employment") (emphasis in original).

69

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

## 2. Smith's Arguments Concerning IBM's Motive in Enforcing the Noncompetition Agreement Are Not Relevant to the Court's Analysis

Smith asserts that his Noncompetition Agreement is unenforceable because, in his view, some IBM executives had an "improper motive" in seeking to enforce that agreement. Smith argues that IBM is pursuing a policy of retention, rather than seeking to protect the confidential information that Smith possesses. Under New York law, however, Smith's Noncompetition Agreement with IBS *is* enforceable as it is necessary to protect IBM's trade secrets, regardless of what some individuals at the Company might feel or think.

In *Estee Lauder*, the court rejected the same argument as Smith advances here. There, the defendant-former employee argued that injunctive relief should be denied because the noncompetition agreement at issue in that case was being enforced for what the former employee claimed was an "impermissible purpose" of "insulat[ing] [the former employer] from competition." 430 F. Supp. 2d at 178. The former employee proffered testimony from the former employer that the agreement was being used "to secure the longevity of [the employer's] management" and "make it harder for [the employer's] competition to approach [management]." *Id.* at 178. The court held that this evidence of one purpose for the agreement did not prevent enforcement under New York law where enforcement was "necessary to prevent the misuse of trade secrets." *Id.* at 179. The court specifically addressed and rejected the former employee's (and Smith's) motive argument:

> [A]ll covenants not to compete are motivated at least in part by a company's desire to protect management talent to the extent that they are legally entitled to do so. New York law strikes a balance by permitting companies to protect their management from being lured by competitors only to the extent necessary to prevent the misuse of trade secrets.... To hold otherwise would essentially invalidate all covenants not to compete—a result New York courts obviously have not endorsed .... Accordingly, [defendant's] argument that the purpose of the Non-compete Agreement is pernicious to New York's policy regarding covenants not to compete is not credited.

70

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

*Id.* at 179 (internal citation omitted).

There is no case law to support Smith's apparent position that even if he possessed and posed a risk of disclosing IBM's trade secrets, the Noncompetition Agreement for which he was so handsomely compensated would be void, either as a matter of law or as applied to him.

Smith relies on the New York Court of Appeals' decision in *BDO Seidman*, but that case does not help him. *BDO Seidman* held that a noncompetition agreement is enforceable when "it is reasonable in time and area, [and] necessary to protect the employer's legitimate interests." 93 N.Y.2d 382 at 388. The Court did not consider evidence of the employer's motive in its discussion of that issue. Instead, only after determining that the restrictive terms in the noncompetition agreement were both facially overbroad as written *and* unreasonable as applied to the facts, did the *BDO Seidman* court consider "the conduct of the employer in imposing the terms of the agreement" to determine whether the court should narrow an "unreasonable aspect of an overbroad employee restrictive covenant." *Id.* at 394–95. Here, Smith's Noncompetition Agreement is *neither* overbroad as written *nor* unreasonable given the trade secret evidence.[6]

Smith also relies on *International Business Machines Corp.* v. *Visentin*, No. 11 Civ. 399, 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011), but that case is not on point either. In that case, the court denied IBM's request to enforce a *different* noncompetition agreement on the grounds that (a) the agreement was facially overbroad and (b) IBM had failed to demonstrate a "legitimate interest" in enforcement. Specifically, the court concluded that IBM had not proven

---

[6] The Noncompetition Agreement limits the restrictions to work which "could result in [Smith] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information." (P's Ex. 5.) A very similar provision, which likewise prohibited the former employee from working for a competitor if, as a result of such work, the employee "could misuse the trade secrets and confidential information to which he became privy while employed" with his former employer, was upheld in *Estee Lauder*. 430 F. Supp. at 179.

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

that its former employee possessed or threatened to disclose trade secrets. *Id.* at *21–22. The court cited IBM testimony that a purpose of what the court found to be an "overbroad" agreement was intended to retain talent, but did *not* rule that any improper motive rendered the agreement unenforceable as a matter of law. Instead, the court noted that because "the reasonableness of IBM's Noncompetition Agreement is determined on a case-by-case basis . . . the Court does not and cannot address the validity of the Noncompetition Agreement under New York law generally." *Id.* at *22 n.7. The scope of that old agreement was found "facially overbroad" because, as written, it would have prevented departing employees from working for any competitor in any capacity regardless of the need to protect trade secrets. *Id.* *21. Those circumstances do not apply to Smith's Noncompetition Agreement.

