# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

        v.

JEFF S. SMITH,

                Defendant.

Case No. 7-17-cv-05808 (CS) (PED)

## DEFENDANT JEFF SMITH'S REVISED
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORGAN, LEWIS & BOCKIUS LLP

Michael L. Banks (*pro hac vice*)
Sarah E. Bouchard (*pro hac vice*)
Brandon J. Brigham (*pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

SCHULTE ROTH & ZABEL LLP

Ronald E. Richman
Max Garfield
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Defendant Jeff Smith*

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    PROPOSED FINDINGS OF FACT ......................................................................5

       A.    Publicly Held Information Concerning Cloud Computing.......................5

       B.    IBM's Non-Competition Program ...........................................................5

       C.    Mr. Smith's Employment at Suncorp .....................................................8

       D.    Mr. Smith's Employment at IBM ............................................................9

       E.    Mr. Smith Was Not Responsible For IBM's Cloud Strategy ...............13

       F.    Mr. Smith's Loyalty to IBM ..................................................................14

       G.    Mr. Smith's Communications with Mr. Jassy .....................................15

       H.    IBM's Attempt to Mislead the Court as to the IBM Procedures Mr. Smith
             Followed in Returning His Electronic Devices ...................................16

       I.    Mr. Smith's Employment at AWS .........................................................17

       J.    Purported IBM Trade Secrets and Confidential Information Known to
             Mr. Smith..............................................................................................21

       K.    Any Remaining Confidential Information that IBM Seeks to Protect
             Would Not Be Useful to Mr. Smith at AWS .........................................36

       L.    IBM Failed to Protect Its Trade Secrets Before and During This Litigation .......37

       M.    Balancing of the Hardships ..................................................................39

III.   PROPOSED CONCLUSIONS OF LAW ............................................................40

       A.    IBM Failed to Meet Its Burden of Proving Circumstances Warranting a
             Preliminary Injunction..........................................................................40

       B.    IBM Has Failed To Demonstrate a Likelihood of Success on the Merits............41

       C.    IBM Is Attempting To Enforce Its Non-Competition Agreement In An
             Overbroad And Anti-Competitive Manner ...........................................52

       D.    IBM Has Failed To Demonstrate Imminent And Irreparable Harm ...................55

       E.    IBM Cannot Establish That The Balance Of Equities Tips In Its Favor.............57

IV.    CONCLUSION ....................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Broad. Cos. v. Wolf,*
52 N.Y.2d 394 (1981) ..................................................................................40

*Am. Inst. Of Chem. Eng'rs v. Reber-Friel Co.,*
682 F.2d 382 (2d Cir. 1982) ............................................................40, 41, 59

*AM Media Comm. Group v. Kilgallen,*
261 F. Supp. 2d 258 (S.D.N.Y. 2003) .......................................................50

*Awards.com, LLC v. Kinko's, Inc.,*
42 A.D.3d 178 (N.Y. App. Div. 1st Dep't 2007) ......................................48

*BDO Seidman v. Hirshberg,*
93 N.Y.2d 382 (N.Y. 1999) .................................................................41, 42

*Biovail Lab., Inc. v. Anchen Pharm., Inc.,*
463 F. Supp. 2d 1073 (C.D. Cal. 2006) ....................................................47

*Borey v. Nat'l Union Fire Ins. Co.,*
934 F.2d 30 (2d Cir. 1991) .......................................................................55

*Brandwynne v. Combe Int'l, Ltd.,*
74 F. Supp. 2d 364 (S.D.N.Y. 1999) ........................................................46

*Carpetmaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.,*
12 F. Supp. 2d 257 (N.D.N.Y. 1998) ........................................................45

*Defiance Button Machine Co. v. C & C Metal Products,*
759 F.2d 1053 (2d Cir. 1985) ............................................................46, 47

*Doninger v. Niehoff,*
527 F.3d 41 (2d Cir. 2008) .......................................................................57

*DS Parent, Inc. v. Teich,*
No. 5:13-CV-1489, 2014 WL 546358 (N.D.N.Y. Feb. 10, 2014) ...........40, 42, 43

*Earthweb, Inc. v. Schlack,*
71 F. Supp. 2d 299 (S.D.N.Y. 1999) ...................................................passim

*Editions Play Bac, S.A. v. W. Pub. Co., Inc.,*
No. 92-cv-3652, 1993 WL 541219 (S.D.N.Y. Dec. 28, 1993) ................44

-ii-

*Estee Lauder Companies v. Batra*,
   430 F. Supp. 2d 158 (S.D.N.Y. 2006) ............................................................. 52

*Faiveley Transport Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ........................................................................... 46

*Fireman's Ins. Co. of Newark v. Keating*,
   753 F. Supp. 1146 (S.D.N.Y. 1990) ............................................................... 57

*Free Country Ltd v. Drennen*,
   235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016) .................................................... 45

*Freedom Holdings, Inc. v. Spitzer*,
   408 F.3d 112 (2d Cir. 2005) ..................................................................... 55, 56

*Frink Am., Inc. v. Champion Rd. Mach. Ltd.*,
   48 F. Supp. 2d 198 (N.D.N.Y. 1999) ............................................................. 44

*Geritrex Corp. v. DermaRite Indus., LLC*,
   910 F. Supp. 955 (S.D.N.Y. 1996) ................................................................. 52

*Glaxo Inc. v. Novopharm Ltd.*,
   931 F. Supp. 1280 (E.D.N.C. 1996), *aff'd*, 110 F.3d 1562 (Fed. Cir. 1997) .......... 47

*Great Lakes Carbon Corp. v. Koch Indus., Inc.*,
   497 F. Supp. 462 (S.D.N.Y. 1980) ................................................................. 46

*Greenblatt v. Prescription Plan Services Corp.*,
   783 F. Supp. 814 (S.D.N.Y. 1992) ................................................................. 46

*H. Meer Dental Supply Co. v. Commiso*,
   702 N.Y.S.2d 463 (3d Dep't 2000) ................................................................. 43

*Hudson Hotel Corp. v Choice Hotels Int'l*,
   995 F.2d 1173 (2d Cir. 1993) ......................................................................... 44

*IBM v. Johnson*,
   629 F. Supp. 2d 321 (S.D.N.Y. 2009) ...................................................... 58, 59

*IBM v. Papermaster*,
   No. 08-cv-9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008) ................... 42, 51

*IBM v. Simonson*,
   988 N.Y.S.2d 523, 2014 WL 783486 (Sup. Ct. 2014) ................................ 44, 56

*IBM v. Visentin*,
   No. 11-cv-399, 2011 WL 672025 (S.D.N.Y. Feb. 16, 2011), *affirmed* 437 F.
   App'x 53 (2d Cir. 2011) ....................................................................... passim

*Johnson v. Kay,*
    860 F.2d 529 (2d Cir. 1988) ........................................................................................40

*LinkCo, Inc. v. Fujitsu Ltd.,*
    230 F. Supp. 2d 492 (S.D.N.Y. 2002) .......................................................................45

*Littlejohn v. Bic Corporation,*
    851 F.2d 680 (3d Cir. 1988) ........................................................................................47

*Marietta Corp. v. Fairhurst,*
    754 N.Y.S.2d 62 (3d Dep't 2003) ...................................................................43, 44, 45, 49

*Marinelli v. Medco Health Sols., Inc.,*
    951 F. Supp. 2d 303 (D. Conn. 2013) .......................................................................49

*Muhammad v. Jenkins,*
    No. 12-cv-8525 CM, 2013 WL 5225573 (S.D.N.Y. Sept. 13, 2013).......................41

*NML Capital, Ltd. v. Republic of Argentina,*
    699 F.3d 246 (2d Cir. 2012) ........................................................................................58

*Pella Windows & Doors v. Buscarena,*
    No. 07-cv-82, 2007 WL 2089298 (E.D.N.Y. July 18, 2007) ...................................58

*Pilot Comms., LLC v. Corlett,*
    665 N.Y.S.2d 377 (N.Y. App. 1997)..........................................................................52

*Rambus, Inc. v. Infineon Techs. AG,*
    No. 00-524, 2005 WL 1081337 (E.D. Va. May 6, 2005)..........................................47

*Reed, Roberts Assoc., Inc. v. Strauman,*
    40 N.Y. 2d 303 (1976).................................................................................................41

*Republic of the Phillippines v. Westinghouse Elec. Corp.,*
    949 F.2d 653 (3d Cir. 1991) ........................................................................................48

*Reuters Ltd. v. United Press Int'l, Inc.,*
    903 F.2d 904 (2d Cir. 1990) ........................................................................................55

*Rodriguez v. DeBuono,*
    175 F.3d 227 (2d Cir. 1999) ........................................................................................55

*Rodriguez v. Rodriguez,*
    175 F.3d 277 (2d Cir. 1999) ........................................................................................55

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984) .....................................................................................................46

*Sasqua Grp., Inc. v. Courtney,*
    No. 10-528, 2010 WL 3613855 (E.D.N.Y. Aug. 2, 2010) ......................................47

*Seneca One Fin., Inc. v. Bloshuk,*
    214 F. Supp. 3d 457, 463 (D. Md. 2016)..............................................................54

*SG Cowen Securities Corp. v. Messih,*
    224 F.3d 79 (2d Cir. 2000) .............................................................................51, 54

*Silipos, Inc. v. Bickel,*
    No. 1:06-cv-02205, 2006 WL 2265055 (S.D.N.Y. Aug. 8, 2006) ...................43, 45

*Ticor Title Ins. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) ...................................................................................42

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ...............................................................................40, 41

*Veramark Techs., Inc. v. Bouk,*
    10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014)...........................................................51

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    No. 09-480, 2012 WL 512681 (W.D. Pa. Feb. 14, 2012) ....................................48

*Weiss v. Allstate Ins. Co.,*
    No. 06-cv-3774, 2007 WL 2377119 (E.D. La. Aug. 16, 2007)............................47

**OTHER AUTHORITIES**

*AWS Price Reduction - SQL Server Standard Edition on EC2* (last accessed Aug.
    11, 2017), https://aws.amazon.com/blogs/aws/category/price-reduction/ .............27

Ed Scannell, *IBM Strategic Imperatives mark a transition into software and*
    *services* (July 2017), http://searchdatacenter.techtarget.com/feature/IBM-
    Strategic-Imperatives-mark-a-transition-into-software-and-services (last
    visited Aug. 25, 2017) .........................................................................................25

Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (June
    25, 2017), https://www.gartner.com/doc/reprints?id=1-
    2G2O5FC&ct=150519&st=sb&aliId=692290087;.........................................13, 35

http://www.cloudping.info/ (last visited Aug. 25, 2017)................................................26

https://aws.amazon.com/elasticloadbalancing/ (last visited Aug. 15, 2017).................26

https://azure.microsoft.com/en-us/services/load-balancer/ (last visited Aug. 15,
    2017)....................................................................................................................26

https://www.intel.com/content/www/us/en/ products/processors/xeon/e5-processors.html (last visited Aug. 25, 2017) .........................................................26

IBM, Biographies, https://www-03.ibm.com/press/us/en/biographies.wss (last visited August 9, 2017).........................................................................11

Jordan Novet, *IBM Launches Object Service on Bluemix, 10 years after AWS Launched S3* (Dec. 7, 2015), available at https://venturebeat.com/2015/12/07/ibm-launches-object-storage-service-on-bluemix-10-years-after-aws-launched-s3/ (last visited Aug. 27, 2017) ...................................32

Simon Sharwood, *IBM CIO leaves for AWS – and Big Blue Flings Sueball To Stop Him*, The Registrar (August 9, 2017) https://www.theregister.co.uk/2017/08/09/ibm_sues_former_cio_who_wants_to_work_for_aws/.........................................................................................14

Steve Rosenbush, *IBM CIO Designs New IT Workflow for Tech Giant Under Pressure*, Wall Street Journal (April 27, 2015) ......................................10

U.S. SEC, *IBM Form 10-K for the Year Ended December 31, 2015*, https://www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226 548z10-k.htm..............................................................................................35

VentureBeat (Dec. 7, 2015), available at https://venturebeat.com/2015/12/07/ibm-launches-object-storage-service-on-bluemix-10-years-after-aws-launched-s3/ (last visited Aug. 27, 2017) ...........................................................................32

# I.    INTRODUCTION

On August 1, 2017, Plaintiff International Business Machines Corporation ("IBM") ran into this Court declaring that it faced an emergency. It claimed that Defendant Jeff Smith, a former executive who left IBM three months earlier, had breached his IBM non-competition agreement by accepting a job at Amazon Web Services ("AWS"). In a publicly filed Complaint, IBM claimed that Mr. Smith was privy to the "crown jewels" of IBM's next generation public cloud, and that disclosure of its trade secrets was imminent. The tale woven to support such an imminent threat was two-fold: Mr. Smith nefariously wiped his iPad and iPhone on his way out the door, and Mr. Smith had *already* shared confidential IBM information with Andrew Jassy, the CEO of AWS. Based on these representations, IBM claimed that it would suffer irreparable injury if Mr. Smith were to work for AWS in *any* capacity.