Smith also relies on *Visentin* for the related argument that even if evidence of an improper motive did not invalidate his Noncompetition Agreement altogether, motive would nevertheless be relevant to the question of whether IBM is seeking to protect a legitimate interest. He points to *Visentin*'s discussion of testimony from an IBM executive in that case regarding IBM's motivation. Critically, however, in *Visentin*, the court cited motive testimony only after it had already found that IBM was not seeking to protect a legitimate interest—that is, only after it had determined that IBM failed to demonstrate that the employee possessed and threatened to disclose trade secrets. *See* 2011 WL 672025, at *21-22. Indeed, the court found that "[t]he testimony from [an IBM executive] regarding IBM's motivations in pursuing its noncompetition program *only buttresses the Court's view* that IBM is not seeking to protect a legitimate interest." *Id.* at *23 (emphasis added). The alleged improper motive did not, on its

72

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

own, lead to a finding that there was no legitimate purpose for enforcement. Because IBM has demonstrated a legitimate interest in bringing this case, its motive for doing so is irrelevant.[7]

**D.    In the Alternative, Sufficiently Serious Questions Go to the Merits, and the Balance of Hardships Weighs in Favor of IBM**

IBM also has raised sufficiently serious questions going to the merits of the dispute and shown that the balance of the equities weighs in its favor to warrant the issuance of a preliminary injunction. In balancing the equities, a court "'must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood.'" *Natsource*, 151 F. Supp. 2d at 470 (quoting *Ticor Title*, 173 F.3d at 69).

Here, the balance of equities tips decidedly in IBM's favor. Smith *agreed* to wait a year before working for one of IBM's competitors, and he did so ███████████████████ ███████████████████████████████. (*See* P's Ex. 5, § 1(e).) After benefiting from those opportunities and that compensation, he left IBM voluntarily. Smith chose to start a new phase of his career at a company that competes against IBM for the very same business, revenue and future growth. There is no inequity in compelling Smith to honor his contractual undertaking to wait before beginning that job.

This is particularly so where Smith's skills can be and have been directly applied in CIO positions for companies that do not directly compete against IBM, and such positions are available to him. Smith was ███████████████████████████████████

---

[7]    Courts have observed that a party's motivation for filing suit is *not* relevant. *See Mendell In Behalf of Viacom, Inc* v. *Gollust*, 909 F.2d 724, 729 (2d Cir. 1990) (noting that a plaintiff's "motives for bringing suit are not relevant"); *Rayfield Aviation, LLC* v. *Lyon Aviation, Inc*, No. 11 Civ. 274, 2012 WL 3095332, at *2 (M.D.N.C. July 30, 2012) (concluding "that the 'motive' for the suit is not relevant to the actual breach of contract claims"); *Cresswell* v *Prudential-Bache Sec Inc*, 105 F.R.D. 64, 64 (S.D.N.Y. 1985) (decision to file suit not relevant); *Rhone-Poulenc Rorer Inc* v. *Home Indem Co*, No. 88 Civ. 9752, 1991 WL 183842, at *2 (E.D. Pa. Sept. 16, 1991) ("[T]he motive behind the institution of an action has been deemed not relevant to the subject matter involved . . . . This reasoning has been consistently followed where discovery has been sought concerning a party's motives in filing suit."); *Digital Equip Corp* v. *Sys Indus, Inc*, 108 F.R.D. 742, 743 (D. Mass. 1986) (same) (collecting cases).

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION



████████████. (PI Tr. 227:13–15.) By Smith's own account, he has ██████

████████████████████████ . (*See id.* 390:3–17.) Further, Smith

has not ████████████████████. (*Id.* 226:8–16.) AWS's CEO

(Jassy) testified by deposition, but he did ████████████████████

████████████████████—an agreement which is shorter in

duration and less broad in scope than the noncompetition agreement AWS made Smith sign

when he started in his "listen and learn" mode. (*Id.* 383:1–18.) Smith himself was ██████

████████████████████. (PI Tr. 224:22–25.)

The evidence suggests that waiting another seven months will not work a hardship

on Smith. Jassy testified that ████████████████ (Jassy Tr. 36:10–

16), that ████████████████ (*id.* 46:7–10), and that ████████

████████████. (*Id.* 46:17–23.) Moreover, Smith was ████████

████████, *supra* ¶ 26, has been able to ████████████████

██, (PI Tr. 390:3–14), and has ████████████. (*Id.* 390:15–17.)

In contrast, for the reasons set forth above, IBM faces immediate and irremediable

damage, including the disclosure of highly confidential and proprietary information, and loss of

substantial business, should AWS gain access to the knowledge Smith has about IBM's

confidential plans and strategies and the customer relationships Smith developed at IBM. *Supra*

¶¶ 33–48. In *Papermaster,* the court found that the balance of equities favored IBM because

74

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

"IBM's need to protect its legitimate business interests substantially outweighs the harm resulting to Mr. Papermaster from temporarily not working for Apple." *Papermaster*, 2008 WL 4974508, at *13. Similarly, any prejudice to Smith is substantially outweighed by the prejudice IBM would suffer absent injunctive relief.