We now know that IBM's factual arguments, many of which it is has abandoned, were false. Despite considerable foot dragging by IBM, discovery confirmed that Mr. Smith followed IBM's protocols when returning his devices, and IBM has effectively conceded that Mr. Smith did not share any confidential information with Mr. Jassy. Meanwhile, IBM's trade secret claims have collapsed into a mix of factual misrepresentations and hyperbole. The only purported "trade secret" still standing is the "monthly cost per server" that IBM hopes to achieve ███████████████████████████████████████████████████████████████. Even that projected cost per server number has been shown to be a useless metric, not only because it is speculative but because it is bereft of any supporting information that would identify the components and underlying calculations. It is also a number that Mr. Smith had no reason to remember before IBM placed it in front of him repeatedly in this litigation. IBM's own witness, John Considine, who is in charge of developing and advancing IBM's next generation

cloud, also could not remember the figures presented in Technology Team meetings, despite studying them in connection with this litigation.

In his new role at AWS, Mr. Smith has no reason or need to violate the restrictions expressed in his IBM non-compete agreement. Mr. Smith's non-compete agreement purports to restrict him from working for a competitor for a year after his departure from IBM, *but only* if the performance of his duties at AWS "could result in [the executive] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information." Krishna Decl., Ex. 1A at § 1(e)(i). Those circumstances are not present here. As Andrew Jassy testified, AWS created a position for Mr. Smith that will not result in the disclosure of or reliance upon IBM's confidential information. Mr. Smith will not have any role in designing the infrastructure of the AWS cloud, network, usage of compute, or usage of storage; in cloud storage pricing; or in cloud storage commercial sales (except to the extent the sale may include a component for one of his existing areas of responsibility). IBM has failed to demonstrate that Mr. Smith's role at AWS, which is completely different from his role at IBM, would pose any risk of disclosure of IBM trade secrets.

Nevertheless, IBM expresses an unsubstantiated and abstract fear that even with these restrictions in place, Mr. Smith will spill the beans to Mr. Jassy. At most, it offers "remote" and "speculative" concerns, rather than a genuine risk of "actual and imminent" harm warranting the entry of injunctive relief. *See IBM v. Visentin*, No. 11-cv-399, 2011 WL 672025, at *22 (S.D.N.Y. Feb. 16, 2011), *affirmed* 437 F. App'x 53 (2d Cir. 2011). It is undisputed that Mr. Smith did not share one trade secret in his multiple conversations with Mr. Jassy in emails and discussions spanning several years. Mr. Jassy never asked for any such information and Mr. Smith never provided any. Mr. Smith may have been candid, rude, or perhaps even

2

unprofessional in how he described IBM's leadership, but he never revealed anything remotely close to a trade secret. Beyond that, the examination of the laptop Mr. Smith turned in five months ago revealed no improper copying, forwarding or misuse of IBM confidential information. After this examination, James Kavanaugh, Mr. Smith's boss, wanted Mr. Smith to stay at IBM and offered to discuss increasing Mr. Smith's salary if he were willing to consider doing so.

On a more fundamental level, the so-called trade secrets that IBM has cited, including those that we now know IBM announced to the technology industry, would have no value to AWS. Mr. Smith simply knows what everyone in the marketplace is saying, and what his expert witness confirmed without any access to IBM's so-called confidential information: that IBM would like to find a way to add cloud capacity and reduce its cost (and prices) to compete more effectively with AWS, and that it is endeavoring to do so. (Declaration of Jeff P. Smith ("Smith Decl.") ¶¶ 36, 40-42).

The reality is that this lawsuit is not about protecting trade secrets. Instead, it is about: (1) punishing an executive who was critical of IBM's business and who has now chosen to work elsewhere; and, (2) sending a strong message to 1,700 IBM employees with non-competition agreements that they, too, will suffer dire consequences if they accept employment with competitors in non-threatening positions. These strong-arm tactics are no different from the same failed maneuvers six years ago, when IBM sought to prevent a former executive from working at Hewlett Packard ("HP"). *See IBM v. Visentin, supra.* Chief Judge Loretta Preska properly rebuked those tatics. In a 61-page opinion, Chief Judge Preska stated that IBM's non-competition agreements were "retention devices . . . designed *not to protect a legitimate business interest* but, rather, to keep the leadership talent of IBM from leaving." *Id.* at *22 (emphasis

added). Chief Judge Preska even included a "Coda" in which she raised serious questions about IBM's improper use of retention devices cloaked in the form of a non-competition agreement.

Unfortunately, notwithstanding some cosmetic changes in its form agreements since the *Visentin* case, IBM's litigation tactics are unchanged. Essentially, IBM is seeking to preclude Mr. Smith from working as though the prior form was still in effect. That was confirmed by Mr. Smith's former IBM superior (Senior Vice President James Kavanaugh) and by IBM's in-house attorney (Teri Wood). Mr. Kavanaugh and Ms. Wood confessed to Mr. Smith that this lawsuit was punitive, rather than protective; neither took the witness stand to deny what Mr. Smith attributed to them. Indeed, IBM presented no evidence from the Human Resources managers responsible for the non-compete program, or from its CEO Ms. Rometty, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████.

The bottom line is that IBM still seeks to restrain competition unlawfully. In its quest to sideline Mr. Smith, IBM has made repeated misrepresentations to this Court. It claimed information was trade secret when it had already announced those alleged secrets to the public. It claimed that launch dates were confidential even though ████████████████████████ ████████. It defamed Mr. Smith and failed to produce its policies on wiping of devices until backed into a corner. Then, as revealed just last week, it proffered a phony explanation that Mr. Smith should have ignored that policy when returning his devices because he should have expected litigation even though IBM and its team of lawyers did not issue a legal hold until after this litigation commenced. IBM comes to this Court with unclean hands but no substantive showing of an "actual and imminent" risk to its trade secrets.

4

## II.      PROPOSED FINDINGS OF FACT

### A.      Publicly Held Information Concerning Cloud Computing

1.       Cloud computing refers to the delivery of computing services remotely. Cloud computing is an approximately $264 billion year business. The IaaS (infrastructure as a service) and PaaS (platform as a service) market segments are led by three key players: Amazon Web Services ("AWS"); Microsoft, and Alphabet Inc., the parent company of Google. (*See* Declaration of Bernard Golden ("Golden Decl.") ¶¶ 13-20). AWS currently serves as the "benchmark in the industry" because it is the "most advanced cloud provider . . ." (Hr. Tr. 203:8-13).

2.       IBM, a latecomer to the cloud computing market, does not offer anywhere near the breadth and scope of cloud offerings as AWS. (Golden Decl. ¶ 21). IBM has not innovated or improved its cloud offerings at the pace of AWS. (*See id.* at ¶¶ 22-26; Hr. Tr. 203:5-13). While IBM has announced an intention to compete more effectively with AWS in the future, this aspiration is not a secret. In addition to the articles and presentations in the public domain, IBM has made very detailed disclosures of what it intends to do in its cloud program, including details relating to its cost and design. (Golden Decl. ¶¶ 27-40, Ex. 2 & 3; Hr. Tr. 196:20-199:16).

### B.      IBM's Non-Competition Program

3.       IBM's former Senior Vice President of Human Resources, James Randall MacDonald, the self-proclaimed architect of IBM's non-competition program, testified in the *Visentin* litigation that IBM views its non-competition agreements as "retention devices." 2011 WL 672025, at *22. IBM adopted the program primarily to dissuade employees from leaving their employment. *Id.*

4.       After the *Visentin* decision, the language of the agreements was changed to state

that IBM executives are precluded from working for competitors for a year if the employment "*could* result in [the executive] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information." Krishna Decl., Ex. 1A at § 1(e)(i) (emphasis added). The form agreement contains no additional guidance or definition that would enable employees, competitors or courts to determine how such a risk would be evaluated, *i.e.*, whether a mere hypothetical or remote possibility of disclosure would be enough to prevent a former executive from working elsewhere.

5.     Despite the changes in the language of the non-competition agreement, IBM still uses its restrictive covenant program and the threat of litigation to restrain executives from leaving and to punish former executives who decide to work for competitors even in non-threatening positions. An in-house IBM attorney, Teri Wood, admitted to Mr. Smith that the revised non-compete agreement was drafted to keep executives from leaving IBM. (Smith Decl. at ¶ 62, Hr. Tr. 281:3-10). IBM's Senior Vice President of Transformation and Operations, James Kavanaugh, who was also Mr. Smith's immediate superior, stated that IBM was being punitive in its threats to prevent Mr. Smith from working at AWS. (*Id.* at ¶ 66; Hr. Tr. 39:20-40:4).

6.     IBM did not even attempt to rebut those points with testimony from Ms. Wood or Mr. Kavanaugh, even though Ms. Wood sat though all three days of the evidentiary hearing. Indeed, it did not present a single witness to testify about the purpose of its "revised" non-competition program or the decision to seek enforcement to put Mr. Smith out of work. (Hr. Tr. 40:5-6).

7.     ████████████████████████████████████████████

████████████████████████████████████████████████

6

████████████████████████████████████████████. (Court Ex. 12, IBM-

JSS_00014697-98; *see also* Hr. Tr. 36:10-38:11). At that time, Ms. Rometty had no information

as to what Mr. Smith's job would entail at AWS, whether Mr. Smith still had access to

confidential information that was shown to him months earlier, or whether it was possible to

scope his job at AWS so that he would not be in a position to use IBM trade secrets. Without

any information suggesting wrongdoing by Mr. Smith, ████████████████████████████████

████████████████████████████████████████.

    8.    ██████████████████████████████████████████████, and as

confirmed to Mr. Smith by his immediate superior, Mr. Kavanaugh, and by IBM's attorney, Ms.

Wood, IBM is seeking to punish Mr. Smith for leaving the company and accepting a position

with a competitor and send a message to other IBM executives who may consider leaving IBM,

rather than focusing on his duties and responsibilities at AWS to determine whether there is a

risk of Mr. Smith using IBM trade secrets.

    9.    IBM's non-competition program works in tandem with a "clawback" mechanism.

(Am. Compl. ¶¶ 66-74). If an employee engages in what IBM determines to be "detrimental

activity" or violates his or her non-competition agreement, IBM can choose to invoke the

clawback mechanism, meaning it can (a) cancel all of that employee's unvested and unexercised

equity grants; and (b) recover from the employee the dollar value of vested equity that the

employee has already cashed out in the year before the departure. (*Id.*). As a result, the

clawback can make it extremely expensive or even impossible for an employee to leave IBM and

begin working for a competitor. *Visentin*, 2011 WL 672025, at *22 ("the clawback provision

appears to be punitive; its only real purpose is to make it prohibitively expensive for an

employee to leave his current employment with IBM").

7

10.     Here, Mr. Smith has already repaid to IBM a $600,000 signing bonus that he received when he joined the company. (Smith Decl. ¶ 70). Beyond that, IBM is seeking to clawback an additional $1.7 million in equity that vested and per the terms of the plan set forth by IBM was no longer subject to clawback. At the same time, IBM is attempting to prevent Mr. Smith from working at AWS and earning a living. (Am. Compl. ¶¶ 11, 82, 96; Smith Decl. ¶¶ 70-71).

11.     Despite IBM's insistence that enforcing Mr. Smith's Non-Competition Agreement is the only way to protect its trade secrets, IBM has conceded that employees in critical engineering and product development roles who were exposed to the very same confidential information as Mr. Smith are not subject to non-competition agreements, but rather, IBM is sufficiently protected by its non-disclosure provisions. (Hr. Tr. 135:15-136:20; *see also id.* 83:20-85:21 (conceding that IBM permits its California Technology Team participants to see the same materials even though they are not subject to a non-competition agreement)). Mr. Considine testified that IBM's non-competition program is based on an individual's seniority, and that non-executives – including several hundred employees who are part of the innovation group and who are exposed to highly technical trade secrets – do not have non-competition agreements. (*Id.* 152:11-153:1). IBM relies on confidentiality agreements to protect the trade secrets developed by, and shared with those other employees, and has conceded by its actions that non-competition agreements are unnecessary in protecting such information.

### C.     Mr. Smith's Employment at Suncorp

12.     Prior to working at IBM, Mr. Smith worked at Suncorp and Suncorp Business Services ("SBS"), a finance, insurance, and banking corporation headquartered in Brisbane, Australia, as the Chief Information Officer ("CIO") and Chief Executive Officer ("CEO"),

respectively. (Smith Decl. ¶¶ 7, 15; Hr. Tr. 251:12-20). While at Suncorp, Mr. Smith partnered with AWS to move its transactional systems, web sites, mobile apps, and data streaming services onto the AWS cloud. (Smith Decl. ¶ 77; Jassy Decl. ¶ 5). It was through this partnership that Andrew Jassy, the current CEO of AWS, recognized Mr. Smith's "uncommon vision, leadership skills and ingenuity," and was impressed with Mr. Smith's leadership throughout the high-speed migration. (*Id.*). Following Mr. Smith's departure from Suncorp, Mr. Smith and Mr. Jassy remained in contact on both a professional and personal level. (*Id.* at ¶ 7).

13.     Mr. Smith does not have a background in developing technology. (Smith Decl. ¶ 3). His resume evidences a varied career, in which he moved into increasingly prominent roles at a number of companies due to his managerial and leadership skills, rather than technical expertise. Mr. Smith was not hired by IBM to develop or improve technology, but instead because of his demonstrated ability to build, develop, and lead agile teams, which remained his focus throughout his relatively brief tenure at IBM. (Smith Decl. ¶¶ 2-3; Wall Street Journal, *IBM CIO Designs New IT Workflow for Tech Giant Under Pressure*[1]).