### E.     Smith's Twelve-Month Noncompetition Agreement Should Be Enforced

For the reasons discussed above, *supra* 26–32, the factual record and case law support enforcement of the 12-month employment restriction Smith agreed to when he joined IBM and when he ███████████████████████████████. That restriction is reasonable as written, because it is limited to the risk of disclosure of confidential information; and that restriction is reasonable as applied to Smith, because he poses a risk of disclosure of confidential information.

This is not a case where "partial enforcement" or "blue penciling" applies. Those are mechanisms of enforcement where, unlike this case, the restrictive covenant is *facially overbroad* in terms of its scope, geographic reach or duration. *See, e.g.*, *Mister Softee, Inc.* v. *Tsirkos*, No. 14 Civ. 1975, 2014 WL 2535114, at *8-9 (S.D.N.Y. June 5, 2014) (finding that although the contract as written prevented competition for "well over 100 miles," the agreement should extend only to the employee's "former territories" and other targeted areas, and concluding that "the restrictive covenant, narrowed in this fashion, is reasonable"); *Misys*, 2004 WL 3058144 at *8 (paring 18-month, worldwide restriction down to 12-month restriction in specific geographic areas); *Career Placement of White Plains, Inc.* v. *Vaus*, 354 N.Y.S.2d 764, 772–73 (Sup. Ct. 1974) (observing that "courts have the power to sever 'the impermissible from the valid and uphold the [non-compete] covenant to the extent that it is reasonable'").[8]

---

[8]     Courts also have found partial enforcement of facially overbroad agreements justified where the employer demonstrates an "absence of overreaching, coercive use of dominant bargaining power, or other anticompetitive

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

Here, the one-year duration of the noncompetition period is reasonable and enforceable;[9] the geographic scope is reasonable, as IBM and AWS compete in Cloud Computing worldwide;[10] IBM has a legitimate interest in safeguarding its plans for the development of its next generation Cloud from being revealed to a competitor,[11] and in protecting the client relationships developed by Smith at IBM's expense;[12] and given Smith's possession of IBM trade secrets regarding its next generation Cloud initiatives, his proposed employment as a top executive at IBM's primary cloud competitor before the expiration of his 12-month restricted period would violate his contractual obligations.

## CONCLUSION

For the foregoing reasons, IBM is entitled to (1) an order requiring that defendant Jeff Smith's employment with AWS terminate immediately, and (2) a preliminary injunction prohibiting Smith from (a) commencing employment with or performing services as an executive for AWS prior to the expiration of his twelve-month noncompetition period (May 2, 2018); (b) directly or indirectly soliciting, for competitive business purposes, any IBM customer with which Smith was directly or indirectly involved as part of his job responsibilities during the last twelve months of his employment with IBM prior to the expiration of his customer non-solicitation

---

misconduct, but has in good-faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing." *Pure Power Boot Camp, Inc* v. *Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 508 (S.D.N.Y. 2011) (internal quotation marks omitted)).

[9] *See Estee Lauder*, 430 F. Supp. 2d at 180; *Papermaster*, 2008 WL 4974508, at *11; *USI Ins Servs* , 801 F. Supp. 2d at 186–88.

[10] *See Papermaster*, 2008 WL 4974508, at *11; *Estee Lauder*, 430 F. Supp. 2d at 181; *Bus Intelligence Servs , Inc* v. *Hudson*, 580 F. Supp. 1068, 1073 (S.D.N.Y. 1984); *Marsh*, 2008 WL 4778239 at *15–18; Krishna Decl. ¶ 57 & n.1.

[11] *See Estee Lauder*, 430 F. Supp. 2d at 176–77; *IDG USA*, 2010 WL 3260046, at *10; *Payment Alliance*, 530 F. Supp. 2d at 482; *Lumex*, 919 F. Supp. at 629–30; *Misys*, 2004 WL 3058144 at *9; *DoubleClick, Inc* v. *Henderson*, No. 116914/97, 1997 WL 731413, at *4 (N.Y. Sup. Ct. Nov. 7, 1997)

[12] *See Johnson Controls*, 323 F. Supp. 2d at 534; *see also Marsh*, 2008 WL 4778239, at *15–17; *Spinal Dimensions*, 2007 WL 2296503 at *6; *BDO Seidman*, 93 N.Y.2d at 391.

SUBMITTED UNDER SEAL
CONTAINS CONFIDENTIAL
INFORMATION

period; or (c) otherwise breaching his noncompetition, customer non-solicitation, or

confidentiality obligations to IBM.

Dated: New York, New York
August 29, 2017

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: _/s/ Robert A. Atkins_
Robert A. Atkins
Lorin L. Reisner
Gregory F. Laufer

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
ratkins@paulweiss.com

_Attorneys for Plaintiff_
_International Business Machines Corporation_

77

**SUBMITTED UNDER SEAL**
**CONTAINS CONFIDENTIAL**
**INFORMATION**