### D.     Mr. Smith's Employment at IBM

14.     In August 2014, Mr. Smith became the CIO of IBM. (Smith Decl. ¶¶ 12-13). As CIO, Mr. Smith had two primary responsibilities. First, based on the general "know-how" he had acquired at Suncorp, he was tasked with implementing "Agile," a particular method of managing and structuring large organizations that is increasingly prevalent in the technology industry, and which he implemented successfully at Suncorp. Second, he was responsible for overseeing IBM's Information Technology ("IT") department. The IT department provides tools, such as software, hardware and applications, to IBM employees. IT also supports IBM

employees with problems that arise with the use of those tools. (*Id.* at ¶¶ 2, 20-27).

15.     In the IBM CIO role, Mr. Smith was focused on IBM's internal technology services. He had no role in developing products, marketing strategy for customers, or leading sales teams. (*Id.* at ¶¶ 18-28). Mr. Smith testified that while he had meetings with many CIOs at other companies during his time at IBM, he never discussed cloud computing, including IBM's cloud, in those meetings; rather the content was always around agile transformation. (*Id.* ¶ 46; Hr. Tr. 385:23-386:2, 4491:1-21).

16.     Mr. Smith's team often had a role in pilot programs as a consumer of IBM's products and services. This consumer role included IBM's cloud services. Mr. Smith was routinely pressured by senior leadership, including IBM's CEO Virginia "Ginni" Rometty, to utilize IBM's cloud services rather than services offered by competitors. While Mr. Smith was willing to support IBM's understandable goal to use its own cloud offerings rather than support competitors, he also recognized that IBM's cloud services were considerably more expensive, that they lacked key features █████████████████████████████████████████████ ██████████████████████████████████████████████████████████ █████████████████████████████████████████████████ █████. ███████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████

17.     Mr. Smith's pursuit of better tools for IBM employees was stifled by senior leadership at IBM, which often insisted that the company use its own software on its own cloud,

---

[1] Steve Rosenbush, *IBM CIO Designs New IT Workflow for Tech Giant Under Pressure*, Wall Street Journal (April 27, 2015), https://blogs.wsj.com/cio/2015/04/27/ibm-cio-designs-new-it-workflow-for-struggling-tech-giant/.

notwithstanding their widely recognized technical shortcomings and the availability of superior cloud services from AWS and other companies. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18.     Mr. Smith had little to no awareness – or for that matter, reason to learn of – IBM's confidential information regarding its cloud services offerings. Such in-depth knowledge of the technology and IBM's strategies to improve its service was not necessary for Mr. Smith to execute his role as the company's CIO. (*Id.* at ¶¶ 28-41). Additionally, while Mr. Smith certainly had important responsibilities at IBM, he was only one of the 65 top executives, and there were 17 senior vice presidents who had higher level positions. IBM, Biographies, https://www-03.ibm.com/press/us/en/biographies.wss (last visited August 9, 2017). Mr. Smith was not a member of IBM's Operating or Strategy Teams, which are comprised of IBM's most senior executives and which are responsible for the most important strategic decisions at IBM.

19.     As the CIO of IBM, Mr. Smith was not responsible for the sales or development of any IBM cloud-based services or products. (Smith Decl. ¶ 34). Because of his role's internal focus, Mr. Smith did not have a business reason to probe specifics of IBM's external sales strategy or product development. (*Id.* at ¶¶ 28, 34-36). IBM makes much of the fact that Mr. Smith was occasionally invited to certain leadership meetings that included IBM's cloud business as an agenda item. (Krishna Decl. ¶¶ 21-22, 35). But IBM is able to point to just a few isolated leadership meetings that Mr. Smith attended, the last of which was in December 2016,

*six months* before Mr. Smith left the company. (Smith Decl. ¶¶ 29-33, 38-41). While IBM suggests that Mr. Smith may have retained specific details of cloud presentations given at these meetings, its assertion is speculative at best, and actually implausible given that IBM's own witness and leader of IBM's next generation cloud could not remember many of those details and Mr. Smith's lack of responsibility for IBM's cloud business. (Hr. Tr. 138: 24-139:12, 152:7-10). There is no evidence that Mr. Smith remembered any detailed technical information from these old presentations. Rather, Mr. Smith remembers only rudimentary and high level points that are well known in the industry and not confidential. IBM has proffered no evidence credibly suggesting that Mr. Smith took materials or documents from IBM, and it has offered no evidence that any information he may have remembered prior to the commencement of this litigation would be useful to him or AWS nearly a year later in his position at AWS. (Hr. Tr. 29:25-30:2).

20.     To the extent that IBM's cloud products and services were discussed in meetings that Mr. Smith attended in 2016, much of this information has since become stale or has been announced to the public. (Golden Decl. ¶¶ 28-29); *see also infra* ¶ 48.



; *see* June 15, 2017 Gartner Report (noting that IBM "is in the midst of a 'Next-Generation Infrastructure' (NGI) engineering project, but it has not announced a release date"); The Register, IBM CIO leaves for AWS – and Big Blue Flings Sueball To Stop Him ("history suggests Big Blue will struggle to deliver its next-gen

cloud on time").[2] ████████████████████████████████

████████████████████████████████████████████████████.

21.     Because Mr. Smith was not involved in the development or design of IBM's next generation cloud products, the details of which were not necessary for him to do his job, his memory of the briefings provided at Technology and Performance Team meetings is limited.  He recalls generalized status updates, similar to what IBM has shared externally to stir up interest in its upcoming cloud products, and some of the discussions that took place at the meetings, but not the technical details of product development projections that had no utility to him in his job as IBM's CIO.  *See infra* ¶ 48.

22.     Mr. Smith also does not have technical expertise or know-how that would enable him to design or implement technology-based solutions to client needs.  (Smith Decl. ¶ 40).  For example, although IBM asserts that Mr. Smith knows confidential information about IBM's cloud services and offerings, Mr. Smith testified, without contradiction, that he has limited technical knowledge, and no expertise, with respect to developing a cloud or cloud-based services.  (*Id.*; Smith. Decl. ¶¶ 3, 12, 36, 45, 80).

23.     In sum, Mr. Smith is not a technical expert, developer, marketer or salesperson, but rather a business manager trained in organizational leadership who was recruited to IBM and then to AWS because of his demonstrated ability to develop and lead teams – a skill independent of industry or technical expertise.

**E.     Mr. Smith Was Not Responsible For IBM's Cloud Strategy**

24.     Less than three years ago, IBM hired Mr. Smith as its CIO.  (Smith Decl. at ¶ 12).

---

[2] Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (June 25, 2017),
https://www.gartner.com/doc/reprints?id=1-2G2O5FC&ct=150519&st=sb&aliId=692290087; Simon Sharwood,

This managerial role was consistent with Mr. Smith's job history. (*Id.* at ¶¶ 12-14). Mr. Smith's primary responsibility at IBM was to set internal information technology policy and to provide effective leadership disciplines in forming teams and distributing work among those teams. (*Id.* at ¶¶ 13-14; *see also* Pl. Ex. 52A).

25.     During his brief tenure at IBM, Mr. Smith was exposed to new products primarily because his internal team was part of a pilot program for such products. (*Id.* at ¶ 5). As noted above, he was not responsible for technical innovation or for developing new products to be offered outside or inside of IBM.

**F.     Mr. Smith's Loyalty to IBM**

26.     While at IBM, Mr. Smith endeavored to equip IBM employees with the best possible tools and resources to perform their job responsibilities efficiently and effectively. (*Id.* at ¶¶ 2, 20). Mr. Smith has testified that every action he took in his role as CIO was with the best intentions in mind, and the fact that his criticisms and recommendations were unpopular or rejected does not render his intentions any less genuine. (*Id.* at ¶ 11).

27.     Mr. Smith's concerns about the performance of IBM's cloud are similar to what other CIOs' concerns would be. IBM's cloud failed to support his team's needs so his desire to use the AWS cloud was motivated by providing the best possible services to his internal IBM team so they could perform their jobs, as well as his goal to help grow IBM's revenues. (Hr. Tr. 128:4-10). Understanding IBM's cloud's inability to deliver the services that Mr. Smith's team required, John Considine felt that Mr. Smith's concerns were "legitimate." Mr. Considine said he had no reason to distrust Mr. Smith, whose goal was to make sure that the IBM's cloud platform met his team's requirements. (*Id.* at 127:23-128:25). In fact, Mr. Considine conceded

that his limited conversations with Mr. Smith focused on what needed to be improved with IBM's cloud platform so the CIO's office could use the cloud effectively. (*Id.* 126:1-7).

28.     Even after leaving IBM, Mr. Smith has continued to try to help IBM succeed. First, on April 25, 2017, Mr. Smith wrote to IBM's CEO and Chair, Ms. Rometty, that in light of his upcoming role at AWS, he hoped that he could become an advocate for IBM at AWS and he believed that IBM could benefit from working together with AWS. (Smith Decl. at at ¶ 68). This letter was not acknowledged by Ms. Rometty, nor did she respond in any way. (*Id.*). Second, Mr. Smith did some consulting work with the Cleveland Clinic and ANZ Bank after departing IBM. (*Id.* at ¶ 73).[3]  In both cases, Mr. Smith introduced these clients to Sean Reilley, who leads the Agile consulting services at IBM, and now both companies have active engagements with IBM for the first time for IBM's business consulting services. (*Id.; see also* Pl. Ex. 52A).  None of Mr. Smith's interactions was aimed at obtaining business for AWS.

**G.     Mr. Smith's Communications with Mr. Jassy**

29.     Because of the relationship that they formed while Mr. Smith was at Suncorp, Mr. Smith and Mr. Jassy continued to exchange correspondence while Mr. Smith was employed by IBM. (Hr. Tr. 319:22-320:1; 412:1-7).  During these exchanges, Mr. Smith expressed his frustration at various IBM actions and their current cloud offering.[4]  (Hr. Tr. 310:17-20).  For example, in response to an email from Mr. Jassy in which Mr. Jassy expressed frustration that IBM intended to omit its partnership with AWS and Google on a specific deal, Mr. Smith agreed

---

https://www.theregister.co.uk/2017/08/09/ibm_sues_former_cio_who_wants_to_work_for_aws/.

[3]      ANZ Bank is a distinct entity from Key Bank. Mr. Smith did not work for Key Bank but instead had dinner with his college roommate. (Hr. Tr. 229:7-230:18).

[4]      Mr. Smith recognizes that these communications did not portray him in the best light and he could have chosen his words more carefully. (Hr. Tr. 311:1-5).  But this unprofessional language in no way demonstrates Mr. Smith would disclose confidential or trade secret information at AWS.  To the contrary, these emails confirm that Mr. Smith recognizes the boundaries of what he can share.

with Mr. Jassy and expressed similar frustration. (Jassy Dep. 108:6-17; Hr. Tr. 450:9-19).
Likewise, Mr. Smith vented to Mr. Jassy that IBM's cloud did not have basic offerings –
publicly available information well known to the market. (Hr. Tr. 421:8-16).

30.     Despite having more than three years of communications between Messrs. Smith
and Jassy, IBM did not offer into evidence a single email or communication in which Mr. Smith
disclosed IBM's confidential information. To the contrary, the correspondence establishes Mr.
Smith's commitment to maintain the confidentiality of IBM information. Specifically, when a
question arose whether information was public, Mr. Smith spoke with IBM executives and
determined that he should not disclose a white paper to AWS. (Hr. Tr. 436:18-437:10, Pl. Ex.
27).

### H.    IBM's Attempt to Mislead the Court as to the IBM Procedures Mr. Smith Followed in Returning His Electronic Devices.

31.     In an attempt to mislead the court, IBM accused Mr. Smith of concealing
wrongdoing by "wiping" his IBM-owned iPad and iPhone IBM before returning the devices to
the company in early May 2017. (Hr. Tr. 4:6-22). At the TRO hearing, IBM described this as a
nefarious attempt by Mr. Smith to cover his tracks and hide evidence of wrongdoing. Nothing
could be further from the truth. IBM failed to explain that Mr. Smith was merely adhering to
IBM's published protocol and established practice. (*Id.* 221:22-224:21).

32.     IBM's protocol requires departing employees to log out of iCloud and reset/wipe
their devices. *See id.*; Court Ex. 11. IBM instituted this protocol because departing employees
were forgetting to log out of iCloud and support teams had to seek assistance from Apple to
restore the devices. (Hr. Tr. 224:9-21). Mr. Smith was aware of these instructions because his
team was in charge of returned devices, and simply followed IBM's procedures and practice.
Accordingly, when IBM asked Mr. Smith to return his mobile devices on May 2, 2017, he

logged out of iCloud, reset his devices and promptly returned them. (*Id.*; Smith Decl. at ¶ 69). Previously, on March 29, 2017, Mr. Smith had returned his two laptops to IBM and IBM shut off his access to all IBM systems, including email. (Smith Decl. ¶¶ 63-64; Hr. Tr. 213:4-217:1). At no time between the return of the laptops and the return of the iPhone and iPad a month later did Ms. Wood or any other IBM executive tell Mr. Smith that he should take any steps to preserve the information on his electronic devices or deviate from IBM's published policy. (*Id.* at 218:21-14, 219:13-18).

33.     IBM's attempt to mislead the Court on this issue became even more transparent after it belatedly produced its policy on the return of devices. IBM attempted to argue that by the time Mr. Smith returned the devices in early May, he should have known that litigation was imminent. Therefore, IBM argues, Mr. Smith should have deviated from the published policy and not reset his devices. There are two reasons why that argument is not made in good faith. First, as noted above, no one from IBM advised Mr. Smith to disregard the company's published policy and turn it the devices without wiping them first. Second, after arguing that Mr. Smith, a non-lawyer, should have disregarded a policy in May because of the likelihood of litigation that *IBM might be filing,* IBM had to concede in a stipulation filed on the last day of the hearing that it did not even issue a document retention notice to its own employees until August 7, more than three months after Mr. Smith returned his IBM-issued mobile devices. *See* Stipulation ¶¶ 1 & 2.

34.     At the first day of the hearing, this Court recognized the "sloppy" handling of this issue by IBM. (Hr. Tr. 5:20-7:4). The follow-up attempt by IBM to recover from its failed assertion by offering another misleading argument is even more troubling.

I.     **Mr. Smith's Employment at AWS**

35.     AWS hired Mr. Smith to lead a newly converged organization of AWS

Marketplace, AWS Developer Tools, AWS Managed Services, AWS Support, AWS Service Catalogue, and AWS Migration Services. (Jassy Decl. ¶ 17; Jassy Dep. 55:10-15).

- AWS Marketplace is an online software store that helps customers find, buy, and immediately start using the software and services that run on AWS's cloud. IBM products run on the AWS Marketplace.

- AWS Developer Tools is a set of services designed to enable developers and IT operations professionals to use AWS services more rapidly.

- The AWS Support team is focused on delivering the right resources to support the success and ongoing operational health of customers' AWS cloud infrastructure. (Smith Decl. ¶ 76).

- AWS Service Catalog allows organizations to create and manage catalogs of IT services that are approved for use on AWS. AWS hopes most enterprises use its service catalog as a way to help their internal employees use the cloud productively in a uniform way. (Jassy Dep. 60:20-61:6).

- Migration Services provides a platform through which businesses can simplify moving large workloads from private on-premises servers to AWS servers using automation. (Smith Decl. at ¶ 77). Businesses undertake these efforts to reduce costs by moving expensive applications from their own data centers to AWS's data centers, thereby also increasing productivity. (*Id.*). Prior to working at IBM, Mr. Smith led a massive migration while employed by Suncorp, so this fit into his skillset as well. (*Id.*). Migration Services was not initially part of Mr. Smith's portfolio, but AWS determined months after Mr. Smith accepted his offer that the Migration Services team was not sufficiently connected to the other services in

the organization, so it made sense to reorganize these two groups, as well. (Jassy Dep. 52:22-57:3).

36. Mr. Smith will review key operating metrics for these teams, develop and implement plans to improve their metrics, ensure the teams' customers remain satisfied, and help to hire the best talent. (Jassy Decl. ¶ 17). The day-to-day operations of these teams will be run by managers who will report up through Mr. Smith. (*Id.*). Mr. Smith will be focused on motivating and leading these teams to drive successful performance and customer satisfaction. (*Id.*). Prioritization by these teams will be based on customer input, not Mr. Smith's input from a different department at IBM.

37. Before hiring Mr. Smith, AWS was aware of his previous responsibilities at IBM and of the non-competition agreement that Mr. Smith had signed. AWS leadership was confident, however, that the newly developed role for Mr. Smith would not be similar to what Mr. Smith did at IBM and would not provide Mr. Smith with the need or opportunity to use any potential confidential information that Mr. Smith learned in his role at IBM. (Jassy Decl. ¶ 11; Jassy Dep. 78:1-81:12, 85:7-20). AWS and Mr. Smith acted reasonably to avoid even an appearance of unnecessary overlap and to address any concerns that IBM might have, even though there was no real risk to IBM's confidential information, let alone the possibility of irreparable harm. (Jassy Decl. ¶ 11; Jassy Dep. 114:9-17).

38. AWS structured Mr. Smith's role in such a way to ensure that his AWS responsibilities would not put him in a position to ever consider using, or actually use any potential knowledge (trade secret or not) he retained from IBM. (Jassy Decl. ¶ 16; Jassy Dep. 79:16-80:19, 132:24-133:7). Given that Mr. Smith was a purchaser of IBM's cloud offerings in his position as IBM's CIO, and because he did not lead or develop any of IBM's cloud initiatives

for the external marketplace, Mr. Jassy knew that Mr. Smith's employment posed no threat to IBM. (Jassy Decl. ¶ 19).

39.     Mr. Smith will be one of eighteen other Vice Presidents and Directors at AWS who report directly to Mr. Jassy, the CEO of AWS.  (*Id.* at ¶ 18).  He also will be responsible for managing about 3,700 employees.  (*Id.* at ¶ 20; *see also* Jassy Dep. 44:14-20).  Mr. Smith will have no role with respect to designing the AWS network, the usage of compute, or the usage of cloud storage.  (Jassy Decl. at ¶ 20).  Mr. Smith also will have no role in setting cloud storage pricing at AWS.  (*Id.* at ¶ 21).

40.     Mr. Smith will have no direct responsibilities in the commercial sales of cloud storage.  (*Id.* at ¶ 22).  The commercial sales of cloud storage are the responsibility of an entirely separate organization, whose leader will be Mr. Smith's peer at AWS.  (*Id.*).  Mr. Smith will not be initiating any sales and is certainly not a sales leader.  (*Id.*).

41.     Mr. Smith did not provide any IBM confidential information or trade secrets to AWS during the interview process.  Any of Mr. Smith's discussions of his role at IBM in the prior two years were limited to a venting of his frustrations regarding what Mr. Smith felt was IBM's unwillingness to allow Mr. Smith to drive the strategy and change that he felt IBM needed to adopt to be successful.  (Jassy Decl. ¶¶ 9-10; Jassy Dep.  97:13-98:15; Smith Decl. ¶¶ 27, 56-58).  As part of Mr. Smith's recruiting, AWS emphasized its requirement that Mr. Smith must not bring any IBM confidential information to AWS and that he was not permitted to use or disclose any such confidential information.  (Jassy Decl. ¶ 23; Jassy Dep.  85:15-86:12).

42.     IBM does not offer similar services to many of those offered by AWS in which Mr. Smith will be involved.  For example, IBM does not produce developer tools for the cloud.  (Hr. Tr. 456:20-457:22).  Instead, IBM uses third-party tools.  (*Id.*).  Mr. Smith was never

involved in or privy to a conversation at IBM, including at Technology Team or Performance Team meetings, regarding IBM's potential future production of its own developer tools. (*Id.*).

43.     Similarly, while IBM has a digital marketplace, which is a place to purchase IBM products, IBM's marketplace is not a cloud-based marketplace like AWS's marketplace. (*Id.* 460:21-461:5). IBM's digital marketplace was not discussed at Technology Team or Performance Team meetings. (*Id.* 462:2-5). Mr. Smith is not aware of any plans for IBM to develop a cloud-based marketplace. (*Id.* 462:6-9).

44.     Support services, also known as a 'helpdesk', is a service that is unique to an enterprise's customer base. Mr. Smith was not part of any discussion of IBM's global support services and the topic was not discussed at Technology Team or Performance Team meetings. (*Id.* 463:13463:23).

45.     As for Migration Services, Mr. Smith received no migration services-type materials through the Technology Team or Performance Team, nor was Mr. Smith privy to any IBM plans to work on migration services or whether IBM even had a migration services solution. (*Id.*). In any event, at AWS, Mr. Smith will not be involved in designing any of the software or hardware or applications that will go into the migration services. (*Id.* 464:14-465:6). Further, Mr. Smith will only be overseeing the automated tools used in migration services, which IBM currently does not offer.

J.     **Purported IBM Trade Secrets and Confidential Information Known to Mr. Smith**

46.     IBM has made several shifting claims as to what trade secrets it believes Mr. Smith possesses. IBM first claimed its trade secrets came from certain presentations Mr. Smith sat through that constituted less than 1% of his time at IBM and related to Mr. Smith's implementation of agile management methodologies. (Hr. Tr. 434:2-6). Then, after being

unable to remember any details from the presentation decks, IBM's witness shifted IBM's theory to the existence of trade secrets in the *discussions* members of certain teams at IBM had based off the presentation decks and IBM dropped its discussion of agile entirely. (*Compare* Original Declaration of Arvind Krishna ¶ 10, Dkt. 20-10, *with* Krishna Decl. ¶ 10) Now IBM appears to have returned to its decks (though continues to ignore its prior agile allegations), but points to just a narrow subset of the information IBM first claimed Mr. Smith possessed and would inevitably share. (*See* IBM's Closing Slide 3). These shifting arguments are relevant as they undermine IBM's credibility and contention with respect to whether it has a legitimate interest to protect. As detailed below, none of the information IBM first pointed to or that it points to now constitutes a trade secret.

47. IBM has not provided any evidence that Mr. Smith kept a single IBM document in any format, including electronic documents, after his resignation from IBM. (Smith Decl. ¶ 39). Any information Mr. Smith would have from these presentation decks would be based wholly on his memory of the presentations. (Hr. Tr. 138: 24-139:12, 152:7-10).

48. Throughout this action, Mr. Smith has continually testified that he was unable to recall in any detail information that he was presented with over eight months ago, at least before IBM placed that information in front of him in a painstaking review at his deposition. (*Compare* Hr. Tr. 478:15-479:4 *with id.* 27:12-25 (alleging generally that Mr. Smith somehow can remember "with nuance and detail the parts of those meetings")). In fact, even Mr. Considine – whose job specifically focuses on IBM's cloud innovation and who had "a lot more knowledge technically . . . . than Mr. Smith" – could not remember specifics from the presentation, including information concerning ███████████████ that IBM contends is a trade secret. (Hr. Tr. 138: 24-139:12, 152:7-10).

i.    Technology Team Meetings: Mr. Krishna alleged that Mr. Smith has confidential information by way of his membership on IBM's Technology Team. (Krishna Decl. ¶¶ 21-22, 29-32, 35, 38). However, Mr. Smith's participation on this team was limited to providing input about what he believed his internal IBM employees would need from the technology. Although Mr. Krishna alleges that Mr. Smith attended these meetings "regularly," the last of the meetings he identifies in January 2017 – which IBM has not shown Mr. Smith attended and Mr. Smith does not recall attending – ███████████████████████████████████████. (*Id.* at ¶ 43; *see also* Hr. Tr. 304:3 ("I don't recall this meeting")). The presentation materials attached to Mr. Krishna's declaration illustrate that the dialogue was either so generalized that no technical or trade secret information would have been revealed, or entirely outdated given the rapid pace of the cloud industry. (Krishna Decl. ¶ 38; Ex. 2B-C, 2E; Golden Decl. ¶¶ 27-28). The Technology Team ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████. (Krishna Decl., Ex. 2C; Golden Decl. ¶¶ 33-36, 40). ████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████. (Krishna Decl., Ex. 2C; Golden Decl. ¶ 40). While the slides were presented in the October meeting, they were prepared in August 2016. (Hr. Tr. 51:12-14). At this meeting, there were "a number of presentations by many people" and Mr. Smith "had no role in drafting" any of the materials in these presentations, ███████████████████. (*Id.* at 51:18-52:4, 54:18-19). The information in these 2016 presentations is a full year old, and is no longer relevant to either IBM or the market at large. Mr. Krishna testified that to the best of his knowledge, "the last time [Mr. Smith] had seen [these materials] before this lawsuit was October

2016, about 10 months ago." (Hr. Tr. 52:25-53:3). Mr. Krishna's only basis for the allegations

that Mr. Smith retained any of the content from these meetings was his "assumption" that the

cloud "interests [Mr. Smith] deeply." (*Id.* 54:9-15). Throughout the Preliminary Injunction

hearing, IBM presented no facts, documents, emails, or any other evidence to substantiate this

"assumption." ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

Moreover, while Mr. Krishna testified that no one at IBM should be exposed to the

information provided in the Technology Team meetings, Mr. Krishna admitted that one member

of the Technology Team based in California and did not have a non-compete. (Hr. Tr. 83:7-

85:3). These materials were also sent by email to several other people who were not members of

the Technology Team, including administrators, when IBM distributed the materials to the

Technology Team members.

       1.    <u>Project Genesis Architecture</u>: Mr. Krishna claimed that Mr. Smith

possesses information regarding "highly secret product innovations IBM has developed and

designed for the specific purpose of competing against AWS in its core business—Cloud

Computing." (Krishna Decl. ¶ 4). Not only are the "highly secret product innovations" not very

secret, but IBM already announced many of them to the market. In fact, IBM publicly

announced virtually every feature of its Next-Generation servers. Industry publications

announced the following regarding its architecture:

> The goal of the project, codenamed Genesis, is to accelerate delivery of
> modern web services and products with what the company calls next-
> generation infrastructure (NGI).
>
> "The NGI product is intended to bring IBM into the modern world of
> infrastructure," Leong said. "It has a hardware design that looks similar to

24

the designs used in AWS or Azure that can then deliver services that look more modern."

The end result of the NGI project will be a fabric computer, which will incorporate technologies such as 3D Torus, a new method of interconnecting multiple servers, and Single Large Expensive Disk. Together, those will reduce latency to less than 20 milliseconds, according to sources briefed by IBM. The company hopes this speed of web services will provide the edge it needs to compete against Amazon.

*See* Ed Scannell, *IBM Strategic Imperatives mark a transition into software and services,*

TechTarget (July 2017), http://searchdatacenter.techtarget.com/feature/IBM-Strategic-

Imperatives-mark-a-transition-into-software-and-services (last visited Aug. 25, 2017).

Thus, while IBM argues the below slides have trade secret information, in reality all of it

has been disclosed.



a.

simply describe general technological concepts already well

known in the field. For example, public articles have discussed hyperscale datacenters for years.

*See, e.g.*, http://searchitoperations.techtarget.com/feature/ SDN-hyperscale-data-center-techn

ologies-to-impact-strategies-in-2014 (last Aug. 25, 2017).

**b.** <u>3D Torus Fabric</u>: IBM announced publicly in March 2017 that its Next- Gen server contained 3D Torus Fabric with "lost cost high brand width [and] low latency."[5] (Golden Decl., Ex. 3, pg. 28-29). Mr. Considine further announced that there was 600 gigabytes per second ("Gbps") connectivity between servers. (Golden Decl., Ex. 3, pg. 28). A fact that Mr. Krishna was unaware of before this litigation. (Hr. Tr. 58:3-20). Mr. Considine also announced that IBM's next-gen infrastructure and data centers would have a "100 gig" backbone, which means the speed at which servers in different data centers speak to another. (Golden Decl., Ex. 2, pg. 11).

**c.** ███████████████████: Similarly, in March 2017, IBM announced that it intended to use flash storage that "will do more than three million IOs per second." (Golden Decl., Ex. 3, pg. 28-29).

**d.** ████████████████████████████████████
████████████████████████████
██████████████████████████████████████
███████████████████████████████████████,
Microsoft publically announced that it intends to use Intel's next-generation microprocessor in its next-generation servers. (*See* Golden Decl., Ex. 4, pg. 4).

**e.** ███████████████████: Competitors already have load shedding and overprovisioning. *See* https://azure.microsoft.com/en-us/services/load-balancer/ (Aug. 15, 2017); https://aws.amazon.com/elasticloadbalancing/ (Aug. 15, 2017). In sum, none of the information on this slide is confidential. IBM is simply trying to catch-up with the market.

---

[5]     Customers already have the ability to measure latency to both Microsoft and AWS datacenters. *See* http://www.azurespeed.com/ (last visited Aug. 25, 2017); http://www.cloudping.info/ (last visited Aug. 25, 2017)

**2.**    ▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬. One of the difficulties that

IBM has experienced in the cloud market relates to the pricing of its services. IBM's cloud

offerings are priced well above those of AWS and other key competitors, and it is well known in

the industry. Pricing for cloud services becomes obsolete quickly in the technology industry, as

capacity improves and competitors vie for business. (*Id.* at ¶¶ 24, 37-38). For example, on July

5, 2017, AWS announced its 62nd price reduction in cloud offerings. Jeff Barr, *AWS Price*

*Reduction - SQL Server Standard Edition on EC2.*[6]    IBM was aware of AWS's ongoing price

reductions ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬. IBM has not explained what, if anything, Mr. Smith would have learned about pricing in

2016 that is currently of interest to a competitor.

        **a.**    <u>Cost Per Server Is An Undefined Term</u>: One of the supposed trade

secrets cited by IBM is the projected monthly cost per server for providing public cloud services,

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬. IBM defines monthly cost per server as a standard metric in the industry.

(Considine Decl. ¶ 22). Cost per server, however, means different things to different companies.

As Mr. Golden testified:

> . . . cost per server can be an ambiguous term or a slippery term, because
> there are a lot of things that go into it and, for example, your cost per
> server might be what is the hardware that I run this thing on cost, and how
> many virtual machines am I putting onto this server, that's my cost per
> server.

---

[6] *AWS Price Reduction - SQL Server Standard Edition on EC2*, (last accessed Aug. 11, 2017),
https://aws.amazon.com/blogs/aws/category/price-reduction/.

> There are many other things that are both direct and indirect costs that should be calculated into that. And what I found, in my experience is, throughout the industry, both end users and cloud providers, often do not take into account all of those costs when they say this is what it cost me to provide a server per hour, for example.

(Hr. Tr. 189:4-18). Mr. Golden also explained that to understand a cost of server, a company would need to know what that number is comprised of, which could be numerous different things. (Hr. Tr. 189:4-191:1). Specifically, a company would want to understand the following in order to determine the true cost per server:

> . . . what is the actual hardware that it runs on? What networking is it using? How much does that cost?

> You'd want to understand whatever storage is going into it and how much it's using and how much that costs. Then you'd want to have less direct infrastructure cost, but still infrastructure costs, along the lines of how much does the facility that it runs in cost? How much does the energy cost to power that and cool it?

> You'd also want to understand the infrastructure software that operates it, so the management software that manages that, that server. And then beyond that, you want to be able to allocate head count against that, both direct, in other words the people that actually run the server, or run the environment that it runs, and then, of course, you probably would want to assign an allocation for the head count generally of the organization.

(*Id.*). Mr. Smith similarly explained that monthly cost per server is a:

> meaningless measure because no because no one buys a server. They don't rent a server. They rent an application or something that runs on it.

> . . . In server costs, they're different by configuration. So, for instance, you can have a low-powered server that, you know, that could be your Honda Civic that's got a few processors on it. It's got a little bit of storage, you know, and that's less expensive than another server than would be, let's say, for Netflix, because it's got to have maybe 20 processors. It's got to have more memory to run a streaming video service. And then maybe, in the analogy of the car, if you want an extra feature for radar for security, you would buy the high availability service, which duplicates your data and your processing. So there are lots of factors. And, in fact, if you go to any cloud provider, there's not a server cost. There may be 50,

28

> 60, 70 different configurations of server platforms. In fact, those costs differ by country, in the same sense that a Honda Accord costs more money in the UK than it does here, because of taxes and component prices.

(Hr. Tr. 424:21-425:7). Accordingly, even if Mr. Smith could remember the bottom-line "price" or "cost" of a cloud server per month, that information would be useless without knowing in great detail the scope of the contract or project, the number of employees expected to work on it, the duration of the deal, the skills required, the base labor costs assumed from the client, the cost of the hardware and an extraordinary number of technical variables that Mr. Smith never knew nor had reason to know given his role. (Smith Decl. ¶¶ 43-44).

        **b.**    <u>IBM's Cost Per Server is Purely Speculative</u>: IBM also contends that the information Mr. Smith will know about IBM's cost per server now and continuing until 2020 constitutes a trade secret. IBM identified the following slide as containing its trade secrets.





**c.**

. Additionally, the larger players in the IaaS and PaaS market segment, Microsoft, Google, and AWS, compete on price because of their size. (Golden Decl. ¶ 39).

**d.** <u>IBM's Cost Per Server Would Be Useless to AWS</u>: AWS has an intense focus on customer's needs and innovates around those needs. (Hr. Tr. 184:22-185:7, Jassy Dep. 152:24-153:9). AWS is also "famous, or infamous" or seeking to lower its costs. (Hr. Tr. 188:10-189:2). Accordingly, even if AWS knew IBM's costs per server, that would not change its strategy in anyway. (*Id.*). AWS, like all companies, is always seeking to lower its costs. (Golden Decl. ¶ 18). As Mr. Jassy explained, he is focused on what customers need and expect, rather than speculative cost projections for 4th or 5th place competitors like IBM. (Jassy Dep. 152:24-153:9).

---

7

**3.** <u>How Project Genesis Addressed IBM's Cloud Failings Is Not Secret</u>: Mr. Considine also alleged that the two slides below that summarized Project Genesis contained highly confidential information. (Considine Decl. ¶ 21, 24). The evidence proved the opposite. Mr. Considine either revealed all of these features or the information would not be useful to AWS.



**a.** ██████████████████: Mr. Considine disclosed the network performance of both the 600 Gbps between servers and the 100 Gbps to each server. (Golden Decl., Ex. 3, pg. 28, Golden Decl., Ex. 2, pg. 11). ████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████, cloud computing companies are well aware of the 100 Gbps metric and have been since 2014. (Hr. Tr. 194:23-195:7; D. Ex. A). Indeed, an article from 2014 noted that "[t]raditional north-south traffic uses the first generation of 100 Gbps interconnect" and the "next generation 100 Gbps interconnect better fits modern data center needs." (D. Ex. A). Companies had already created "100 Gbps links by combining 10 lanes of 10 Gbps . . ." (*Id.*). That occurred in 2014. But technology never stops and

companies have already achieved 400 Gbps north/south traffic. (Hr. Tr. 195:8-196:14, D. Ex. B).

**b.** ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████.

**c.** ████████████: Perhaps identifying the significant difference in the pace of innovation between the two companies, IBM did not even offer object storage until ten years after AWS. *See* Jordan Novet, *IBM Launches Object Service on Bluemix, 10 years after AWS Launched S3*, VentureBeat (Dec. 7, 2015), available at https://venturebeat.com/2015/12/07/ibm-launches-object-storage-service-on-bluemix-10-years-after-aws-launched-s3/ (last visited Aug. 27, 2017). ████████████████████ ████████████████████.

**d.** In sum, these details of Project Genesis are neither secret nor valuable to AWS.



As the above slide shows, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.

    ii.    <u>Performance Team Meetings:</u>  IBM has apparently backed away from its claim that Mr. Smith knows trade secrets from his attendance at Performance Team meetings.  Mr. Krishna claimed that Mr. Smith possesses confidential IBM information that he learned by attending IBM Performance Team meetings.  (Krishna Decl. ¶¶ 21-22, 26-29, 32).  However, Mr. Krishna focused his declaration more on the number of members on this committee and where the meetings took place than identifying what specific confidences that were revealed in these meetings.  He also fails to identify any specific Performance Team meetings since October 2016.  (*Id.* at ¶¶ 51, 61).  Notably, the Performance Team did not focus on designing new products, cloud development, or managing pricing.  (Smith Dep. At 68:20-69:4).  It was a high-level managerial committee of roughly ████ individuals ████████████████, and the senior executives in these meetings – including Mr. Smith – would have no reason to wade through the ████████████████████████████████.  (*Id.*; Hr. Tr. 253:19-20). This is demonstrated by the 2016 Performance Team presentations IBM attached to IBM's Amended Complaint.  (*See* Krishna Decl., Ex. 2G, 2I-J).  ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████.  (Krishna

Decl., Ex. 2G). ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████. Krishna Decl., 2J).  Third, while the

Amended Complaint attached agendas and presentations from January 2017, it does not show, or

even allege, that Mr. Smith attended this meeting and Mr. Krishna was unable to recall if Mr.

Smith was in attendance.  (Hr. Tr. 52:18-21, 304:1-3).

     iii.    <u>Growth & Transformation Team Meetings</u>:  IBM also appears to have backed

away from its claim that Mr. Smith received any trade secrets when attended, along with non-

IBM leaders in the industry, Growth & Technology Team meetings ("G&TT").  Mr. Krishna

also alleges that Mr. Smith's membership on the G&TT exposed him to cloud computing

strategy information.  (Krishna Decl. ¶ 25).  As Mr. Krishna admitted, however, Mr. Smith has

not attended any such meeting since January 2017, which was more than eight months ago.  (*Id.*).

     iv.    <u>Next Generation Cloud Computing Products</u>:  Mr. Smith has no technical

knowledge of IBM's cloud computing products or strategy that would be useful to AWS.  Mr.

Smith testified that he has no network or software engineering background, was not asked to be

involved in the architecture of IBM's cloud products and that he did not work with (or even ever

meet) the engineering team on these products.  His role was limited to identifying "the business

requirements that those technologies have to solve."  (Hr. Tr. 421:20-422:13).  As conceded by

IBM in its reference to the June 15, 2017 Gartner Report, AWS "continues to be the thought

leader and the reference point for all competitors, with an accelerating pace of innovation on top

of an already rich portfolio of services, and an expanding impact across a range of IT markets."

34

While IBM continues to chase AWS's success and targets AWS as a competitor in IBM's public filings,[8] it is clear that IBM was not even one of AWS's top cloud competitors. (Jassy Dep. 109:4-23; Golden Decl. ¶ 13, Gartner, *Magic Quadrant for Cloud Infrastructure as a Service, Worldwide* (June 25, 2017)). Moreover, Mr. Smith testified that (like Mr. Considine) he cannot recall any pricing information for any of IBM's services, including cloud offerings.[9] (Smith Decl. ¶ 43; Hr. Tr. 138: 24-139:12, 152:7-10). IBM has failed to identify any specific information regarding cloud computing in Mr. Smith's possession that could cause competitive harm to IBM. Furthermore, ███████████████████████████████████████████
██████████████████████████████████████████████████████████████████
███████████████████████████████████████████. (Hr. Tr. 65:13-66:7). Thus, ██████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
████████████████████.

      v.                  <u>IBM's Strategies to Attack AWS</u>: IBM's witnesses claim that Mr. Smith possesses confidential IBM knowledge regarding its strategies to become competitive with AWS. A review of the documents on which these witnesses rely, however, reveals that these strategies are based on public information indicating the ████████████████████████████████

---

[8] U.S. SEC, *IBM Form 10-K for the Year Ended December 31, 2015*, https://www.sec.gov/Archives/edgar/data/51143/000104746916010329/a2226548z10-k.htm.

[9] IBM has suggested that it is not credible that Mr. Smith recalls certain details from certain meetings and does not recall those at issue in this litigation. To the contrary, it makes sense that Mr. Smith remembers the details that were



; Golden Decl. ¶ 28-32).

**K.    Any Remaining Confidential Information that IBM Seeks to Protect Would Not Be Useful to Mr. Smith at AWS.**

49.    IBM has failed to present any evidence indicating that the alleged IBM confidences known by Mr. Smith would be useful at AWS.

50.    In contrast, Mr. Jassy testified without contradiction that Mr. Smith "would have no reason to use such information because he is not involved in pricing and, further, AWS has instructed Mr. Smith not to disclose information about IBM's cost structure." (Jassy Decl. ¶ 27).

51.    Additionally, since AWS is the industry leader from a pricing perspective, it operates "from the assumption that every company in the cloud industry is working to lower its cost structure in order to lower prices for their customers." (*Id.*). Thus, any information Mr. Smith may have heard concerning IBM's strategy to lower its pricing would "not be any great revelation to AWS." (*Id.*).

52.    From a pricing perspective, Mr. Jassy has testified that "Jeff will have no role in setting cloud storage pricing." (*Id.* at ¶ 21). He testified further that "Jeff will have no role . . .

---

necessary for him to do his job and when other executives echoed his beliefs that IBM's cloud was not performing well.

in cloud storage commercial sales [with the limited exception of when] someone could consult or inform Jeff about sales activity if the transaction includes a component for marketplace, developer tools, or support and managed service offerings." (*Id.* at ¶ 22).

53.     As illustrated above, the technological capabilities of IBM's next generation cloud product also would not be useful to AWS, as AWS's established cloud and cloud-based products already have the storage performance, application availability, service availability, scale, and cost figures that IBM has aspired to achieve in its forthcoming products. (*Id.* at 111:14-113:9).

54.     AWS is taking Mr. Smith's confidentiality obligations seriously. Even if Mr. Smith had IBM information that was confidential and useful to AWS, AWS has already instructed him multiple times, including in his first week at AWS, not to disclose or use any IBM confidential information in the course of performing his duties. (Jassy Dep. 79:4-7, 79:23-80:19, 85:5-25). AWS also instructed Mr. Smith to report to AWS's counsel any time he believes he is at risk of disclosing IBM confidential information. (Hr. Tr. 465:18-466:3). Mr. Smith confirmed in his testimony that he will comply with his ongoing confidentiality obligations to IBM and AWS's corresponding instructions.

**L.     IBM Failed to Protect Its Trade Secrets Before and During This Litigation.**

55.     As discussed earlier, IBM exposed its Technology Team presentation decks, which supposedly contain eight IBM trade secrets, to IBM employees who do not have non-competes and are free to leave IBM and work for a competitor. (Hr. Tr. 83:20-85:21). Mr. Considine testified that employees on his team working on IBM's next generation cloud are exposed to highly confidential trade secret information. (Hr. Tr. 132:6:-136:4) Yet, Mr. Considine also testified that the majority of the employees on his team do not have non-competes

37

and that only the high-level executives have non-competes. (*Id.*). Those without non-competes are free to work for a competitor and take any trade secret information that they may inevitably disclose with them. (*Id.*).

56.     On August 17, IBM took the deposition of Mr. Smith. During this deposition, IBM presented Mr. Smith with the Technology Team PowerPoint presentations that contained the very trade secrets IBM is seeking to protect. (Hr. Tr. 33:5-34:9).

57.     Counsel for Mr. Smith immediately objected to presenting Mr. Smith with this information, as Mr. Smith is now an executive of AWS – which IBM views as a competitor – and because Mr. Smith had long since forgotten the contents of these presentations so it would be inappropriate to purposefully refresh his recollection due to his current employment. (*Id.*; Smith Decl. ¶ 4).

58.     Nevertheless, IBM insisted on presenting Mr. Smith with its confidential information and thus failed to safeguard its own trade secrets. (Hr. Tr. 33:5-34:9, 255:6-9, 279:8-12 (requesting that AWS representatives leave the room when the presentations were discussed at the preliminary injunction hearing due to the confidentiality of the contents, yet Mr. Smith, a current AWS executive, was directed to review these materials without redactions)).

59.     IBM's actions during Mr. Smith's deposition illustrate that IBM has failed to take appropriate precautions concerning its own trade secrets when interviewing an AWS executive – and perhaps calling into question whether IBM would act so haphazardly with information that was truly trade secret. By purposefully showing the alleged trade secrets to an AWS executive, IBM's actions were not consistent with its position that the information in the presentations is a protectable trade secret. Moreover, by voluntarily showing the information to Mr. Smith during his deposition, IBM should be estopped from arguing that Mr. Smith should be precluded from

working at AWS based on his knowledge of these trade secrets since it intentionally refreshed his recollection concerning these facts. (*Id.* 33:5-34:9).

## M.  Balancing of the Hardships

60.  Mr. Smith's unrebutted testimony establishes that being sidelined for a year would cause serious harm to his career. (Smith Decl. ¶ 85). At his level, he would lose knowledge of "technology changes, process changes, talent changes, . . . [and] a bit of your expertise, because you're not in an operating role." (Hr. Tr. 225:10-17, 455:1-16).

61.  If he is enjoined from working at AWS for a period of time, Mr. Smith would not be guaranteed his same position when the injunction expires. At Mr. Smith's level, it generally takes 9 to 12 months to find a job. With no guarantee of a role at AWS, any job loss resulting from an injunction could impact Mr. Smith well into the future. (*Id.* at 225:1-227:4; Smith Decl. ¶ 85). Even if AWS will keep Mr. Smith's position open to him, AWS has not promised to pay Mr. Smith during the non-competition period. The ramifications of this potential job and income loss are compounded by the false and disparaging suggestions made by IBM in its public filings and comments to the press to the effect that Mr. Smith concealed wrongdoing when, in fact, he merely followed IBM policy in wiping his iPad and iPhone before returning them in May. The damage caused to Mr. Smith's reputation and future prospects would be compounded by an improvidently entered injunction.

62.  IBM's attempt to block Mr. Smith from working in any capacity at AWS is overbroad, anti-competitive, and unfairly restricts Mr. Smith from pursuing a highly sought after position leading and developing internal teams – a position that directly plays to Mr. Smith's strengths and experience. The injunction sought by IBM would impact Mr. Smith professionally and personally, as Mr. Smith already begun uprooting his family from New York to move across

the country and wants to work for many years into the future. (*Id.*).

## III. PROPOSED CONCLUSIONS OF LAW

### A. IBM Failed to Meet Its Burden of Proving Circumstances Warranting a Preliminary Injunction

1.    A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *DS Parent, Inc. v. Teich*, No. 5:13-CV-1489, 2014 WL 546358, at *2 (N.D.N.Y. Feb. 10, 2014); *Visentin*, 2011 WL 672025, at *6. "New York courts adhere to a strict approach to enforcement of restrictive covenants because their enforcement conflicts with 'the general public policy favoring robust and uninhibited competition,' and 'powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood.'" *Am. Inst. Of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982) (quoting *Am. Broad. Cos. v. Wolf*, 52 N.Y.2d 394, 404 (1981)). To obtain a preliminary injunction, the movant must demonstrate: (1) the likelihood of success on the merits; (2) imminent and irreparable harm absent the granting of the injunction; and (3) that the balance of the equities is in the movant's favor, including public interest considerations. *Id.* To prevail, the movant must "by a clear showing" carry the burden of persuasion. *DS Parent, Inc.*, 2014 WL 546358, at *2.

2.    Moreover, if the preliminary injunction sought either (i) is mandatory in that it will alter the status quo if granted by commanding a positive act, or (ii) will provide all the equitable relief that the movant is seeking and, once complied with, cannot be undone, then a higher standard must be met – the "movant must show a substantial likelihood of success on the merits, rather than merely a likelihood of success." *Johnson v. Kay*, 860 F.2d 529, 540 (2d Cir. 1988); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (applying heightened standard when injunctive relief would provide "substantially all the relief that is

40

sought"); *Muhammad v. Jenkins*, No. 12-cv-8525 CM, 2013 WL 5225573, at *11 (S.D.N.Y.

Sept. 13, 2013) ("Where, as here, the movant seeks the entry of a preliminary injunction that . . .

would give him all the relief he would receive at the end of the case were he to win, the

likelihood of success standard is heightened; he must show a substantial likelihood of success on

the merits."). This heightened standard applies because if the preliminarily injunctive relief

sought by IBM is granted and Mr. Smith later prevails at trial, it will be impossible for him to

reclaim the time he missed or undo the effect of the injunction. *See Tom Doherty Assocs.*, 60

F.3d at 35. Therefore, IBM must satisfy this higher standard of proving a clear or substantial

likelihood of success.

**B.** **IBM Has Failed To Demonstrate a Likelihood of Success on the Merits**

3. IBM does not have any meaningful likelihood of successfully enforcing its non-

compete to prevent Mr. Smith from working for AWS in a non-competitive position. Courts

start their analysis with the premise that non-competes are disfavored because they are

antithetical to "the general public policy favoring robust and uninhibited competition," and

"powerful considerations of public policy which militate against sanctioning the loss of a man's

livelihood." *Am. Inst. of Chem. Eng'rs*, 682 F.2d at 386. Non-competes will not be enforced

simply to restrain employees from leaving one company or working for another in the same

industry. *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 391-92 (N.Y. 1999); *Reed, Roberts*

*Assoc., Inc. v. Strauman*, 40 N.Y. 2d 303, 307 (1976) ("[O]ur economy is premised on the

competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no

restrictions should fetter an employee's right to apply to his own best advantage the skills and

knowledge acquired by the overall experience of his previous employment" (internal citations

omitted)). To overcome the general disfavor of noncompete agreements and the public policy

41

favoring robust and uninhibited competition, a plaintiff must establish that a defendant's new employment threatens a legitimate business interest. *BDO Seidman*, 93 N.Y.2d at 391-92. Here, IBM cannot.

4.     New York law recognizes three main categories of legitimate protectable interests: (1) preventing disclosure of trade secrets; (2) preventing an employee's release of confidential information regarding the employer's customers; or (3) protecting against irreparable harm where the employee's services to the employer are unique or extraordinary. *DS Parent, Inc.*, 2014 WL 546358, at *6; *BDO Seidman*, 93 N.Y.2d at 389; *IBM v. Papermaster*, No. 08-cv-9078, 2008 WL 4974508, at *11 (S.D.N.Y. Nov. 21, 2008) (quoting *Ticor Title Ins. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999). IBM has not established that Mr. Smith's AWS employment would infringe on any of these three interests, and in fact only argues Mr. Smith will disclose trade secret information.

5.     Further, to establish a likelihood of success, IBM must establish that Mr. Smith will breach or has breached the plain terms of the Non-Competition Agreement. Specifically, even under the terms of the Non-Competition Agreement, IBM must prove that the performance of Mr. Smith's duties at AWS "could result in [the executive] intentionally or unintentionally using, disclosing, or relying upon IBM Confidential Information." Krishna Decl., Ex. 1A at § 1(e)(i). The evidence proffered by IBM falls short of establishing Mr. Smith will "inevitably disclose" any confidential IBM information.

6.     In New York, courts hold that "[a]bsent evidence of actual misappropriation by an employee, the doctrine [of inevitable disclosure] should be applied in the rarest of cases." *See Earthweb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999) ("[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory."). IBM has

not presented any credible evidence of trade secret misappropriation by Mr. Smith.

7.    New York courts have repeatedly cautioned against an overzealous application of the definition of a trade secret, and they consistently recognize that "mere knowledge of the intricacies of a business is simply not enough." *Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62 (3d Dep't 2003) (rejecting trial court's "overly expansive definition" of trade secrets that would "encompass nearly all confidential business documents" and finding that "pricing data and market strategies" do not constitute trade secrets); *see also DS Parent, Inc.*, 2014 WL 546358, at *9 (holding that strategic plans and communications and emails discussing the company's equipment, industry areas of profitability, and supplier/bid pricing were not trade secrets and where other employees' generally knew of the information, "[t]he overall lack of secrecy weighs against a finding that [the information] were trade secrets"); *H. Meer Dental Supply Co. v. Commiso*, 702 N.Y.S.2d 463, 465 (3d Dep't 2000) (business and financial information, such as market reports did not qualify as protectable confidential information); *Silipos, Inc. v. Bickel*, No. 1:06-cv-02205, 2006 WL 2265055, at *4 (S.D.N.Y. Aug. 8, 2006) (finding marketing sales reports, gross margin reports, future marketing plans, technical information regarding upcoming products and pricing information were not protectable trade secrets).

8.    IBM has not presented evidence of an actual and imminent risk that Mr. Smith will use or disclose its trade secret information, either deliberately or inadvertently. Mr. Smith attended only a handful of meetings discussing IBM's overall strategy for all of its internal lines of business. Any information discussed in these meetings is now either publically available or dated, ████████████████████████████████████████████████████████████

████████. (Hr. Tr. 64:13-65:1 (stating that the fact that IBM was "trying to develop technology to compete with AWS" was not a secret, but "when it will be launched" was the trade secret).

43

*See also Visentin*, 2011 WL 672025, at *10-11 (rejecting argument that Mr. Visentin's new leadership position would require inevitable disclosure of IBM's trade secrets where Mr. Visentin could not recall specific details from meetings where IBM confidential information was discussed and IBM "was unable to identify any specific information in Mr. Visentin's possession regarding cloud computing that could cause competitive harm to IBM"); *Simonson*, 2014 WL 783486, at *6-7 (holding that there was "no serious argument that Simonson, who was employed in a sales-related position, is a risk for divulging trade secrets, as 'mere knowledge of the intricacies of a business is simply not enough' to constitute a trade secret") (quoting *Marietta Corp. v. Fairhurst*, 754 N.Y.S.2d 62 (3d Dep't 2003)).

9.     Whatever limited information has not gone stale with the passage of time is not a trade secret because it has already been disclosed to the market or was already known by the public as common industry practices.  For example, IBM's strategy to ███████████████ ████████████████████████████ is clearly not the type of proprietary information that trade secret laws are designed to protect – this is common sense.  *Editions Play Bac, S.A. v. W. Pub. Co., Inc.*, No. 92-cv-3652, 1993 WL 541219 at *5 (S.D.N.Y. Dec. 28, 1993) ("[M]ethods which are generally known in the industry . . . cannot be trade secrets.").  Likewise, IBM has also marketed the product specifications of Project Genesis during its March 2017 Interconnect presentation, which obviously means that information cannot constitute a trade secret.  *See Hudson Hotel Corp. v Choice Hotels Int'l*, 995 F.2d 1173, 1177 (2d Cir. 1993) (citations omitted, applying New York law) ("Once Hudson marketed the Microtel concept, therefore, it could not constitute a protectible [sic] trade secret because, from that time forward, it could not be used secretly and continuously in its business."); *Frink Am., Inc. v. Champion Rd. Mach. Ltd.*, 48 F. Supp. 2d 198, 207 (N.D.N.Y. 1999) (holding no trade secret protection for information

contained in snow plow manufacturer's engineering and production drawings of its plows where manufacturer offered plows for sale).

10. Additionally, any information concerning IBM's pricing strategies to compete with AWS are not only irrelevant to AWS, but also insufficient to constitute a trade secret. (Jassy Decl. ¶ 27). *See also Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 567 (S.D.N.Y. 2016) ("the prices of materials and costs of manufacturing, are not trade secrets"); *Marietta Corp. v. Fairhurst*, 301 A.D.2d 734, 754 N.Y.S.2d 62, 67 (App. Div. 2003) (finding that "pricing data and market strategies" do not constitute trade secrets); *Silipos, Inc. v. Bickel*, No. 1:06-CV-02205, 2006 WL 2265055, at *5 (S.D.N.Y. Aug. 8, 2006) ("[T]he underlying mechanics of Silipos's discount pricing structure, such as profit margins, fails to rise to the level of trade secrets with respect to the restrictive covenant at issue. In economic terms, any seller's publicly-available prices signal to competitors some information about the underlying mechanics of the seller's pricing structure. Silipos is no different. Realistically, Silipos's concern is about the extent to which Bickel may divulge information about these underlying mechanics, over and above what competitors already know or could readily ascertain. Bickel's ability to do so is limited, however, because Bickel does not possess any documents that contain greater information about the underlying mechanics of Silipos's pricing structure"); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499-500 (S.D.N.Y. 2002) (noting that "information consisting simply of business possibilities or goals is not a trade secret" and finding it highly unlike that an "amalgamation of business concepts, strategies, and ideas to be used in the eventual construction of a marketable computer software program" could constitute a trade secret); *Carpetmaster of Latham, Ltd. v. Dupont Flooring Sys., Inc.*, 12 F. Supp. 2d 257, 262 (N.D.N.Y. 1998) (holding plaintiff failed to meet its burden that "costs, prices, budgeting, and general business information

are entitled to trade secret protection"); *Great Lakes Carbon Corp. v. Koch Indus., Inc.*, 497 F. Supp. 462, 470 (S.D.N.Y. 1980) (holding price and cost estimates are not trade secrets or confidences).

11.      Further, most of IBM's plans for future improvements in its current cloud offering are not novel and, in fact, are well known in the industry. Accordingly, these improvements in IBM's servers and cloud offerings cannot be afforded trade secret status. *See, e.g., Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 377 (S.D.N.Y. 1999) (holding unpatented chemical formulations, related test results, and data used in connection with the development of product did not constitute trade secrets because of product's "lack of novelty").

12.      Moreover, IBM failed to protect its alleged trade secrets by exposing them to employees who do not have non-competes and voluntarily disclosing them to Mr. Smith, now an AWS employee, during discovery. As the owner of a trade secret, IBM was obligated to take reasonable measures to protect its secrecy. *Defiance Button Machine Co. v. C & C Metal Products*, 759 F.2d 1053, 1063 (2d Cir. 1985); *Earthweb, Inc.*, 71 F. Supp. 2d at 314; *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("Because of the intangible nature of a trade secret, the extent of the property right therein is defined by the extent to which the owner of the secret protects his interest from disclosure to others."); *Greenblatt v. Prescription Plan Services Corp.*, 783 F. Supp. 814, 826 (S.D.N.Y. 1992) (if owner of a trade secret fails to take reasonable precautions to protect the information, the information loses the protection of trade secret law). Under New York law, factors courts consider in determining whether a purported trade secret is entitled to protection include "the extent to which the information is known outside of the business" and "the extent of measures taken by the business to guard the secrecy of the information." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir.

2009).

13.    By showing the information to Mr. Smith – an employee of a competitor who otherwise does not have the documents or remember the content therein – IBM's actions were not consistent with its obligation to protect its trade secrets.  Courts have recognized that the disclosure of trade secrets to competitors destroys their status as trade secrets.  *See Defiance Button Mach. Co.*, 759 F.2d at 1063-64 (plaintiff's customer lists lost their character as trade secrets because the company failed to take reasonable steps to protect the lists from coming into the hands of their competitor and thereby "forfeited the protections of trade secret law"); *Sasqua Grp., Inc. v. Courtney*, No. 10-528, 2010 WL 3613855, at *19 (E.D.N.Y. Aug. 2, 2010), *report and recommendation adopted*, No. 10-CV-528, 2010 WL 3702468 (E.D.N.Y. Sept. 7, 2010) (database containing client information, which plaintiff referred to as "the lifeblood" of its business, lost its character as a trade secret where the owner of the company failed to take reasonable steps to protect it, including directing that a departing executive have access to the database to complete searches after he left the company).

14.    IBM failed to treat the information as a trade secret when it required Mr. Smith to view it during the deposition.  The owner of a trade secret waives its right to protect the trade secret where it discloses the trade secret during a judicial proceeding, even where there is a protective order in place.  *Littlejohn v. Bic Corporation*, 851 F.2d 680 (3d Cir. 1988) (disclosure of the information during trial constituted a waiver of whatever confidential interest might have been preserved under the protective order); *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280, 1301 (E.D.N.C. 1996), *aff'd*, 110 F.3d 1562 (Fed. Cir. 1997) (applying *Littlejohn* in the trade secret context); *Weiss v. Allstate Ins. Co.*, No. 06-cv-3774, 2007 WL 2377119, at *3 (E.D. La. Aug. 16, 2007) (noting that "[o]ther courts have likewise concluded that admission into evidence

of confidential documents precludes an ex post invocation of confidentiality provisions set forth in a previously entered protective order." (citing *Biovail Lab., Inc. v. Anchen Pharm., Inc.*, 463 F. Supp. 2d 1073, 1081 (C.D. Cal. 2006); *Rambus, Inc. v. Infineon Techs. AG*, No. 00-524, 2005 WL 1081337, at *3 (E.D. Va. May 6, 2005))). This rule applies even with respect to documents that are not filed with the court. *Republic of the Phillippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 659 (3d Cir. 1991) ("[t]he common law right of access is not limited to evidence, but rather encompasses all judicial records and documents."); *W. Penn Allegheny Health Sys., Inc. v. UPMC*, No. 09-480, 2012 WL 512681 (W.D. Pa. Feb. 14, 2012) ("Previous disclosure of information in open court, and even outside of court, operates to waive any right to seal judicial records containing such information.").

15.     Accordingly, IBM has waived protection of its alleged trade secrets by not taking reasonable steps to protect such information. As a result of this purposeful disclosure of its alleged confidential information, IBM cannot prevail on its argument that Mr. Smith should be precluded from working at AWS on the basis of his alleged knowledge of IBM trade secrets contained in the Technology Team presentation decks. *See Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 189 (N.Y. App. Div. 1st Dep't 2007) (dismissing claim for injunctive relief based on violation of nondisclosure agreement when plaintiffs publicly filed document allegedly containing trade secrets, and holding that "plaintiffs waived any trade secret protection").

16.     Even if IBM had established Mr. Smith has an independent recollection of trade secrets that would be valuable to AWS, it cannot obtain injunctive relief without establishing that Mr. Smith would inevitably disclose such trade secrets in the course of his new employment. When determining whether the disclosure of trade secrets is inevitable, courts consider whether:

> (1) the employers in question are direct competitors providing the same or very similar products or services; (2) the employee's new

position is nearly identical to his old one, such that he could not
reasonably be expected to fulfill his new job responsibilities
without utilizing the trade secrets of his former employer; and
(3) the trade secrets at issue are highly valuable to both employers.

*EarthWeb*, 71 F. Supp. 2d at 310. Here, as to the first factor, AWS and IBM compete on a

limited basis. As to the second factor, as discussed above, the CIO position that Mr. Smith held

at IBM is quite different from his current job at AWS, which involves primarily the management

of various business teams. *See Marietta*, 754 N.Y.S.2d at 64 (declining to apply inevitable

disclosure doctrine where plaintiff's former vice president of sales and marketing subsequently

took a position with a direct competitor as president of operations with responsibilities of a

senior salesperson).

17.     Also, the restrictions placed on Mr. Smith's responsibilities are adequate to ensure

that he has no need to disclose information about IBM's cloud strategy. Partial overlap of duties

between the positions, without more, will not suffice to put an employee out of work. In

*Visentin*, the defendant's former position at IBM and his new position at HP overlapped in the IT

space, but the court found no risk of inevitable disclosure because "Mr. Visentin ha[d] agreed to

limit his responsibilities" in the overlapping areas. 2011 WL 672025, at *19. *See also Marinelli*

*v. Medco Health Sols., Inc.*, 951 F. Supp. 2d 303, 318 (D. Conn. 2013) (finding that, even though

the plaintiff accepted a position in the same industry and there was a slight overlap in job

responsibilities, there was not "a realistic threat" that the plaintiff would disclose or use

confidential information).

18.     Finally, as to the third factor, the information that IBM seeks to protect is not

highly valuable since the vast majority of the information is either public or stale, or too

generalized or speculative to be useful to a competitor.

19.     IBM's has not introduced evidence showing that this is the "rarest of cases" in

which the Court should prevent a former employee from working because of possession of alleged confidential information. Accordingly, because none of the factors warranting application of the inevitable disclosure doctrine are met, this Court declines to find IBM has a substantial likelihood of success on the merits.

20.    Moreover, even if IBM were adhering to the language of its revised Non-Competition Agreement, the agreement remains overbroad. It prevents IBM employees from accepting future employment of their choosing where such employment "could" result in the disclosure of IBM's confidential information or trade secrets. Under New York law, the proper standard for inevitable disclosure is that the employee "could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer." *EarthWeb*, 71 F. Supp. 2d at 310. It is not enough that an employee's new position "could" result in the disclosure of IBM's confidential information or trade secrets. Rather, IBM must show that the employee must rely on IBM's confidential information and trade secrets in order to perform his new job responsibilities. *Visentin*, 2011 WL 672025, at *19 (finding no risk of inevitable disclosure where the plaintiff agreed to limit his responsibilities in the areas where his former and current employers overlapped). IBM has not met that standard here.

21.    In New York, a non-competition agreement is enforceable only "to the extent that the covenant is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *AM Media Comm. Group v. Kilgallen*, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003) (internal quotations omitted).

22.    As stated above, IBM's attempt to enforce its Non-Competition Agreement to prevent Mr. Smith from working for a competitor in any capacity is overbroad and anti-

competitive.  *See Veramark Techs., Inc. v. Bouk*, 10 F. Supp. 3d 395, 407 (W.D.N.Y. 2014) (holding an overreaching and coercive non-compete should not be enforced).

23.    IBM has not demonstrated that *any* restrictive covenant is necessary to protect its purported trade secrets, as evidenced by the fact that such information is shared with California based employees and others in technical positions who do not even have non-competition agreements.  Furthermore, as discussed above, IBM has introduced no evidence suggesting that its confidential information is genuinely at risk, and, therefore, it cannot establish a likelihood of success on the merits in its attempt to restrain lawful competition.  *See SG Cowen Securities Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (upholding district court's refusal to enforce non-competition agreement where employee "consented to being enjoined from divulging [his former employer's] trade secrets or other confidential information, and from soliciting any client he had brought to [his former employer]"); *see also Visentin*, 2011 WL 672025, at *13 (refusing to enforce IBM's non-competition agreement where "at most, IBM has demonstrated the possibility of some confidential information that [plaintiff] acknowledges he will not disclose").

24.    IBM relies on several cases in which non-competition agreements were enforced, but those cases do not support its request for relief.  For example, in *IBM v. Papermaster,* No. 08-cv-9078, 2008 WL 4974508 (S.D.N.Y. Nov. 21, 2008), the employee who was enjoined from working for Apple was a Vice President with highly technical expertise and knowledge of IBM's "power architecture" trade secrets, and he was recruited specifically to manage the development of consumer electronics products for a competitor in the field of microprocessor technology. The court described Papermaster as IBM's "top expert in the development and application" of the technology at issue.  Those circumstances bear no relation to this case, in which Mr. Smith has at most a much more generalized business knowledge and no specific knowledge of technical

trade secrets. *See Visentin*, 2011 WL 672025, at *2-3 (rejecting the argument that Mr. Visentin's new leadership position would require inevitable disclosure of IBM's trade secrets because his managerial role was not focused on the technical aspects of the competitor's business, and so "he does not need any of that information to do his job").

25. Similarly, IBM's reliance on *Estee Lauder Companies v. Batra*, 430 F. Supp. 2d 158 (S.D.N.Y. 2006) is misplaced. In *Estee Lauder*, this Court's enforcement of a non-competition agreement was predicated on a very different factual record. First, unlike the instant case, the enforcing employer only sought to prevent its former employee from using confidential information to harm his former employer's business. Second, the employee in *Estee Lauder*, was deeply immersed in his former employer's trade secrets. Third, the employee acted disingenuously by deliberately misleading his employer, inducing another senior manager to breach her duty of loyalty by assisting him in preparing to compete, and even working for the new company while still employed by the plaintiff. Those facts are not present in this case.

**C.    IBM Is Attempting To Enforce Its Non-Competition Agreement In An Overbroad And Anti-Competitive Manner.**

26. New York courts also refuse to enforce restrictive covenants that are not reasonably limited in scope and necessary to protect the employer from unfair competition. *See Geritrex Corp. v. DermaRite Indus., LLC*, 910 F. Supp. 955, 959 (S.D.N.Y. 1996); *Pilot Comms., LLC v. Corlett*, 665 N.Y.S.2d 377, 377-78 (N.Y. App. 1997). IBM is attempting to enforce restrictions far broader than necessary to protect IBM's legitimate interests. While IBM has facially revised its non-competition agreement in light of its loss in *Visentin*, it is taking such a broad approach with respect to enforcement that is acting as though the old version remains in effect. *See Visentin*, 2011 WL 672025.

27. Coupled with an overbroad and punitive "clawback" provision in the Long Term

Performance Plan for senior executives, IBM's non-competition program is designed primarily to prevent employees from leaving IBM and working in their chosen fields, rather than to enforce a legitimate interest in protecting trade secret and confidential information. The Agreements at issue here contain none of the hallmarks and safeguards that would indicate a proper purpose. *See id.* at *22 (stating that IBM's non-competition program "is designed not to protect a legitimate business interest but, rather, to keep the leadership talent of IBM from leaving" and referring to the "clawback" provision as "punitive").

28.     IBM cannot establish that the non-competition provisions in Mr. Smith's Non-Competition Agreement are necessary to protect its trade secrets, given that IBM has shown highly confidential information to employees without valid Non-Competition Agreements. Mr. Krishna testified that IBM permits its California Technology Team participants to see the same materials. (Krishna Tr. at 69:6-71:25; Hr. Tr. 83:20-85:21). Moreover, other IBM employees, who are exposed to this information daily as they work on the next generation cloud (and have the ability to implement it elsewhere), are not restrained from working at a competitor immediately upon leaving IBM.

29.     Furthermore, ███████████████████████████████████████
███████████████████████████████████, illustrates that IBM's enforcement has nothing to do with its legitimate business interests. Ms. Rometty had no knowledge of Mr. Smith's responsibilities at AWS, nor did she ask. She also had no information suggesting wrongdoing by Mr. Smith before he tendered his resignation. All she knew – and all she needed to know – was that he was going to be employed by a competitor in some unspecified position. Notwithstanding the slight revision in IBM's form agreement, Ms. Rometty was treating the restrictive covenant as a blanket prohibition from working for a competitor in any capacity,

which is how the agreement was used prior to the revision.

30.     In *OfficeMax Inc. v. Sousa*, the court concluded that attempts to enforce a non-competition agreement more broadly than drafted evidence an improper motive. 773 F. Supp. 2d 190, 212, 242 (D. Me. 2011). There, OfficeMax attempted to enforce its non-competition agreement to prohibit a former employee from working from any competitor in any capacity, despite the language of the agreement that limited the former employee from selling services or merchandise provided by his former employer. *Id.* at 212, 242. The court concluded that "OfficeMax's request that Mr. Sousa relinquish any employment with W.B. Mason goes beyond what was contractually required of him and provides sufficient basis from which a jury could conclude that the lawsuit was intended to achieve an improper purpose. . . ." *Id.*

31.     IBM's agreement with Mr. Smith also contains stringent non-solicitation and confidentiality provisions. Thus, and especially under the circumstances described above, the non-competition provision is unnecessary and will not be enforced. *See Seneca One Fin., Inc. v. Bloshuk*, 214 F. Supp. 3d 457, 463 (D. Md. 2016) (holding that since "the Contract already has a separate provision addressing the employee's confidentiality obligations, . . . the non-competition provision is unnecessary for the protection of this interest . . . [and since it] is not reasonably necessary to protect the goodwill that Ms. Bloshuk created with customers or Seneca One's Confidential Information, the provision is facially overbroad"); *SG Cowen Securities Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (stating that "it is difficult to see how [the prior employer] is seriously harmed" by court declining to enforce non-competition agreement where employee agreed to not divulge trade secrets or other confidential information).

32.     IBM's interpretation of its Non-Competition Agreement as prohibiting Mr. Smith from working for AWS in a role completely different than his role at IBM is overbroad and anti-

competitive.

**D.**    **IBM Has Failed To Demonstrate Imminent And Irreparable Harm**

33.    To establish irreparable harm, IBM "must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999)); *see also Visentin*, 2011 WL 672025, at *7 (explaining that if the irreparable harm identified is "remote, speculative, or a mere possibility, the motion must be denied") (citing *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)). "The mere possibility of harm is not sufficient: the harm must be imminent and the movant must show it is likely to suffer irreparable harm if equitable relief is denied." *EarthWeb, Inc.*, 71 F. Supp. 2d at 308. "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Rodriguez v. Rodriguez*, 175 F.3d 277, 234 (2d Cir. 1999) (internal citations omitted).

34.    IBM has failed to meet its burden of demonstrating that it will suffer imminent and irreparable harm if Mr. Smith is allowed to continue in his new position at AWS. It has offered only generalities rather than probative facts to support its request for extraordinary relief of keeping Mr. Smith from working, and it has failed to provide specific examples of confidential or trade secret information that would actually be used to IBM's detriment if Mr. Smith were allowed to assume his new position at AWS.

35.    Mr. Smith has not breached the Non-Competition Agreement, nor would his position at AWS result in a breach under the plain language of the non-compete. IBM's maturation of cloud products has been publicly acknowledged as trying to follow those of AWS;

otherwise broadcasted;[10] and/or rely on otherwise public open source technology or common sense steps. Mr. Smith and the CEO of AWS have demonstrated without contradiction that even if Mr. Smith had some continuing knowledge of IBM's confidential cloud pricing or strategy, he would have no need to draw on such information to do his new job.

36. Furthermore, IBM has not even shown that Mr. Smith is in possession of significant confidential IBM information about IBM's cloud initiatives that would be useful to AWS. Any confidential information to which he was exposed in 2016 is either too granular to be remembered, especially since he did not need such details to do his IBM job, or it is already stale and outdated. While IBM has announced its intention to compete more effectively with AWS, Microsoft and Google for cloud offerings, its product development and implementation lag considerably behind these competitors and Mr. Smith's knowledge of IBM's catch-up initiatives is cursory at best.

37. Thus, there is no material risk that IBM would suffer an "actual and imminent" injury if Mr. Smith is allowed to work at AWS. *Freedom Holdings, Inc.*, 408 F.3d at 114; *see also Visentin*, 2011 WL 672025, at *10 (finding that IBM failed to demonstrate that it would suffer irreparable harm where it could not identify any specific examples of confidential or trade secret information that could be used to its detriment if the plaintiff went to work for a competitor); *IBM v. Simonson*, 988 N.Y.S.2d 523, 2014 WL 783486, at *6-7 (Sup. Ct. 2014) (findings that IBM failed to identify "the type or quality of information it claims Simonson possesses" and that information "based on casual memory is not actionable").

38. IBM attempts to overcome its evidentiary shortcomings by relying on a

---

[10] As of August 14, 2017, IBM has made available several presentations describing in detail its forthcoming products. These presentations are viewable by the public at https://www.ibm.com/cloud-

boilerplate provision in the Non-Competition Agreement that supposedly acknowledges the existence of irreparable injury if an employee works for a competitor. According to IBM, Mr. Smith has conceded this "fact" merely by signing the agreement. But a preliminary injunction preventing a person from working is an extraordinary remedy, and IBM cannot satisfy a critical element of its quest for equitable relief by pointing to its own heavy handed drafting. "[P]arties to a contract cannot, 'by including certain language in the contract, create a right to injunctive relief where it would otherwise be inappropriate.'" *Visentin*, 2011 WL 672025, at *7 n.4 (quoting *Fireman's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990)).

### E.     IBM Cannot Establish That The Balance Of Equities Tips In Its Favor

39.     Absent a clear and substantial likelihood of success on the merits, IBM must show that the balance of hardships tip "*decidedly* in [its] favor." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (emphasis added). IBM has failed to satisfy that burden.

40.     As discussed above, IBM has failed to show that it will actually suffer any harm if Mr. Smith continues working for AWS in his intended role. IBM has not identified any trade secrets or confidential information that Mr. Smith would inevitably disclose in violation of the Non-Competition Agreement, and has failed to provide any evidence that Mr. Smith will not abide by his duty of confidentiality to IBM.

41.     Conversely, Mr. Smith has established that he will suffer considerable harm to his career and livelihood if he is forced to "sit on the sidelines" for any further time than he has already. Being unable to work in his relevant industry for a year will severely hamper Mr. Smith's employment prospects. Mr. Smith would also not be paid during this period. This hardship must not be overlooked. *See EarthWeb*, 71 F. Supp. 2d at 313 (finding that a one-year

computing/us/en/interconnect/ and clicking on "Watch replays on IBMGO." The transcripts of these presentations

non-compete as applied to a professional in the technology industry was "too long given the dynamic nature of this industry . . . where his success depended on keeping abreast of daily changes" and given the rapidly evolving nature of this field, one's knowledge "will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before the year is up"); *Visentin*, 2011 WL 672025, at \*23 (removing employee from the workforce for a year was undue prejudice where it would alienate his new employer and harm his future employment prospects); *IBM v. Johnson*, 629 F. Supp. 2d 321, 336 (S.D.N.Y. 2009) ("[F]orcing Mr. Johnson, a 55-year old man who is at the peak of his career, to abstain from plying his trade for a year would cause him not insubstantial harm . . . The damage to Mr. Johnson's career and the risk that he will be sentenced to an early retirement, especially during these volatile economic times, cannot be underestimated."); *Pella Windows & Doors v. Buscarena*, No. 07-cv-82, 2007 WL 2089298, at \*9 (E.D.N.Y. July 18, 2007) (holding that the balance of hardships favored the employee because he would be prevented from working in a field that would advance his career).

42.     Courts must also consider the effect on an injunction on third parties when balancing of the equities. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 264 (2d Cir. 2012). Here, AWS would certainly suffer harm since it will not be able to fulfill a role after it already restructured its organization. Moreover, if it issued an injunction, the Court would send a strong message to 1,700 IBM employees with non-competition agreements that they, too, will suffer grim consequences if they accept employment with competitors in non-threatening positions. In fact, the Court would be rewarding IBM even though it sought to enforce the non-compete for punitive purposes and mislead the Court on numerous occasions, which would in turn invite other parties to do mimic IBM's outlandish actions.

---

are Exhibits 2 & 3 to the Golden Declaration.

43.     Finally, New York's strong public policy against non-competition agreements tips the balance of hardships against IBM. *See American Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982) (noting "the general public policy favoring robust and uninhibited competition," and "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood"); *Johnson*, 629 F. Supp. 2d at 337 (holding that New York's public policy strongly disfavoring non-competition agreements was "another factor in determining that the balance of equities here does not tip decidedly in favor of IBM").

## IV.    **CONCLUSION**

Accordingly, for the reasons discussed above, IBM's Motion for a Preliminary Injunction is denied, and the Temporary Restraining Order that was entered on August 2, 2017 is hereby vacated.

Dated: August 29, 2017
       New York, New York

MORGAN, LEWIS & BOCKIUS, LLP

By:    */s/ Sarah E. Bouchard*
       Michael L. Banks (*pro hac vice*)
       Richard G. Rosenblatt (*pro hac vice*)
       Sarah E. Bouchard (*pro hac vice*)
       Brandon J. Brigham (*pro hac vice*)
       1701 Market Street
       Philadelphia, PA 19103
       (215) 963-5000

SCHULTE ROTH & ZABEL LLP

       Ronald E. Richman
       Max Garfield
       919 Third Avenue
       New York, New York 10022
       (212) 756-2000

       *Attorneys for Defendant Jeff Smith*